**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| Cheryl H. Powell, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No.:  4:08-cv-2482-RBH-TER |
| Nan Ya Plastics | ) | |
| Corporation, America | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.  SUMMARY OF THE CASE

Nan Ya Plastics Corporation, America ("Nan Ya") terminated Plaintiff Cheryl H. Powell ("Powell") for insubordinate conduct towards her supervisor, in conjunction with a history of poor performance and a continued problem with tardiness for which she had recently been reprimanded. Powell filed this action against Nan Ya on June 12, 2008, alleging that she was subjected to *quid pro quo* sexual harassment and a hostile work environment based on her sex and gender, and terminated in retaliation for reporting the alleged harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq*. Powell also alleges that she was denied a transfer to a new position because of her age in violation of the Age Discrimination in Employment Act (ADEA) of 1967.

## II.  FACTUAL BACKGROUND

### A.  Powell's Employment with Nan Ya

Nan Ya produces polyester fiber in it's Lake City, South Carolina  plant and maintains a Quality Control Department on site. The Quality Control Department is divided into two sections, Quality Control (QC) and Quality Control Auto-Packing (QCAP). (Page Dep. p. 9.) The Departments are housed in two physical locations, commonly referred to as Side One on the south side of the plant and Side Two on the north side of the plant.  Nan Ya hired Powell to work in the Quality Control Department on March 8, 1999, as one of three Administrative Assistants. (Pl. Dep. p. 31.) Powell initially worked on Side One, but moved to Side Two in 2002.  All of Powell's allegations concern events occurring in August of 2006 or later, when she worked on Side Two. (Pl. Dep. p. 33; Pl. Dep. Ex. 15.)

Powell's job duties on Side Two included preparing morning reports consisting of the previous night's downtime, data entry of these results, distributing the morning reports, recording absences and vacations of employees, and making sure these requests were approved. (Pl. Dep. p. 45.) Powell was also responsible for tasks such as balancing the manual time reports with the time clock reports and preparing control charges weekly of how the products were being run. (Pl. Dep. p. 45.)  Powell had only one change in her duties while working on Side Two; Powell entered information into a program known as SQC for about four months, and when management decided to no longer use SQC, Powell no longer input data. (Pl. Dep. pp. 46-47.)

### B.  Powell's Managers

Powell worked under several managers in QC. (Page Dep. p. 10.)  When Powell worked on Side Two, Bruce Chen served as the QC Department Head (Director); Greg Cooper and subsequently David Trammel served as the QC Manager; Stephen Page served as the QCAP

Manager; Travis Hyman served as the QC Assistant Manager; and Brent Cutright served as the QC Supervisor. (Pl. Dep. pp. 38-39; 34-35; 39-40.) Chen, Hyman, Cutright and Page all had offices physically located on Side Two, and Trammel's office was located on Side One. (Pl. Dep. pp. 32-33; 40-42.) Powell shared her office on Side Two with four persons, Hyman, Page, Cutright, and Greg Morris. (Pl. Dep. pp. 41-42.) Various persons worked in a sixth desk during this time. (Pl. Dep. pp. 41-42.) Powell was the only person continuously in the office as the managers that shared the office also had duties to attend to on the floor. (Pl. Dep. p. 54.) Chen, as the Director, had an adjacent office located outside of Powell's office from where he could see all six desks. (Pl. Dep. p. 43.)

## C. Powell Received Poor Performance Reviews

Plaintiff's performance was evaluated by different managers in the Quality Control Department during her employment. (Pl. Dep. pp. 48-49.) Chen assigned Page and Trammel, as his direct managers, the authority to evaluate Powell's performance. (Page Dep. p. 9; Trammel Aff. ¶ 4.) Page prepared Powell's first performance review in 2000 and gave her a rating of 89 points out of 100, which was the highest rating Powell received during her employment at Na Ya. (Pl. Dep. 49-50; Pl. Dep. Ex. 2.) The 2000 performance review noted what would become a chronic tardiness problem, stating that Powell needed to work on being in the office at 8 a.m. every day. (Pl. Dep. pp. 55-56.) In 2001, Page and Cooper[1] evaluated Powell. (Pl. Dep. 57; Pl. Dep. Ex. 3.) In the employee comment section Powell referenced her tardiness, writing that she planned to "work harder on my attendance and efficiency." (Pl. Dep. pp. 56-57.) In 2002, Page again prepared Powell's performance review and again handwrote on

---

[1] Cooper is no longer employed at Nan Ya. Trammel took over Cooper's job, and Trammel left for other employment last year.

the evaluation that Powell needed to be in the office by 8 a.m. each morning. (Pl. Dep. pp.59-60; Pl. Dep. Ex. 4.)

In 2003, Trammel began evaluating Powell and gave her a rating of 75, stating that Powell needed to "focus on time management, understanding details, reports and what managers are looking for in reports." (Pl. Dep. pp. 61-62; Pl. Dep. Ex. 5.) Trammel noted twice in the 2003 evaluation that Powell needed to improve on her time management. (Pl. Dep. pp.62-63.)  The comments were a "reflection of [Powell's] continual tardiness problem." (Trammel Aff. ¶ 9.)

In 2004, Trammel and Chris Chapman[2] evaluated Powell. (Pl. Dep. p. 64; Pl. Dep. Ex. 6.) Chapman wrote that "punctuality is of the utmost importance," and stressed punctuality more than once.  Trammel went further and declared that Powell needed to be "performing at a higher level (technically, responsibility, etc.); [i]mprovement is needed." (Pl. Dep. pp. 64-65.) Powell received a rating of a 66 in 2004, placing her in the "needs improvement" category. (Pl. Dep. p. 65.)  Nan Ya employees are rarely given such a low score;  Powell herself estimated that out of the Company's 240 or more salaried employees, only about three employees receive such a low rating in any given year. (Pl. Dep. p. 66.)

In 2005, Powell received a rating of 80.5 by Trammel who stated that she "needed to continue improving [her] attendance." (Pl. Dep. p. 81; Pl. Dep. Ex. 9.) Despite rating her higher than the previous year, Trammel stated that Powell was not competent and still had tardiness issues. (Trammel Aff. ¶ 10.)  Trammel rated her as competent in order to "save her job." (Trammel Aff. ¶ 10.) If Powell had received a "needs improvement" rating two years in a row, her employment would have been terminated. (Trammel Aff. ¶ 10.)

---

[2] Chapman is no longer employed at Nan Ya.

In 2006, Trammel again evaluated Powell lowering her rating to a 78.8. (Pl. Dep. Ex. 10.) Trammel listed Powell's strengths in her job as "office housekeeping and courteous phone skills" because he could not think of any other positive remarks to make. (Trammel Aff. ¶ 11.)

Trammel, a "neutral" party as he no longer works at Nan Ya, stated that Cheryl was the worst Administrative Assistant the QC Department had, that she was not reliable, and that she could not handle complex jobs. (Trammel Aff. ¶¶ 6, 7.) He also added that throughout her employment, Powell had a consistent problem with punctuality and was verbally counseled often. (Trammel Aff. ¶ 6.)

Notably, all of the performance reviews discussed above were completed prior to Powell's allegations beginning in August of 2006. (*See* SCHAC Charge, Pl. Dep. Ex. 15.) Further, Powell's lowest ratings were given by Trammel, whom Powell has not included in any of her accusations.

Page prepared Powell's final performance review on April 9, 2007. (Pl. Dep. Ex. 13.) Powell received a rating of "improvement needed" due to her being late to work, failing to seek out work when she completed tasks, and her receipt of two warnings for being late during the evaluation period. (Pl. Dep. p. 114.) Page acknowledged that, despite these issues, Powell had a "good attitude." (Pl. Dep. p. 114.)

### D. Powell Received Several Warnings

In addition to poor performance reviews, Powell received several warnings while employed, although she insists that none of the warnings were her fault. On January 21, 2003, Chen gave Powell a warning for failure to follow directions. (Pl. Dep. Ex. 7; Pl. Dep. pp. 68.) Powell argues she was singled out, claiming that Chen "wanted a write up," although she was unable to give a reason why. (Pl. Dep. pp. 68-70.)

On September 15, 2004, Powell received a Letter of Counseling for tardiness and leaving work early. (Pl. Dep. Ex. 8.) Powell refused to sign the warning claiming it was not true. (Pl. Dep. p. 73.) The Letter of Counseling, written by Chris Chapman, also stated that Powell's "quality of work is par at best." (Pl. Dep. Ex. 8.) Even when confronted with this statement, Powell argued that she was not aware of any quality problems with her job performance. (Pl. Dep. pp. 79-80.)

Powell continued to struggle with tardiness after this 2004 warning, as evidenced by her performance reviews. Management did not write Powell up every time she was tardy, and, in fact members of management often had morning meetings and were not in the office when Powell arrived. In early 2007, Chen told Trammel and Page that they needed to do a better job of managing Powell's tardiness. He also told them that they were doing a poor job as managers if they could not get Powell to come to work on time. (Trammel Aff. ¶ 12; Chen Aff. ¶ 14; Page Aff. ¶6.) As a result, on February 21, 2007, Trammel issued a warning to Powell for tardiness after she was five minutes late on both February 15, 2007 and February 20, 2007. (Pl. Dep. Ex. 11, 12; Pl. Dep. pp. 85-86; Trammel Aff. ¶¶ 6-7.) These incidents were typical of Powell's tardiness pattern over the years. (Trammel Aff. ¶ 12; Hyman Dep p. 8.) Trammel and other members of management met with Powell to discuss the warning, (Powell Dep. pp. 86-87), and she refused to admit that she had a tardiness problem (Trammel Aff. ¶ 13).[3]

In issuing the February warning, Trammel told Cheryl that her chronic tardiness was "unprofessional," and she retorted that some members of management made "unprofessional" comments regarding getting "under the boss' desk to get a promotion." (Trammel Aff. ¶ 13.) Powell then wrote on the warning that "due to the lax atmosphere in the office [she] didn't think

5-4 minutes would really impair [her] job work habits." (Pl. Dep. Ex. 11.)[4]   At that time, Trammel informed Powell that she needed to discuss her comments regarding unprofessional comments with Personnel, (Pl. Dep. p. 147), and he also reported the comments to Eric Stevenson, at that time the Personnel Section Manager. (Trammel Aff. ¶¶ 13-14).

Despite the February warning and numerous performance reviews stating Powell needed to improve her punctuality, on March 1, 2007, Powell received another Letter of Counseling for tardiness. (Pl. Dep. Ex. 12.)  Trammel and other management personnel again met with Powell. (Pl. Dep. p. 111; Trammel Aff. ¶ 15.)  Management informed Powell that her punctuality continued to be a serious problem and that "this pattern of behavior is not acceptable and will not be tolerated . . . *Additional problems, including attendance,* may result in further disciplinary action up to and including termination." (Pl. Dep. Ex. 12.)  Powell *still* denied any problem existed, writing "The closer it gets to evaluations it seems that tardiness becomes an issue. I expect to be evaluated on quality of work, not just time of a minute or 2 late." (Pl. Dep. Ex. 12; Pl. Dep. p. 112.)

### E.  Powell Discussed "Unprofessional" Comments in the Office

Powell made no allegations regarding "unprofessional" comments in the office until, after numerous reminders to be on time, she received the February 21, 2007 warning regarding her tardiness.[5]  (Pl. Dep. p. 147.)   Powell initially objected to discussing her allegations of unprofessionalism with Stevenson. (Pl. Dep. p. 147; Pl. Dep. Ex. 15.)  However, at Stevenson's insistence, Powell met with him; Christian Mann, the Personnel Supervisor; and Anny Tsai,

---

[3] All parties agree that Trammel was not the only manager in the meeting, however, Powell cannot remember the managers that were present. (Pl. Dep. p. 86.) Hyman, Page, and Cutright were also in attendance at the meeting. (Trammel Aff. ¶ 13.; Page Dep. p. 16)
[4] Powell admits that she did not perceive being on time to be a priority.
[5] Powell claims she called Stevenson, while Stevenson affirms Trammel told him of the allegations and he asked Powell to meet with him, but this fact is immaterial.

Senior Account Manager, whom Powell requested be present. (Pl. Dep. p. 89; Stevenson Dep. p. 8; Mann Aff. ¶ 6; Tsai Aff. ¶¶ 4,5.) Powell's complaint was that management employees Hyman, Page, Cutright, Greg Morris, and Devin Baxley, and an hourly employee, Will Evans, made comments about "getting a promotion if you get underneath the boss's desk." (Pl. Dep. p. 90; Pl. Dep. pp. 135-136; Mann Aff. ¶ 6; Mann's Dep. p. 6.) The comments were made between the male employees. Powell admitted that the comments were not directed at her, but that she overheard the remarks and admitted that the men were "joking." (Pl. Dep. pp. 92, 94, 102, 135-136; Mann. Aff. ¶6.) Powell stated that the employees "were being unprofessional, [and] that I wished that [Eric Stevenson] would talk with them and ask them to stop and [sic] especially Steve Page."[6] (Pl. Dep. p. 96.)

Powell made no other accusations in this meeting, and admitted that she did not allege that she was being sexually harassed. (Pl. Dep. p. 97.) Stevenson took the complaint seriously. He and Mann met with all of the named management employees and told them that the comments were not professional and directed them to stop making such comments. (Mann. Aff. ¶ 7; Stevenson Dep. Ex. 2, p. 03CD000046.) All of the management employees stated that they did not mean to make anyone uncomfortable and pledged to refrain from making unprofessional comments in the future. (Stevenson Dep. Ex. 2, p. 03CD000046.) Powell admitted that after she met with Stevenson the comments ceased, (Pl. Dep. p. 98), until one comment made on the last day of her employment.

---

[6] Stevenson, Mann and Tsai all deny that Powell asserted Page was more to blame for the inappropriate banter than other participants. (See Mann Aff. ¶ 7; Tsai Aff. ¶¶ 11-13; Stevenson Aff. ¶ 12.) However, for purposes of Summary Judgment, Nan Ya cites Powell's version of the facts.

**F.  Nan Ya Terminated Powell**

On Thursday, May 24, 2007, Powell claimed she was obtaining paperwork from a printer in another office near the desk of Administrative Assistant Brandy Morris. (Pl. Dep. p. 115; Page Dep. p. 13.)  When Page walked by, Powell was engaged in conversation with her boyfriend Ronald Cox, who was also at the printer with a coffee cup in his hand. (Page Dep. p. 13; B. Morris Aff. ¶ 8; ESC Tr. p. 43.) Page instructed Powell and Cox to resume working. (Pl. Dep. pp. 115-116.)  Powell appeared offended by Page's instructions.  (B. Morris Aff. ¶ 11.)  Before she left, Powell said in a loud, sarcastic voice that she would just have to "make an appointment to come over to Ms. Morris' office." (B. Morris Aff. ¶ 12.) Morris also stated that Powell made several unintelligible statements while walking out.  (B. Morris Aff. ¶¶ 13-14.)

When Powell returned to her office, she challenged Page asking him why he did not ask her what she was doing before telling her to return to work. (Pl. Dep. p. 116.) Powell continued to argue with Page and became confrontational. (Page Aff. ¶ 13; Liu Aff. p. ¶ 4.) Powell denied she yelled, but admitted in her deposition that Page told her "don't holler or yell or don't fuss with me." (Pl. Dep. p. 116.)  In fact, Powell refused to acknowledge that her behavior was inappropriate, and even attempted to justify her behavior at the unemployment hearing when Page stated that she was "loud, argumentative and confrontational" by asking:

> Powell:        Okay. Is it a fair statement to say that I was reacting in a normal, human response after being accused of socializing?

(ESC Tr. pp. 48-49.)    Powell continued to be confrontational even after Page told her several times to stop.  (Page Dep. p. 13.)  Powell then asked Page to review records and Page told her that the records were not his; Powell argued with him about this as well. (Pl. Dep. p. 116; Page Dep. pp. 13-14.)  At some point, Page asked Powell for her attendance record as it is standard procedure for supervisors to sign attendance records. (Page Dep. p. 14; ESC Tr. pp. 78-79.)

Columbia 232635.1

Powell questioned why Page was signing her attendance records, and then argued about his handling her evaluation. (Page Dep. p. 14; ESC Tr. pp. 78-79.)

Page reported the incident to Stevenson who investigated the occurrence. (Stevenson Dep. p. 18.) Jim Liu, a Director from a different department, was in the office when Powell argued loudly with Page. (Pl. Dep. p. 119; Stevenson Dep. p. 19; Liu Aff. ¶ 4.) Liu overheard a significant portion of this exchange and stated that Powell's behavior was rude, loud, and insubordinate. (Stevenson Dep. p. 19; Liu Aff. ¶¶ 4-7.) Stevenson and Chen decided Powell's termination was warranted based on Page's report of the incident, Liu's corroboration of the events, and Powell's overall performance history. (Stevenson Dep. p. 21.)

### G. Powell Made New Allegations After She Was Terminated

Powell made accusations in her Charge that were not made to Stevenson or anyone else at Nan Ya before her termination. (Pl. Dep. Ex. 15; Pl. Dep. p. 128.)

### 1. Allegations Regarding Page:

Powell asserted that by requesting Stevenson talk "especially [to] Steve Page" she was "insinuating" she was sexually harassed.[7] (Pl. Dep. pp. 101-102.) Powell admitted that Page never asked her out, nor did he ever touch her inappropriately. (Pl. Dep. p. 149.) However, Powell stated that in January of 2007, Page told her she looked good in jeans. (Pl. Dep. p. 138.) Page acknowledged that he may have complimented Powell at some point. (Page Dep. p. 11.) Powell's major assertion of harassment is that in March of 2007 she was connecting Page's computer while he was seated at his desk, and as she emerged from under the desk he stated "[t]his is the way to get a promotion." (Pl. Dep. pp. 141-142.) Powell stated that Cutright, Greg

---

[7] Again, Stevenson, Mann, and Tsai all deny that Powell asserted Page was more to blame for the inappropriate banter than other participants. (See Mann Aff. ¶ 7; Tsai Aff. ¶¶ 11-13; and Stevenson Aff. ¶12.)

Morris and Hyman were all present, laughed, and chimed in, making a joke out of the incident.[8] (Pl. Dep. p. 142.) Powell admits she never told Stevenson about this alleged incident. (Pl. Dep. p. 128.) Although Powell makes repeated assertions in her deposition that she was asked for oral sex, this was based on the banter in the Department that was not directed towards her. This incident is the <u>only</u> time Powell asserts a comment was made directly to her about "getting under the bosses desk." (Pl. Dep. pp. 142; 148-149.)

### 2. Allegations Regarding Hyman:

Powell claimed that on August 1, 2006, Hyman told her that each morning she should go by the desk of Chen, the Director, and make sure that he saw her. (Pl. Dep. p. 134.) Plaintiff failed to explain how this was harassment. Hyman explained that he wanted Chen to see Powell each morning to ensure that she was at work on time. (Hyman Aff. ¶¶ 6-7.) Powell also stated that in early 2007, after comforting Hyman when his mother was dying, he thanked her the next day and said that her hug meant more to him than simply a sympathy hug. (Pl. Dep. p. 139.) Hyman stated that he simply told Powell that her expression of sympathy meant a lot. (Hyman Aff. ¶ 10.)

### 3. Allegations Regarding Cutright:

On approximately November 11, 2006, the company decided it would no longer use a system known as SQC. (Pl. Dep. p. 134.) The decision impacted Powell's job as one of her duties was to input data for this system, and she no longer had this job duty. (Pl. Dep. p. 134.) Powell claimed Cutright told her to keep busy despite losing this task. Powell argued this was harassment because she believed she would lose her job if she didn't keep busy, but references no sexual or gender inference. (Pl. Dep. pp. 134-135.) Powell also maintained harassment

---

[8] Page, Cutright, Hyman and Greg Morris deny that this incident occurred. (Page Dep. p. 17; Cutright Dep. p. 9; Hyman Dep. pp.13-14; G. Morris Aff. ¶14.)

occurred on February 19, 2007, when Cutright told her to stop eating at her desk because Chen had complained about this since non-management employees are provided a lunch period and breaks in which to eat. (Pl. Dep. p. 140.) Powell admitted that she received no reprimand regarding this, it did not appear in her evaluation, and that no other managers made such comments. (Pl. Dep. pp. 140-141.) Powell argued, however, that she was insulted. (Pl. Dep. p. 141.)

### 4. Other Allegations:

Powell claimed the warnings of tardiness she received in February and March of 2007 were harassment. (Pl. Dep. pp. 143-145.) Powell also claimed that on approximately April 25, 2007, Page and Hyman made comments to each other, in her presence, about "getting their sugar" from Mr. Lin, one of Nan Ya's top executives in the company. (Pl. Dep. Ex. 15; Pl. Dep. pp. 153-155.) Powell did not know what this comment meant, but declared anyway that the comment was of a sexual meaning. (Pl. Dep. p. 155.)

Powell averred in her Employment Security Commission hearing and in her Charge that a "homosexual" conversation occurred on the day that she was fired. (Pl. Dep. Ex. 15; Pl. Dep. p. 167.) However, despite providing these dates herself, and despite previously acknowledging that no comments occurred after Stevenson met with management, at her deposition Powell refused to acknowledge that the alleged conduct occurred on the date she was terminated. (Pl. Dep. pp. 103-110.) Powell stated that the "conduct" she alleged was of a homosexual nature consisted of a conversation between Eric Watson and Devin Baxley. (Pl. Dep. pp. 167-168.) Baxley, who is no longer employed with Nan Ya, explained that the "incident" that occurred when Watson, who was typing an e-mail to his wife aloud while talking on the phone to Page, mistakenly read part of the e-mail and stated "I love you" to Page. (Baxley Aff. ¶ 4.) Baxley subsequently teased

Watson about "loving" his boss, and Powell stood up and stated that she objected to their "homosexual conversation." (Baxley Aff. ¶ 4.) Powell stated in her deposition that she cannot remember what occurred, but believed the incident involved more comments regarding being "under the desk." Powell never discussed this alleged incident with Stevenson since she was terminated the same day. (Pl. Dep. pp.106, 167.)

### 5.   Allegations of Age Discrimination

Powell asserted in her Charge that she was denied a transfer to a job as an administrative assistant in General Affairs, and that the job was given to a younger person. (Pl. Dep. pp. 139-140.) Powell testified that she was told Hyman had to sign off on her being recommended for a transfer, and admitted that no one told her Hyman blocked her from this move. (Pl. Dep. 140.) In fact, neither Page nor Hyman had decision-making authority, were involved in the hiring process, or could compel the General Affairs Section to hire Powell. (Hyman Aff. ¶12.) Tim Harvey, the Section Manager in General Affairs, acknowledged that he knew Powell was interested in a position in General Affairs. (Harvey Aff. ¶¶ 2-3.) Harvey stated that he did not hire Powell as his Director, Andy Chen, "was disinclined to consider internal transfers because it had the potential to interfere with interdepartmental relationships and it forced the company to cross-train the transferred employee as well as still hiring and training a person for the vacated position." (Harvey Aff. ¶6.) For these reasons, Harvey recruited a candidate from outside the company. (Harvey Aff. ¶7.) Powell admitted that she was told that General Affairs wanted to hire someone from outside the Company. (Pl. Dep. p. 140.)

## II.   SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that summary judgment should be granted unless a non-moving party can present probative evidence establishing a question of material

fact. Fed.R.Civ.P. 56(c). While Powell may show some disputed facts in this case, none are material to an element of a claim or defense. When no genuine issue of material fact exists, summary judgment is appropriate. *Ellison v. First Citizens Bank & Trust Co.*, No. 97-1623, 1998 WL 276273, at *2 (4th Cir. 1998) (unpublished).[9] Powell has no evidence in support of her allegations. Accordingly, summary judgment should be granted in favor of Nan Ya.

### III. POWELL'S SEXUAL HARASSMENT CLAIMS

The Fourth Circuit recognizes sexual discrimination in two forms: a hostile work environment and *quid pro quo* harassment. *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983.)

### A. Quid Pro Quo Harassment

To establish a *prima facie* case of *quid pro quo* sexual harassment Powell must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment complained of was based on sex; (4) Powell's reaction to the harassment affected tangible aspects of her compensation, terms, conditions, or privileges of employment; and (5) Nan Ya knew or should have known of the harassment and took no effective remedial action. *Spencer v. Gen. Elec. Co.,* 894 F.2d 651, 658 (4th Cir. 1990); *Bishop v. Monroe,* No. 5:04-2319 (D.S.C. June 27, 2006).

The only possible allegation of *quid pro quo* harassment is Powell's assertion that Page asked her to hook up his computer, and that while she did so Page made a comment similar to "this was the way to get a promotion, get under the bosses desk." (Complaint ¶¶ 5-6; Pl. Dep. Ex. 15.) Powell now asserts that Page was "seeking oral sex" from Powell. (Complaint ¶ 6.) The others who plaintiff says were present when this happened, Page, Hyman, Cutright and Morris, all say the incident never occurred. (Page Dep. p. 17; Cutright Dep. p. 9; Hyman Dep. pp.13-14; G. Morris Aff. ¶14.) Regardless, even Powell's enhanced version of the story admits that it was

[9] Copies of all unpublished cases are attached to Nan Ya's Motion for Summary Judgment.

a joke allegedly told in the presence of four other employees, all of whom had made similar jokes with each other. Even if Powell's accusation is treated as fact, Powell's claim still fails. No where does Powell provide evidence that she was denied a promotion, a transfer, or any other privilege of employment for refusing to give Page oral sex, nor does she show that other employees received preferential treatment on the basis of sexual favors. *Spencer*, 894 F.2d at 659 (finding that *quid pro quo* sexual harassment did not occur as there was no proof that sex was mentioned with a promotion or that other employees received benefits due to sexual favors). In fact, in light of her poor performance, her allegations are ludicrous.

While the alleged comment, if made, was crude and in poor taste, Powell still provides no nexus between the alleged statement and the request for a transfer. First, Powell stated that the comment was made jokingly. (Pl. Dep. p. 102.) Second, Page provided Powell with the best performance reviews she received. (*See* discussion *infra*, Part B, Powell's Poor Performance Reviews.) Third, Powell requested a transfer in February in which she claimed she was told Hyman had to sign off on her being recommended for a transfer. (Pl. Dep. pp. 139-140; Pl. Dep. Ex. 15.) Powell made no allegation that Page was involved with her request for a transfer.

There is simply no evidence that Powell was denied a promotion or a material benefit for refusing to grant sexual favors. Powell fails to establish a *prima facie* case as she cannot prove the fourth element, that she was denied tangible aspects of her employment. Powell's allegations merely attempt to recast her hostile environment claim as a *quid pro quo* claim.

## B. Powell's Claim Of A Hostile Environment Fails.

Powell fails to provide direct evidence of a hostile environment claim. *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) ("What is required . . .is evidence of conduct or statement that both reflect directly the alleged discriminatory attitude and that bear directly on the

contested employment decision.") Accordingly, Powell must establish a claim for hostile environment sexual harassment under Title VII by demonstrating that (1) she belongs to a protected group; (2) she was the subject of unwelcome conduct; (3) the conduct occurred because of her gender/sex; (4) the conduct "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) a basis exists for holding the employer liable. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). Regardless of whether Powell can prove the other elements, Powell cannot provide supporting evidence that the conduct was severe or pervasive enough to constitute a hostile work environment, nor can she prove employer liability.

### 1. The Alleged Conduct Was Not Sufficiently Severe Or Pervasive

Powell fails to show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993); *Signal v. Gonzales,* 430 F.Supp.2d 528 (D.S.C. May 9, 2006); *see also, Giang v. Potter,* 369 F.Supp.2d 763 (E.D.Va. May 10, 2005) ("In assessing whether a work environment is objectively hostile, courts consider the totality of the circumstances. That includes the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance"). In discussing this element, the Supreme Court mandates that the "conduct must be *extreme*." *Faragher,* 524 U.S. 775, 788, 118 S.Ct. 2275 (1998) (emphasis added). Also, "to be actionable . . . a sexually objectionable environment must be *both* objectively and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so." *Faragher* at 787 (emphasis added). *See also, Ocheltree v. Scollion Productions, Inc.*, 335 F.3d 325 (4th Cir. 2003), cert. denied by 540 U.S. 1177, 124 S.Ct. 1406, (2004).

All circumstances must be examined in order to determine whether a work environment is hostile or abusive. The relevant factors are: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* Commenting on these factors, the Supreme Court has stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788. Based upon the facts, it is evident that Powell did not suffer a hostile work environment.

Powell's only real allegation is that comments regarding "getting under the desk" were repeatedly made. These comments were not made towards her, but were part of the general office banter. There was only one occasion in which Powell claimed the comment was directed to her by Page, and Powell admitted that others were laughing and "joking." (Pl. Dep. p. 102.) Powell also fails to demonstrate how the comment made to her was based on sex or gender when the male employees made identical comments to each other as well. (Pl. Dep. pp. 92, 93, 136.)

Additionally, Powell asserted that Page told Powell once that she looked good in jeans, (Pl. Dep. p. 138.). Powell cited Hyman's alleged comment that her hug meant "more." (Pl. Dep. p. 139.) Finally, Powell asserted Page and Hyman made comments in her presence, but not directed to her, about "getting their sugar" from their supervisor. (Pl. Dep. Ex. 15; Pl. Dep. pp. 153-155.) Powell herself is unable to state how this comment is offensive. (Pl. Dep. p. 155.) These isolated incidents above, even if all true, do not create a hostile environment.

Likewise, Powell's other allegations do not provide Powell with an actionable case, and in fact do not support any claim of a hostile environment. There was nothing sexist in Hyman's request that Powell go by Chen's desk each morning due to her tardiness problem. (Pl. Dep. p. 134; Hyman Aff. ¶¶ 6-7.) Likewise, the assertion that the Company's decision to no longer use a system known as SQC constituting harassment/intimidation makes no sense. (Pl. Dep. pp. 134-135.) Even if Cutright told Powell to keep busy, this did not insinuate she would lose her job due to her sex, but due to lack of work. Similarly, if Cutright told Powell to stop eating at her desk, this does not create a hostile environment. Powell's real complaint is that she was not a management employee and therefore was subject to different rules than management employees.

The Fourth Circuit has previously held that situations involving more frequent or egregious behavior than that involved in the present case do not amount to sexual harassment as a matter of law. For example, in *Singleton v. Dept. of Corr. Health*, No. 03-2160, 2004 WL 2603642 (4th Cir. 2004) (unpublished) the court held that the plaintiff's co-worker, who worked as her supervisor at times, engaged in conduct that may have been "boorish and offensive, [but] is more comparable to the kind of rude behavior, teasing, and offhand comments that have been held are not sufficiently severe and pervasive enough to constitute sexual harassment" when he stated: the plaintiff should be spanked every day; complimented her every day; stared at her breasts; measured the length of her skirt and told her it looked 'real good'; constantly told her that she was attractive; made references to his physical fitness given his advanced age; asked if he made her nervous; and told the plaintiff that if he had a wife as pretty as plaintiff was that he would not let her work in a prison." *See also, Ocheltree v. Scollon Productions Inc.*, 308 F3d 351 (4th Cir. 2002) (finding that plaintiff would have been subjected to same atmosphere if she had been male in the listed offensive behavior, only three incidents were directed at the plaintiff and

the majority "occurred in group settings as part of the male workers' daily bantering toward one another and was overheard or witnessed").[10]

The conduct Powell is alleging is nothing more than sporadic, isolated incidents, and several irrelevant incidents, none of which constitute actionable harassment. *See Faragher*, 524 U.S. at 788. The alleged conduct, even if offensive, was not sufficiently frequent or serious enough to alter Powell's employment situation into the abusive working environment that Title VII bars. The work environment Powell describes involved simple teasing (usually not involving her) and a repeated crude joke. Powell never even mentioned the conduct until, after receiving several reprimands for tardiness on her performance reviews and verbal counseling's, she received a serious warning.

### 2. Powell Cannot Establish Employer Liability Because Nan Ya Meets the Requirements of the *Faragher and Ellerth* Affirmative Defense

Powell cannot satisfy the liability element of her hostile work environment claim because even if the actions and comments of which Powell complains constitute actionable sexual harassment, Nan Ya can satisfy the affirmative defense articulated by the United States Supreme Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In *Faragher* and *Ellerth*, the Supreme Court held that an employer may be vicariously liable for harassment engaged in by a supervisor unless the company can satisfy a two-pronged affirmative defense. First, the company must establish that it "exercised reasonable care to prevent and correct any sexually harassing behavior," and second, that the

---

[10]*See, Dwyer v. Smith*, 867 F.2d 184, 187-88 (4th Cir. 1989) (finding evidence that female police officer was subjected to fellow officers' sexually explicit conversations was not enough to constitute harassment); *Harris v. Clyburn*, No. 94-1009, 1995 WL 56634, at *3 (4th Cir. 1995) (unpublished) (per curiam) (affirming summary judgment for employer where "only specific factual allegation of sexual harassment [was] occasional tickling [by her male superior] in the hallway"); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 578-579 (11th Cir. 2000)(citation omitted) (abrogated on other grounds as recognized by *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir.2008) (no hostile work environment harassment where a supervisor called an employee several times after work, stared at her inappropriately, touched her inner thigh, unbuckled his pants in front of her, and lifted her skirt).

"employee unreasonably failed to take advantage of any preventative or corrective opportunity provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807.

> (i.) **Nan Ya Exercised Reasonable Care to Prevent Any Sexually Harassing Behavior:** Pursuant to *Faragher* an employer's issuance of an anti-harassment policy with a complaint procedure ordinarily satisfies the first prong of the affirmative defense. *Faragher*, 524 U.S. at 807; *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) (finding that distribution of anti-harassment policy, even though employer did nothing else, proved company exercised reasonable care). Nan Ya had a sexual harassment policy in its employee handbook which was distributed to all employees, including Powell. (Stevenson Dep. Ex. 2, at 03CD000051-71; Stevenson Aff. ¶14, Ex. 1) The policy tells employees to promptly report such behavior, and contains the following language:

> > Employee complaints about harassment should be made to the Personnel Manager or to the Plant Manager. . . If an investigation reveals that the complaint is valid, appropriate action will be taken. No employee will be retaliated against for reporting good faith concerns.

(Stevenson Dep. Ex. 2, at 03CD000051-71.) With the issuance of this policy alone, Nan Ya satisfies the first prong of the affirmative defense.

The conclusion that Nan Ya exercised reasonable care to prevent any alleged sexual harassment directed at Powell is buttressed by Powell's own testimony. Powell admits that after she complained to Stevenson, no further harassment occurred. (Pl. Dep. p. 98.) On the day Powell *first* complained about the behavior, Nan Ya took reasonable care to promptly correct any harassing behavior. *Mikels v. City of Durham*, 183 F.3d 323, 329-330 (4th Cir. 1999) (holding that where an employer's remedial response results in a cessation of the complained of conduct, liability must cease as well); *Spicer v.*

*Virginia Dep't of Corrections*, 66 F.3d 705, 710-11 (4th Cir. 1995) (holding that immediate action taken to prevent sexually harassing conduct and warning that inappropriate conduct would not be tolerated, after which complained of conduct stopped, was adequate response *as a matter of law*). While Powell now attempts to argue that she continued to be subject to harassment due to comments by Baxley and Watson, she did not address such conduct with Stevenson. (Pl. Dep. p. 106.)

**(ii.)** **Powell Unreasonably Failed to take Advantage of Nan Ya's Preventive and Corrective Measures:** Powell alleges conduct began occurring in August of 2006, but she did not make any complaints until February of 2007. Powell cannot fault Nan Ya for alleged harassment that she did not report. *See Reese v. Meritor Automotive, Inc.*, No. 00-1604, 2001 WL 227329 (4th Cir. 2001) (unpublished) (stating any evidence that employee failed to utilize employer's complaint procedure suffices to satisfy the second element of affirmative defense). After Powell reported the conduct to Stevenson, no further sexual harassment occurred. The Fourth Circuit has held, "any evidence that [the employee] failed to utilize [the employer's] complaint procedure will normally suffice to satisfy [its] burden under the second element of the defense." *Lissau v. Southern Food Service*, 159 F.3d 177, 182 (4th Cir. 1998) (quoting *Faragher*, 524 U.S. 775, *Ellerth*, 424 U.S. 742).

**3.** **Nan Ya Terminated Powell's Employment for a Legitimate Reason**

There is simply no doubt that Nan Ya had a legitimate, non-discriminatory reason for terminating Powell's employment. *Hill v. Lockheed Martin Logistic, Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). Even the most casual review of Powell's employment record would lead to the inescapable conclusion that she was a marginal employee with chronic tardiness problems who

reacted negatively to attempts to manage her shortcomings in an inappropriate and unacceptable fashion. To briefly summarize, some of the excerpts from her annual evaluations and warnings included:

- "Be in the office at 8:00 a.m. every morning."

- "Needs to focus on time management."

- "Cheryl does what is asked of her, but still requires repeat instructions and training. Punctuality is the utmost importance."

- "Areas of further development improvement are: (1) initiative; (2) follow-up/recheck work; (3) technical training/development; (4) punctuality; and (5) accuracy."

- "Cheryl has worked here several years. By this time, she should be performing at a higher level (technically, responsibility, etc. improvement is needed)."

- "…your quality of work is par at best."

- "Continue improving attendance."

- "The major issues are being late to work and seeking out work when caught up on routine items."

(Pl. Dep. Exs. 2,4,5,6,9,10,13.) When Department Director Bruce Chen insisted that Page and Hyman manage Powell's tardiness more aggressively, she was reprimanded. (Pl. Dep. Ex. 11,12; Pl. Dep. pp. 85-86.) After receiving a reprimand on February 21, 2007, Powell deflected and made a complaint regarding "unprofessional" comments. However, her pattern of tardiness continued and resulted in another reprimand on March 1, 2007. (Pl. Dep. Ex. 12.) It was only when she berated her supervisor and refused to return to work when instructed, with two active warnings on file, that Nan Ya terminated her. The termination was consistent with Nan Ya's rules as stated in the employee Handbook: "[e]xcessive, unapproved, or unexcused absences or tardiness will not be tolerated" and "[i]insubordination and confrontational conduct are prohibited." (Stevenson Dep. Ex. 2, at 03CD000070.) Also, both warnings notified Powell that

her employment could be terminated for further violations, even the warning given on February 21, 2007, prior to her making a complaint.

###     4.     No Evidence of Pretext

Powell received numerous comments in her evaluations that she needed to work on her punctuality and be on time to work. Rather than attempting to meet her employers legitimate expectations (i.e. come to work on time), she consistently denied that she had a problem. Powell admitted the notations for her to improve on the time she arrived at work were common on her evaluations, and admitted she was not aware of such a notation being on other administrative assistant's evaluations or of any other salaried employee's evaluations. (Pl. Dep. p. 78-79.) The most Powell can suggest in inferring that such language was not directed to her is to argue that some hourly employees received similar comments, but she admits that such comments were not common even for the hourly employees. (Pl. Dep. p. 78.) Powell argues that the hourly employees that received comments regarding tardiness were being "singled out," providing no reason for why the employees would be singled out other than perhaps for being late to work. (Pl. Dep. p. 79.)

Likewise, Powell denied that the warnings she received *before* any of the alleged harassment were appropriate. Powell in fact claimed the warnings were "lies," yet she has no reason for why such warnings would be falsified. (Pl. Dep. p.73.) In 2004, 2005, and 2006, *prior* to any alleged harassment, Powell consistently received low ratings by Chapman and Trammel, and Powell has not accused Chapman and Trammel of any of the alleged harassment. Finally, Powell, after receiving two warnings in 2007 for tardiness in close proximity, was insubordinate and argued loudly with her manager about returning to work, and then again while discussing paperwork.

Powell was terminated for these issues. Nan Ya relied on Powell's disciplinary record and an unbiased witness of the incident in deciding to terminate her Powell had numerous performance reviews citing examples of her problem with tardiness and her poor performance, and had received prior warnings regarding the same. In the Fourth Circuit, a plaintiff's perception that she should not have been terminated is irrelevant; it is the perception of the decision-maker that matters. *Smith v. Flax*, 618 F.2d 1062 (4th Cir. 1980) ("Smith's perception of himself is not relevant. It is the perception of the decision-maker which is relevant.") Additionally, Nan Ya determined that Powell's insubordinate behavior warranted termination, and Powell has failed to show Nan Ya believed otherwise. *Holland v. Washington Homes, Inc*., 487 F.3d 208, 216 (4th Cir. 2007) (holding that to demonstrate pretext, the employee must demonstrate that his employer did not honestly believe the employee engaged in misconduct at the time of his termination).[11]

### C. Powell's Claim Of Gender Discrimination Fails.

#### 1. Powell Cannot Show that She was Disciplined Differently Due to Gender:

Powell provides no direct evidence of gender discrimination. Accordingly, to make out a prima facie case of gender discrimination based on disparate discipline/discharge, Powell must show that: "(1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated employees outside the protected class." *Brockman v. Snow,* No. 06-1004, 2007 WL 493926 (4th Cir. Feb. 13, 2007) (unpublished) (internal citation

---

[11] *See also Davis v. Seven Seventeen HB Philadelphia Corp.,* No. 1:02CV332, 2003 WL 21847841, at *7 (M.D.N.C. June 3, 2003) (unpublished) (holding that the plaintiffs "protestations over the merits of the complaints against her are irrelevant to the issue of pretext" because none of the "testimony is effective to show that Defendants honestly believed [the plaintiff's] version of events but disciplined her anyway").

omitted). Plaintiff's cannot make a *prima facie* case. Powell simply abandons this claim as she points to no other male employee that was treated differently under the same circumstances.

### 2. Powell Cannot Establish a Failure to Promote Claim Due to Gender:

To establish a *prima facie* case of gender discrimination premised on a failure to promote, Powell must show: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [Defendant] rejected her application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food, Inc.,* 370 F.3d 423, 430 (4th Cir. 2004) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.,* 333 F.3d 536, 544-45 (4th Cir. 2003)). Powell has cited to no promotion that she was denied. Assuming that Powell is asserting she was denied a transfer, the position at issue, Administrative Assistant of General Affairs, was filled by a female employee, Danielle Miles, in April of 2007. (Stevenson Aff. ¶ 21) Hence Powell cannot establish a *prima facie* case of gender discrimination based on failure to promote allegations as she cites to no promotion she did not receive, and the position she alleged she was denied a transfer to was given to a female. Further, Powell fails to establish she was qualified for the position. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230-31 (4th Cir. 1999) (finding plaintiff who failed to show qualified for higher position did not demonstrate *prima facie* case.)

### IV POWELL'S RETALIATION CLAIM FAILS AS A MATTER OF LAW

The mere fact that a party allegedly engaged in protected conduct does not immunize her from otherwise valid disciplinary action. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 366 (4th Cir. 1985); *Thomas v. Westinghouse Savannah River Co.*, 21 F.Supp.2d 551, 558 (D.S.C. 1997). To establish a *prima facie* case of retaliation, Powell must show (1) that she engaged in protected activity, (2) that Nan Ya took an adverse employment action against her,

and (3) that a causal connection existed between the protected activity and the adverse action. *See Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir. 2006); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996).   Powell provides no evidence of a causal connection, and therefore her claim of retaliation fails.

1.    **Powell Cannot Establish a Causal Connection.**

Even if Powell engaged in protected activity, she fails to show a causal connection between any of her alleged protected activity and the alleged retaliatory conduct.   Powell did not complain of any unprofessional comments until after she received the February 2007 discipline for tardiness.   Powell had a chronic problem of tardiness, which prompted the February 2007 write-up.

Powell fails to show that a causal connection existed between the protected activity and the adverse employment action.   Powell has the burden of proving she would not have been disciplined "but for" her having complained.   A causal connection may be demonstrated through direct evidence of retaliatory animus directed against the complainant.   *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2nd Cir. 1990); *See e.g. Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 546 (4th Cir. 1999).   There is no such evidence in this case.

2. **Legitimate Reason for Terminating Powell:**

Nan Ya cites to clear, documented reasons for its decision to terminate Powell.   Powell would not take responsibility for her tardiness and had consistently demonstrated  performance problems in the past. (*See*, discussion, *supra.*)   Powell then argued with her supervisor loudly and disruptively in front of other persons, and refused his direct orders to return to work.   The decision to terminate Powell occurred after repeated offenses of tardiness and poor performance culminating in Powell's insubordination towards Page.   It is well established that "'mere

knowledge on the part of an employer that an employee . . . [has participated in protected activity] is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons'" for an adverse personnel action against an employee. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (quoting *Williams v. Cerebronics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)).

Further, where no other evidence supports a finding of retaliatory motive, the "[t]emporal proximity [between Charging Party's harassment claims and her subsequent discipline] . . . is simply too slender a reed on which to rest a . . . retaliatory discharge claim." *Bartges v. Univ. of N. C. at Charlotte*, 908 F.Supp. 1312, 1331 (W.D.N.C. 1995) (quoting *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993)); *See also Mathis v. Perry*, 996 F.Supp. 503, 518 (E.D.Va. 1997). *See Horne v. Reznick Fedder & Silverman*, CA No. 05-1025, 2005 WL 3076921, *3 (4th Cir. 2005) (unpublished); *Spence v. Panasonic Copier Co.*, 46 F. Supp.2d 1340, 1348 (N.D. Ga. 1999), *aff'd,* 204 F.3d 1122 (11th Cir. 1999) ("while a short lapse of time might raise an inference of discrimination, such an inference does not arise when intervening factors are established."); *Kodengada v. Int'l Bus. Mach. Corp.,* 88 F.Supp.2d 236, 245 (S.D.N.Y.2000) (intervening incidents of misconduct broke the chain of causation); *Hite v. Biomet, Inc.,* 38 F.Supp.2d 720, 743 (N.D. Ind. 1999) (no causal connection where, during the two-month lapse between the protected activity and the termination, plaintiff failed to report to work). Powell's inability to establish a causal connection provides yet another basis for the dismissal of her retaliation claims as a matter of law.

### 3. Powell Cannot Establish Pretext.

Even assuming Powell has presented a *prima facie* case of retaliation, Nan Ya has effectively rebutted it by articulating legitimate, non-discriminatory reasons for its actions, as described above. Powell must now prove that the proffered reasons are pretext for unlawful

retaliation.  *See Burdine*, 450 U.S. at 253; *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 189 (4th Cir. 2004) (once employer articulates legitimate, non-discriminatory reason, plaintiff must prove that reason is a pretext for discrimination).  To establish Nan Ya's asserted reasons were pretextual, Powell must demonstrate they were not the true reasons for Nan Ya's actions, either with evidence that a retaliatory reason actually motivated the employer or by showing that the employer's proffered explanation is unworthy of credence. *Honor*, 383 F.3d at 189.

In this case, Powell provides no evidence that the reason was not legitimate, and argues only that she was told she was terminated for "socializing."  (Pl. Dep. p. 119.) A plaintiff's subjective beliefs and speculation that retaliatory conduct occurred are insufficient to defeat summary judgment.  See Fed.R.Civ.P 56(e) (a party opposing summary judgment "may not rest upon the mere allegations or denials" but "must set forth specific facts showing that there is a genuine issue for trial."); *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993) (speculation that company would have treated employee differently if white has no merit). Powell's inability to establish pretext warrants that summary judgment be entered in favor of Nan Ya on Powell's retaliation claim.

## V. POWELL'S AGE DISCRIMINATION CLAIMS FAIL

Powell alleges the failure to "promote" her and her termination violated the ADEA. Powell bears the burden of proving by a preponderance of the evidence that the adverse employment actions were motivated by age discrimination.  *O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir. 1995).  Powell "'may meet this burden under the ordinary standards of proof by direct or indirect evidence relevant to and sufficiently probative of the issue.'"  *O'Connor,* 56 F.3d at 545 (quoting *EEOC v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir. 1992)).  Powell has not alleged any direct evidence of age discrimination, therefore, she

must proceed under the *McDonnell Douglas* shifting burdens analysis. *O'Connor,* 56 F.3d at 545.

1.      **Powell Fails to Prove a Claim of Discriminatory Discharge Based on Age:**

To make out a *prima facie* case of age discrimination based on discriminatory discharge, Powell must show that:  (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing her job at the level that met the employer's legitimate expectations; and (4) she was discharged under circumstances that raise a reasonable inference of unlawful age discrimination. *Brice v. Joule Inc.,* 229 F.3d 1141, 2000 WL 1225547, at *2 (4th Cir. 2000) (unpublished).

Powell cannot meet the third element of the *prima facie* case because she cannot demonstrate that she was meeting Nan Ya's legitimate job expectations. *Warch v. Ohio Casualty Ins. Co.,* 435 F.3d 510, 514 (4th Cir. 2006); *Hill,* 354 F.3d at 298 ("Hill has failed to establish a *prima facie* case of … discrimination because….she has failed to demonstrate that she was performing her job duties at a level that met Lockheed's legitimate expectations").  In determining satisfactory job performance, it is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff.  *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (plaintiff's own testimony of satisfactory job performance cannot establish a genuine issue as to whether he was meeting employer's expectations in race discrimination case) (citations omitted); *see also Brice*, 2000 WL 1225547, at *2 (although plaintiff argues his performance was satisfactory and offers the testimony of a co-worker as proof, it is the perception of the decision-maker, not the opinions of co-workers, that is relevant).  Plaintiff's file is replete with evidence to establish that she was not satisfactorily performing her duties, as explained in detail earlier in this Memorandum.

Moreover, Powell cannot meet the fourth element of the *prima facie* case, in part, because she cannot identify a valid comparator. *See, e.g., Causey v. Baulog,* 162 F.3d 795, 801-02 (4th Cir. 1998) (noting that while age-based animosity can be shown by differential treatment of similarly situated younger employees, the plaintiff's conclusory statements of less favorable treatment without specific evidentiary support were insufficient to defeat a motion for summary judgment); *Tyler v. Ratner Co.,* No. 3:07-150, 2008 WL 2307517 (D.S.C. June 2, 2008) (unpublished) (holding that Plaintiff failed to establish a *prima facie* case of discrimination because she failed to identify a similarly situated employee outside the protected class and, therefore, failed to prove the fourth element of the *prima facie* case). Powell points to no similarly situated, younger employee treated differently under similar circumstances.

### 2.      Powell Fails to Prove a Claim of Failure to Promote Based on Age:

Powell fails to provide evidence that she was denied a promotion. Instead, Powell requested a transfer that she was denied. As the Fourth Circuit has not specifically addressed a case involving a failure to transfer, Nan Ya assumes the denial of a transfer is analogous to the denial of a promotion. Accordingly, to make out a *prima facie* case of age discrimination based on a failure to promote, Powell must show that she:  (1) is a member of a protected class; (2) applied for the position in question and was qualified for the position; (3) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA. *Laber v. Harvey*, 438 F.3d 404 (4th Cir. 2006) (citing *prima facie* case).

First, Powell is unable to demonstrate that she was qualified for the position.  Powell's poor performance, discussed previously, shows she was not a good candidate for a transfer to

another position as she was not meeting expectations in her current position.

Additionally, Powell cannot establish the third prong, that she was rejected for the position under circumstances that give rise to unlawful discrimination. Neither Page nor Hyman had decision-making authority, were involved in the hiring process, or could compel the General Affairs Section to hire Powell. (Hyman Aff. ¶12.) There is no formal process for requesting a transfer at Nan Ya, however, Tim Harvey acknowledged that he knew Powell was interested in a position in General Affairs. (Harvey Aff. ¶3.) Harvey cited to legitimate reasons for choosing not to hire Powell. Harvey's Director, Andy Chen, "was disinclined to consider internal transfers because it had the potential to interfere with interdepartmental relationships and it forced the company to cross-train the transferred employee as well as still hiring and training a person for the vacated position." (Harvey Aff. ¶6.) As a result, Harvey recruited a candidate from outside the company. (Harvey Aff. ¶7.) Powell admitted that she was told that General Affairs wanted to hire someone from outside the Company. (Pl. Dep. p. 140.)

Even assuming that Powell could establish a *prima facie* case, she does not offer sufficient evidence to show that the reasons given for not transferring her were a pretext for age discrimination. Nan Ya has offered a legitimate reason for failing to transfer Powell. Powell offers no evidence of pretext in the decision to hire from outside the Company. "A plaintiff may attempt to prove the employer's reasons for promoting the successful applicant were pretext by presenting evidence that she was more qualified for the position than the successful applicant." *Chavis v. Barhnart,* No. 6:05-CV-1783, 2007 WL 1032300 (D.S.C. Mar. 31, 2007) (unpublished) (citations omitted) (findings in analogous race discrimination case). "When comparing the relative qualifications of two candidates, the plaintiff must make a strong showing that her qualifications are *demonstrably superior* to the qualifications of the successful

[applicant]." *Id*. (emphasis in original)(citations omitted) It is not sufficient for Powell to assert her belief that she was more qualified, rather she must demonstrate that the decision-makers did not "honestly believe[]" that another person was better qualified for the position. *Ware v. Potter*, No. 03-1577, 2004 WL 1775010, at *3 (4th Cir. June 2, 2004) (unpublished). To the extent Powell relies on Danielle Miles as a comparator, Powell cannot establish that she and Miles were similarly situated in their qualifications. Nothing in the record reflects Miles' qualifications.

## **CONCLUSION**

For all of the foregoing reasons, Nan Ya respectfully requests that this Court enter an Order granting summary judgment in favor of Nan Ya and dismiss Powell's claims, with prejudice.

Respectfully submitted

/s/ Jonathan P. Pearson

By:    Jonathan P. Pearson (Federal ID# 3027)
Richele K. Taylor (Federal ID#09422)
Attorneys for Defendant
Nan Ya Plastics Corporation, America
jpearson@laborlawyers.com
rtaylor@laborlawyers.com

Fisher & Phillips LLP
Post Office Box 11612
Columbia, South Carolina 29211
Telephone: (803) 255-0000
Facsimile: (803) 255-0202

Dated this 20th day of May 2009.