In the United States District Court

District of South Carolina

Florence Division

CHERYL H. POWELL,                    )
                                     )
                    PLAINTIFF,       )
                                     )   Civil Action No.
versus                               )   4:08-cv-2482-RBH-TER
                                     )
NA YA PLASTICS                       )
CORPORATION, AMERICA                 )
                                     )
                    DEFENDANT.       )
                                     )

– – –

The Deposition of Cheryl Powell

– – –

Fisher & Phillips
1901 Main Street, 14th Floor
Columbia, South Carolina
January 29, 2009
10 a.m. – 5:20 p.m.

In behalf of the attorneys for the Defendant, the
deposition of the above-named witness was taken
before me, Judith H. Hayes, Certified Court Reporter and
Notary Public in and for the State of South Carolina,
pursuant to notice and/or agreement in the above-entitled
cause pending in the above-named court.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990

1    Q.   Have you ever had any other part-time jobs like

2    that like maybe selling Tupperware or Amway or anything

3    like that?

4    A.   My husband and I got into Amway once.

5    Q.   That was long before Nan Ya?

6    A.   Yes, sir.

7    Q.   Did you ever sell any other products like that?

8    A.   Airbon (phonetic).

9    Q.   What is that?

10   A.   Skin care products.  I am dealing with that a

11   little bit right now.

12   Q.   Anything else other than Aloette, Amway and

13   Airbon?

14   A.   Not that comes to mind at this time.

15                     (Break at 11 a.m.)

16                     (Back on the record.)

17   BY MR. PEARSON:

18   Q.   Going back to Exhibit One, do you remember about

19   when you were hired by Nan Ya?

20   A.   March 9, 1999.  I believe so.

21   Q.   What position were you hired into?

22   A.   Administrative Assistant.

23   Q.   In QC?

24   A.   In QC.

25   Q.   And QC stands for Quality Control?

1    A.   Yes.

2    Q.   I believe you said in 1999 your job was in the

3 Building One, is that right?

4    A.   Yes, sir.

5    Q.   Was Building Two complete at the time?

6    A.   I am not sure.

7    Q.   How long were you in Building One?

8    A.   Until '02.

9    Q.   2002?

10    A.   Yes, sir.

11    Q.   Who was your supervisor when you were in Building

12 One?

13    A.   Greg Cooper.

14    Q.   Greg Cooper?

15    A.   Yes, sir.

16    Q.   What was his title?

17    A.   He was the manager of Quality Control.

18    Q.   Manager of QC?

19    A.   Yes.

20    Q.   Was that job later taken by David Trammel?

21    A.   I am not sure but I think he was the next one

22 after Greg.

23    Q.   Trammel became the manager of QC Department and

24 was, in fact, manager of the QC Department when your

25 employment was terminated, wasn't he?

1    A.   And, yes, he was one.

2    Q.   Trammel's office continued to be in Building One

3 after you moved to Building Two, wasn't it?

4    A.   Yes, sir.

5    Q.   In fact, Trammel never had an office in Building

6 Two, did he?

7    A.   He did before I went over to side two.

8    Q.   While you were at two, Trammel didn't have an

9 office there, did he?

10    A.   No, sir.

11    Q.   You are not alleging that anything in this

12 lawsuit happened while you were at Building One, are you?

13    A.   No, sir.

14    Q.   Do you remember who interviewed you for your job?

15    A.   Eric Stevenson.

16    Q.   Did any of the people in the QC Department

17 interview you?

18    A.   Steve Page, Dean Leeal (phonetic), and David

19 Chen, I do believe.  He was with the Automation Department.

20    Q.   What were your job duties in Building One?

21    A.   I produced the certificates of accuracy.  I gave

22 results to our customers of what our products' quality and

23 their testing results into a certificate and that went

24 along to the customer.

25    Q.   When you were in Building One, who did you report

1   to?

2        A.   Gregory Cooper.

3        Q.   Directly?

4        A.   Yes, sir.

5        Q.   So you didn't have any intermediate supervisors

6   or assistant managers that you reported to in Building One?

7        A.   Gregory Cooper was my man, my direct supervisor.

8        Q.   Is he the only one you took orders from and

9   worked for in Building One?

10        A.   Yes, sir.

11        Q.   Who was Bruce Chen?

12        A.   At side one at that time he was not.  He was

13   Director of Technical Services.

14        Q.   When did he have that title?

15        A.   That's when I came on.  That's where he was.

16        Q.   Did his job ever change?

17        A.   He came over and took Dean Leeal's place.

18        Q.   When you say came over, do you mean to side two?

19        A.   Side one.

20        Q.   Side one.  And took Dean Leeal's place, is that

21   Director of QC?

22        A.   Yes, sir.

23        Q.   Was he Director of QC when you left?

24        A.   Bruce Chen?

25        Q.   Yes.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990

1     A.   Yes, sir.

2     Q.   Let's talk about when you went to side two.  You

3 say that was approximately '02?

4     A.   Yes, sir.

5     Q.   Where did you park when you worked at side two?

6     A.   The north side parking lot.

7     Q.   Is that where all the employees parked that

8 worked at side two building?

9     A.   And side one.

10    Q.   So it's across the street from side two, isn't

11 it?

12    A.   Yes.

13    Q.   You were a salaried non-exempt employee?

14    A.   Yes, sir.

15    Q.   That means you got a weekly salary but you were

16 eligible for overtime if you worked overtime?

17    A.   Yes, sir.

18    Q.   So you didn't punch a time clock, did you?

19    A.   No, sir.

20    Q.   Did you have a time sheet you filled out every

21 week?

22    A.   No, sir.

23    Q.   So if you were absent, did you fill it out on an

24 absence and vacation sheet?

25    A.   Yes, sir.

1    Chen?

2         A.   Dean Leeal.  He was on my side director, Dean

3    Leeal on side two.

4         Q.   What was Bruce Chen's job on side two?

5         A.   He later came over there.

6         Q.   Do you know what his job was?

7         A.   He became the Director of QC.

8         Q.   Let's focus on, say, the last couple of years

9    before you were terminated, 2005 to 2007.  Was Bruce Chen

10   the Director of QC then?

11        A.   Yes, sir.

12        Q.   His name is C-h-e-n?

13        A.   Yes, sir.

14        Q.   Does Bruce have an office over there on side two?

15        A.   Yes, sir.

16        Q.   And who did he share his office with?

17        A.   Chen-Fu Lin.

18        Q.   What was Chen-Fu Lin's job?

19        A.   He was manager of POY.

20        Q.   That stands for what?

21        A.   Partially Oriented Yarn.

22        Q.   Was the QC manager under Bruce Chen David

23   Trammel?

24        A.   Repeat that again, please.

25        Q.   Was David Trammel the QC manager working directly

1  understood Bruce Chen?

2      A.   I am not really sure.

3      Q.   You don't know.  What was Steve Page's job?

4      A.   He was over the Automated Packaging Department.

5      Q.   Do you remember him being the manager of QCAP?

6      A.   Yes, sir.

7      Q.   Is that Quality Control Automated Packing?

8      A.   Yes, sir.

9      Q.   So did he report to Mr. Chen, Bruce Chen?

10     A.   Yes, sir.  On side two.

11     Q.   David Trammel's office was on side one but he

12  reported to Mr. Chen, is that correct?

13     A.   2005 through 2007 we're still talking about?

14     Q.   Yes.

15     A.   Yes, sir.

16     Q.   Steve Page was the manager of QCAP, wasn't he?

17     A.   Yes, sir.

18     Q.   Steve Page was working in the same office that

19  you were working in, wasn't he?

20     A.   Yes, sir.

21     Q.   He also reported to Mr. Chen, didn't he?

22     A.   Yes, sir.

23     Q.   What was Travis Hyman's job?

24     A.   I believe he was like David Trammel.  He was a

25  manager.

1    Q.   Could he have been assistant manager of QC?

2    A.   He was at one time.

3    Q.   What about 2005 to 2007?

4    A.   He was a manager.

5    Q.   Who was Brent Cutright?

6    A.   Supervisor.

7    Q.   In QC.  He was a supervisor in what department?

8    A.   Brent Cutright?

9    Q.   Yes.

10    A.   A supervisor in QC2 in '05.

11    Q.   But he was in your office as well, wasn't he?

12    A.   (Nodding.)

13    Q.   How about Greg Morris?

14    A.   Greg Morris was in my office.

15    Q.   Was he a supervisor or assistant supervisor, do

16 you remember?

17    A.   I don't think he ever had a title.

18    Q.   Are you sure he didn't have a title or could he

19 have had a title and you didn't know about it?

20    A.   Maybe he had a title and I didn't know about it.

21    Q.   How about Eric Watson?

22    A.   Eric did not have an office on my side.

23    Q.   Where was his office?

24    A.   In side one.

25    Q.   On side two, you worked in a pretty large office,

1  didn't you?

2      A.    Yes, sir.

3      Q.    There were six desks in there, correct?

4      A.    Yes, sir.

5      Q.    And you sat at one of them, right?

6      A.    Yes.

7      Q.    And that leaves five, right?

8      A.    Yes, sir.

9      Q.    And Mr. Hyman sat at one, didn't he?

10     A.    Yes, sir.

11     Q.    And Mr. Page sat at one?

12     A.    Yes, sir.

13     Q.    Who sat at the other three?  Brent sat at one?

14     A.    Brent sat at one.

15     Q.    That's four.

16     A.    There was a guy before Brent, I can't remember

17 his name, and then -- yes, Brent, and I can't remember the

18 other guy's name that was before Brent.

19     Q.    How about tell me if it's any of these people.

20 Bob Parsons?

21     A.    No, sir.

22     Q.    Devin Baxley?

23     A.    No, sir.

24     Q.    Greg Morris?

25     A.    He didn't sit at the desk where Brent Cutright

1    did.  He sat in another desk.

2         Q.    But another desk in that office?

3         A.    Yes, sir.

4         Q.    So we have Morris, Cutright, Page, Hyman and you

5    in there, right?  That's five desks.  Were all the desks

6    full?

7         A.    Derrick, he now works at Honda.  I don't know his

8    last name.  Derrick Hall.

9         Q.    He was in there as well?

10        A.    He was in there and then Stephen Nothe.

11        Q.    How do you spell that name?

12        A.    N-o-t-h-e.

13        Q.    What was his job?

14        A.    QCAP.

15        Q.    When did he leave Nan Ya's employment?

16        A.    Probably in '07.

17        Q.    After you left?

18        A.    No.  He left right before I did.

19        Q.    Was Mr. Chen, his office, Bruce Chen's office was

20   next door to yours, wasn't it?

21        A.    (Nodding yes.)

22        Q.    And there was a window between the two offices?

23        A.    (Nodding.)

24        Q.    So you could kind of see him if you wanted to

25   look in there?

1     A.   No.  I could see the top of his head if I turned

2  around.

3     Q.  You could see whether he was in there or not?

4     A.  Yes.

5     Q.  If you walked in the door to your office you

6  could, before you sat down you could look over and see who

7  was in there, couldn't you?

8     A.  Yes, sir.

9     Q.  If Mr. Chen was sitting in his office he was

10  facing towards the door of your office?

11     A.  He was facing the door of the copier machine.

12     Q.  Where is the copier machine?

13     A.  Directly across from his office.

14     Q.  Across the hall from his office?

15     A.  Yes, sir.

16     Q.  If he looked into the window of your office what

17  would he see?  Do you know what he saw?

18     A.  I think he could see every desk in there.

19     Q.  There was a hallway running from your office down

20  to what they call the OPS office, wasn't there?

21     A.  I don't know what the OPS, I never heard that

22  terminology.

23     Q.  POY2 Field Office, was that down there where

24  Brandi Morse worked?

25     A.  Yes.

1   personal issues.

2       Q.   Did you handle word processing duties as well?

3       A.   No, sir.  I did manual paperwork, purchase

4   requisitions, a lot of the lab ordering supplies.

5       Q.   Did you do filing?

6       A.   Oh, definitely filing and customer responses,

7   customer complaints, gathered information.

8       Q.   Did you have any responsibilities with the hourly

9   payroll?

10      A.   Yes, sir.

11      Q.   What was that?

12      A.   That was to compare them with what Personnel had

13  from their time clocks.  We had paper reports that were

14  generated and whatever was not agreeing, then I pulled

15  their records and made it balance.

16      Q.   Did you prepare control charts?

17      A.   Yes.

18      Q.   What were control charts?

19      A.   They were how the products were being run.  It

20  was a trend.

21      Q.   Did you do that every day?

22      A.   Weekly.

23      Q.   Did your job duties change while you were on side

24  two?

25      A.   Yes, sir.

1    Q.    How did they change?

2    A.    There was a program that had some kinks in it

3    that they wanted me to key in all the data from each

4    product and each line and so they could see where the kinks

5    were.

6    Q.    What was the name of the program?

7    A.    It was initials and a letter.  I don't remember

8    what that was.  It was a program that they called that was

9    no good.

10   Q.    Did they later quit using the program?

11   A.    Yes.  I do believe.  Yes.  It was not reliable.

12   Q.    Do you know if they were working on it or---

13   A.    Constantly.

14   Q.    Was the program called SQC?

15   A.    That's it.

16   Q.    So there came a time when they basically just

17   told you to quit keying stuff into that, didn't they?

18   A.    Well, the management of the quality lab used to

19   do that.

20   Q.    He used to what, key it in?

21   A.    Well, the assistant supervisors used to do it.

22   And so they gave that to me.

23   Q.    Do you mean the job of keying in the data?

24   A.    Yes, sir.  To help them catch up.

25   Q.    Do you remember who gave that to you?

1    A.    Brent was still there.  Probably the latter of

2  '06.  I'm not really sure.

3    Q.    Is that when they gave that to you, late '06?

4    A.    Yes.

5    Q.    So they asked you to key in this data to SQC?

6    A.    To SQC to help, yes, with the lab.

7    Q.    Did they ask you to stop doing that a couple

8  months later?

9    A.    Yes.  I think they just said they may as well

10  don't use it, it's not valuable information, not accurate.

11  They couldn't get the kinks worked out.

12    Q.    That is something you did for three or four

13  months and then quit?

14    A.    Probably.  I am not real sure how long it was.

15  And, yes.

16    Q.    We were talking earlier about Dr. Ducker and he

17  is in Florence?

18    A.    Florence.

19    Q.    What other doctors have you seen in the last,

20  say, ten years?

21    A.    Tatum.

22    Q.    Who is Tatum?

23    A.    He's my gynecologist.

24    Q.    Has he ever treated you for any emotional

25  problems or ever prescribed anything to you for your mood

1    or just purely gynecological stuff?

2         A.    No.    He knows that I take the Attenanol and the

3    Tranxene.

4         Q.    Have you ever discussed with him depression or

5    anxiety?

6         A.    Yes.

7         Q.    Where is Dr. Tatum?

8         A.    McLeod.

9         Q.    Do you know his first name?

10        A.    Charles.

11        Q.    Any other doctors besides Ducker and Tatum?

12        A.    No, sir.

13        Q.    That's it?

14        A.    (Nodding yes.)

15        Q.    Have you been to any counselors or psychiatrists

16   or psychologists?

17        A.    No, sir.

18        Q.    Did you receive evaluations while you were at

19   Nan Ya?

20        A.    Yes, sir.

21        Q.    How often did you get them?

22        A.    Once a year.

23        Q.    Who usually gave your evaluations?

24        A.    Greg Cooper gave me the first one.   And really I

25   am not real sure of which ones gave the rest.   It had to

1    have been -- they were different probably.  David Trammel,

2    Travis Hyman, Steve Page.

3        Q.   So they kind of swapped around?

4        A.   Yes, sir.

5                     (Defendant's Exhibit No. 2 was

6                     marked for identification>0

7        Q.   Let me ask you to take a look here at Exhibit

8    Two.  Tell me if you can identify this.  Can you identify

9    that as your 2000 evaluation?

10       A.   I just wonder where Gregory Cooper is and why

11   Steve Page has been the reviewer.

12       Q.   Steve Page was the reviewer, in fact, wasn't he?

13       A.   Yes.  But I didn't do QCAP.  I didn't do -- I

14   mean I just realized that.

15       Q.   Regardless, you would agree that Stephen Page

16   evaluated you in 2000, wouldn't you?

17       A.   He signed it, yes.

18       Q.   Look back at the individual goal notations.  Do

19   you see the last four pages of this?

20       A.   Right.

21       Q.   He reviewed those with you too, that is his

22   signature, isn't it?

23       A.   That's his signature.

24       Q.   That is his handwriting down below, isn't it?

25       A.   That is his handwriting down below.

1    Q.   My question.  Look at the next to last page, top

2  right-hand side.  Who does it say reviewed you?

3    A.   Mine must have a double sheet here.  The next to

4  last page it doesn't say anybody.  I have 2 of 3 on the

5  bottom.

6    Q.   Go to 1 of 3.

7    A.   Okay yes.  Okay.  I see Steve Page and G. Cooper,

8  which is Greg Cooper.  That would be right.

9    Q.   Do you remember both of them reviewing you?

10    A.   I do not remember both of them reviewing me.  All

11  of this is QC.  It's not QCAP.

12    Q.   Did you get a pretty good evaluation?

13    A.   It's 89.5 or is it the 87.2?  Recommended

14  overall.  Okay, it's 89.  Pretty good.

15    Q.   That is exceeds, isn't it?

16    A.   Yes, sir.

17    Q.   That is the highest you ever got, isn't it?

18    A.   Yes, sir.  I think so.

19    Q.   Getting an exceeds would qualify you for a raise,

20  wouldn't it?

21    A.   Well, yes.

22    Q.   You got a raise of 4.5 percent that year, didn't

23  you?

24    A.   Yes, sir.

25    Q.   When you were on side two, your hours were 8 to

1    and looked at some written documents?

2         A.    Yes.   And some POY printouts, quality data

3    sheets.

4         Q.    But on occasion, would other people come in to

5    the office and sit down and look at something or say hello

6    or use the telephone or something like that?

7         A.    Yes, sir.

8         Q.    But you were the one who probably spent the most

9    time in that office during the day, is that correct?

10        A.    That's correct.

11        Q.    Because your job duties were focused primarily in

12   that office?

13        A.    That's correct.

14        Q.    And these other folks who were in there had job

15   duties on the floor, right?

16        A.    Yes, sir.

17        Q.    In fact, some of them would have to go down to

18   Building One from time to time to meet with people, go to

19   the Admin Building, et cetera, is that right?

20        A.    Yes, sir.

21        Q.    Did you have any duties in Building One or side

22   one during that last two years of your employment?

23        A.    No duties unless I had -- unless I was asked to

24   go take dyed samples to deliver, to pick up special

25   projects that they wanted us to test or either we were

1    testing what they wanted, so I was back and forth.

2         Q.   But that was a special request someone would make

3    to you?

4         A.   Yes, sir.

5         Q.   It wasn't a regular job duty for you to go over

6    to side one, for example, on a particular day and do

7    something?

8         A.   No, sir.

9         Q.   Did you ever have any regular job duties that

10   required you to go to the Admin Building?

11        A.   No.  No regular duties.

12        Q.   Did the Admin Building, was it kind of positioned

13   between side one and side two?

14        A.   Yes, sir.

15        Q.   That's where Mr. Stevenson's office is?

16        A.   Yes, sir.

17        Q.   Look back at this document that I gave you and I

18   am going to refer to some little numbers on the bottom

19   right-hand side, on the bottom of that document, right-hand

20   side.  Do you see those little tiny numbers down there?

21        A.   Yes, sir.

22        Q.   The first one ends in 13.  Look at the page that

23   is numbered 20.  Do you see that second block

24   "Professionalism?"

25        A.   Yes.

1     Q.   Do you see where it says "good attitude, needs to

2  be at office by 8 a.m. every day?"

3     A.   Yes, sir.

4     Q.   Do you remember them discussing with you you need

5  to be punctual and be at the office at 8 a.m. every day?

6     A.   Oh, yes.  That was everyone.  Everybody was told

7  that.  That was -- I do remember.

8     Q.   But it's in your particular evaluation here,

9  right?

10     A.   Right.

11     Q.   And it's under the category "Professionalism,"

12  right?

13     A.   Right.

14     Q.   And were you aware that the company considered

15  tardiness to be unprofessional?

16     A.   I was aware that, yes, I was aware that 8 o'clock

17  you should be at your desk.

18     Q.   Let's look at the next exhibit.

19              (Defendant's Exhibit No. 3 was

20              marked for identification.)

21     Q.   Take a look at what we have marked as Exhibit

22  Three and see if you can identify it.

23     A.   Yes, sir.

24     Q.   Is this your 2001 Rating Summary?

25     A.   Yes, it is.

1    Q.   This is your evaluation for 2001?  Let me take a

2  quick break here.

3                    (Break at 12 noon.)

4                    (Back on the record at 12:05 p.m.)

5  BY MR. PEARSON:

6    Q.   Look at Exhibit Three and can you tell me what

7  that is?

8    A.   It looks like a good rating.  Oh, and the

9  comments were right.

10    Q.   This is a performance rating for your performance

11  through May 7, 2001?

12    A.   This is what this is on Exhibit Three, yes, sir.

13    Q.   Who signed it?

14    A.   I believe it's Steve Page again.

15    Q.   Can you look down at your comments?

16    A.   And Greg Cooper, excuse me.

17    Q.   Your comments were "My desire is to follow the

18  Nan Ya 5's and prepare for Nan Ya 10's.  I plan to work

19  harder on my attendance and efficiency."

20    A.   Right.

21    Q.   Do you remember whether they discussed with you

22  your attendance and efficiency?

23    A.   They didn't.

24    Q.   Why would you put in there that you are going to

25  work harder on attendance and efficiency?

1    A.   I do not remember what date.

2    Q.   Can you look back at the rating summary at the

3    second page, what was that second area of improvement that

4    he put down there?

5    A.   Are you looking at employee has these particular

6    strengths?

7    Q.   No, the next one down.

8    A.   Areas for further development?

9    Q.   Yes.  Did he put be in the office 8 a.m. every

10   morning?

11   A.   Yes.  I do see that.  May I add to that?

12   Q.   Yes.

13   A.   I am very familiar with these forms.  I've seen a

14   lot, I've typed the evaluations for the supervisors, and

15   that is something that was in most or all of the comments,

16   to be on time.

17   Q.   Those comments were not typed, they were

18   handwritten, weren't they?

19   A.   Yes.

20   Q.   And you were supposed to be at your office at 8

21   a.m. every morning, weren't you?

22   A.   And I was.

23   Q.   You were repeatedly asked to be there at 8 a.m.

24   every morning?

25   A.   Yes.

1       Q.    Okay.  And you were---

2       A.    On the evaluation.

3       Q.    And you were---

4             MR. MABRY:  You all are talking over each other.

5             MR. PEARSON:  Do what?

6             MR. MABRY:  You're talking over each other.

7  BY MR. PEARSON:

8       Q.    And you were the only admin assistant in that

9  office, weren't you?

10      A.    Yes.

11      Q.    And the only admin assistant in QC, weren't you?

12      A.    Yes.

13                        (Defendant's Exhibit No. 5 was

14                         marked for identification.)

15      Q.    This is Exhibit Five.  Can you identify this

16 document?

17      A.    This was on 1/17/03 like six months later from

18 Document Four.

19      Q.    Document Four, I believe, was completed or dated

20 in the top right-hand corner March 8, 2002.  And Document

21 Five appears to have been dated March 1, 2003.  Is that not

22 correct?

23      A.    Yes, sir.

24      Q.    So they're about a year apart, aren't they?

25      A.    Well, it was signed off on Steve Page on Document

1  Four as June 26, '02, and the print date June 13, '02.  On

2  Document Five, it was signed off by David Trammel on

3  2/10/03, so that's still January, February, March, April,

4  May, June, July, six months.

5       Q.   So would you conclude from that, that Mr. Page

6  was late with his evaluation and Mr. Trammel was early?

7       A.   One or the other, yes.

8       Q.   Let's look at Number Five again.  Who evaluated

9  you in 2003?

10      A.   2003 was Greg and Steve.

11      Q.   Exhibit Five is 2003.

12      A.   Exhibit Five is 2003.  I show David Trammel.

13      Q.   David Trammel was the manager of QC, correct?

14      A.   QC1.

15      Q.   And Steve Page was manager of QCAP, right?

16      A.   Yes, sir.

17      Q.   Did you work for both of them?

18      A.   I started working for QCAP when I got over to

19  side two.

20      Q.   If you didn't work for QCAP when you were at side

21  one, why was Steve Page evaluating you?

22      A.   I do not know.

23      Q.   Does he work in the same office with you?

24      A.   He had a desk there and he had a desk at side

25  two.

1    Q.   Mr. Trammel said, if I read correct, that you

2  need to focus on time management, understand details,

3  reports and what managers are looking for in reports.   Do

4  you remember that?

5    A.   Well, tell me that again.  Where are you?

6    Q.   I am on the page that is numbered, the little

7  number---

8    A.   I found it.

9    Q.   37.

10    A.   Thank you.  Well, it's a bit confusing, because

11  David Trammel was not over on my side.  My management was

12  Travis Hyman.

13    Q.   Let me go back to the question I asked you.  Did

14  David Trammel tell you you needed to focus on time

15  management?

16    A.   I see that is a comment.

17    Q.   Down below when it says areas for further

18  development and improvement, number one was time

19  management, wasn't it?

20    A.   That's just what you just repeated?

21    Q.   But it's on here twice, isn't it?

22    A.   No.  I don't see that twice.  Okay.

23    Q.   Look at the top line.

24    A.   Okay.

25    Q.   It says you need to focus on time management,

1  right?

2      A.   Right.

3      Q.   Look down to the third section.

4      A.   Right.

5      Q.   Handwritten number one, doesn't that say time

6  management?

7      A.   Yes, sir.

8      Q.   If you look back on the very last page of this

9  exhibit, under Cost/Expense Control, he mentions work on

10 time management again, doesn't he?

11     A.   Yes.

12     Q.   Is this the first time Mr. Trammel has evaluated

13 you?

14     A.   Yes.

15     Q.   Was Mr. Trammel on side two or side one when he

16 evaluated you?

17     A.   He came over to side two to evaluate me.  That

18 day to do that.

19                 (Defendant's Exhibit No. 6 was

20                 marked for identification.)

21     Q.   Take a look, if you will, to what we have marked

22 for identification as Exhibit Six.  Tell me if that is an

23 evaluation that was completed on or about February 2004?

24     A.   Yes, sir.

25     Q.   Who gave you this evaluation?

1     A.   That may be David Trammel's signature.

2     Q.   Is that the same signature, appear to be the same

3 signature as on Exhibit Five?

4     A.   Yes, sir.

5     Q.   Please look back at the page with the small

6 number 43 at the bottom.

7     A.   Yes.

8     Q.   Up at the top, did he tell you punctuality is of

9 the utmost importance?

10    A.   That is what Chris Chapman wrote.

11    Q.   So that's his handwriting.  Look down for areas

12 of further development or improvement.

13    A.   Yes.

14    Q.   Number Four.  Is that punctuality?

15    A.   Yes, sir.

16    Q.   Then when you say employee's comments, you say I

17 will try to be more punctual, is that you saying that?

18    A.   That is me saying that.

19    Q.   Can you look at the approving manager's comments?

20 Is that David Trammel's signature?

21    A.   That's David Trammel's signature.

22    Q.   Did he tell you, did he say this:  "Cheryl has

23 worked here several years.  By this time she should be

24 performing at a higher level (technically, responsibility,

25 etc.).  Improvement is needed."  Is that what he said?

1    A.    That's what I see.

2    Q.    Is that what he said---

3    A.    I don't---

4    Q.    ---in the evaluation?

5          MR. MABRY:  Object to the form.

6    A.    To me?  Excuse me?

7          MR. MABRY:  Object to the form.  You still have

8 to answer.

9    A.    I don't recall that I had a bad performance, that

10 he had said that.  I mean he wasn't there.  I mean I don't

11 know how I could get a manager's comment like that whenever

12 he wasn't. . . .

13   Q.    Can you turn back to the first page?

14   A.    My supervisor or manager.

15   Q.    Can you turn back to the second page of this

16 document?  What rating did you get?

17   A.    66.2.

18   Q.    Is that an improvement needed rating?

19   A.    Yes.  It is.

20   Q.    That is not a good rating, is it?

21   A.    That is not a good rating.

22   Q.    Do you know how many salaried employees there are

23 at Nan Ya?

24   A.    Probably three hundred or so.

25   Q.    Do you have any idea how many improvement needed

1   ratings are given each year?

2       A.   Probably three.

3       Q.   If you look at the second page from the back of

4   Exhibit Six, it said warning for being late, counseled by

5   manager.  Do you remember that?

6       A.   I'm sorry.  Are we on Number Six exhibit?

7       Q.   We are.

8       A.   What number again, please.

9       Q.   Look at the little number at the bottom, and the

10  page ends in 44.

11      A.   Okay.  "Responsibility."  It says warning for

12  being late and counseled by manager.  And that was from my

13  supervisor Chris Chapman.  Is that what he's referring to,

14  you think?

15      Q.   I don't know, but he is definitely referring to

16  punctuality, isn't he?

17      A.   Yes.  He is.

18                      (Defendant's Exhibit No. 7 was

19                      marked for identification.)

20      Q.   Take a look at Exhibit Seven and see if you can

21  identify that.

22      A.   Yes, sir.

23      Q.   What is that?

24      A.   That is when there was a purchase requisition

25  that at the end of the day that Bruce Chen wanted to be

1          MR. MABRY:  Object to the form.

2      A.   Well, it was in '03.  And I think it was -- I was

3  being singled out.

4      Q.   You were being singled out?

5      A.   Yes.

6      Q.   What does singled out mean?

7      A.   To have -- to be written up.

8      Q.   Why would Bruce Chen single you out?

9      A.   Why would Bruce Chen single me out?

10     Q.   Yes.

11     A.   Why would he move me from one position to

12  another?

13     Q.   No.  My question to you is why do you think Bruce

14  Chen singled you out in 2003?

15     A.   He had reasons that I can't explain, but I can't

16  explain in words.

17     Q.   Why can't you explain them in words?

18     A.   I don't know why he in the first place had this

19  -- why this happened.  It still puzzles me to this day.

20     Q.   Why what happened?

21     A.   Why this request and it was followed through as

22  Bruce Chen wanted and I was written up.

23     Q.   But you were the only admin assistant in that

24  department, is that correct?

25     A.   No.  I was in side two.  He had two others on

COLUMBIA TRANSCRIPTS, INC.
803/356-1990

1    side one.

2        Q.    But you said that he singled you out?

3        A.    To go from side two to pick up this PR from side

4    one and that is where I had Anthony Martin to sign the

5    purchase requisition, and then I walked it up to the Admin

6    Building.

7        Q.    You have already explained your version of the

8    facts.  I asked you why Bruce Chen would have written you

9    up when you don't believe you did anything wrong, and you

10   said he was singling me out, and I asked you what you meant

11   by that, and I am still waiting for an explanation.

12           MR. MABRY:  Object to the form.  You still have

13   to answer.

14           THE WITNESS:  Are you talking to me?

15           MR. MABRY:  I just made an objection for the

16   record.  You have to answer.

17       A.    Because he wanted a writeup.  He wanted a

18   writeup.

19       Q.    He just wanted a writeup of anybody?

20       A.    To me.

21       Q.    Why?

22       A.    Because I was on side two.  And he wanted me to

23   walk to side one.  That is the explanation.

24       Q.    Are you saying he didn't like you?  Are you

25   saying that you have done something to offend him?  Why

1  would he decide to give you a warning that you didn't

2  deserve?

3       MR. MABRY:  Object to the form.

4       A.   Because I was on side two and I was going to side

5  one.  Maybe he didn't think that I would -- he was going to

6  do a writeup.  A lot of people wouldn't have done this

7  after five.  They're gone.  I did this.  He knew I would do

8  this.  He knew that I would go get this PR and that I would

9  take the time.  Why I got written up for it I don't

10 understand.  I did what was requested.

11      Q.   So is your answer you don't understand why you

12 got written up for it?

13      A.   My answer is why I got -- yes, why I got written

14 up for it.  It is just totally beyond my -- of my world to

15 figure out why this even happened.

16      Q.   So you don't have any idea why you got that

17 writeup?

18      A.   No.  I did exactly as I was told.

19                 (Defendant's Exhibit No. 8 was

20                 marked for identification.)

21      Q.   Can you identify what we have marked as Exhibit

22 Eight?

23      A.   Yes, sir.  This is a letter of counseling.  And

24 this says during your yearly evaluation -- (Reading.)  And

25 this was in '04.  That says that I did not agree and I

1  no record of it, is there?

2      A.   No.  If I do not write it down it is not

3  recorded.

4      Q.   If you walk in late and Mr. Chen looks through

5  the window and sees you coming in late, then he knows you

6  are late, doesn't he?

7      A.   No, sir.  Because I come in -- my job was to fix

8  the coffee first thing in the morning.  There's two ways to

9  enter to my desk.  And I was told you're to have coffee by

10  eight.  A lot -- that was what I had to do, what I began to

11  do at side two.

12      Q.   When someone sees you coming in the door and you

13  have your pocketbook in your hand and your coat on and

14  you're coming in from the parking lot you hadn't been

15  fixing coffee, had you?

16      A.   No, sir.

17      Q.   I am asking you on September 15, 2004, did you

18  get a counseling for being late?

19      A.   I got a counseling for being late, leaving five

20  times early or coming back from lunch.  I deny that.

21      Q.   You deny that you received this counseling?

22      A.   No.  I do not deny I received the counseling.  I

23  do not agree as it states.  It was a lie.

24      Q.   Why do you think it was a lie?

25          MR. MABRY:  Object to the form.

1    on you.  Do you think the other admin assistants in Quality

2    had that in their evaluations?

3        A.   I doubt it.

4        Q.   How about the other salary exempt people in

5    Quality, do you think they had it in their evaluations?

6        A.   I doubt it.

7        Q.   So who else had it in their evaluations?

8        A.   Some hourly employees and me.

9        Q.   Some hourly employees.  How many?

10       A.   A percentage?

11       Q.   I don't care if you give me a number or

12    percentage.

13       A.   I don't know a number or a percentage.  But I

14    would say it's common generally speaking.

15       Q.   It's common generally speaking for the salaried

16    employees' supervisors to write on their evaluation by hand

17    to be here on time, is that what you are saying?

18          MR. MABRY:  Object to the form.

19       A.   Did you say salaried?

20       Q.   No.  Is it common, for hourly employees, to write

21    by hand on an hourly employee's evaluation to be here by 8

22    a.m.?

23       A.   I have seen that.

24       Q.   I asked you if it was common.

25       A.   If it's common, no, it wasn't common.

1     Q.   That is what they did on your evaluation, wasn't

2  it?

3     A.   It was very common for mine.

4     Q.   It was.  That's the point.

5     A.   Yes.

6     MR. MABRY:  Object to the form.

7  BY MR. PEARSON:

8     Q.   So let me get this straight.  The notation to be

9  at work at eight o'clock was, number one, very common on

10  your evaluations, right?

11     A.   Yes.

12     Q.   But you are not aware of it being on any

13  administrative assistants' in QC other than you, are you?

14     A.   Right.

15     Q.   And you are not aware of it being on any of the

16  salaried employees', other salaried employees' in QC, are

17  you?

18     A.   Right.

19     Q.   But you do say that sometimes it appears on

20  hourly employees' evaluations?

21     A.   If -- yes, if they're, you know, being singled

22  out.  Those would be the ones.

23     Q.   Go back to Exhibit Eight if you will.  Did you

24  talk to Mr. Stevenson or anyone else about this letter of

25  counseling?

1     A.   No, sir.

2     Q.   How about Exhibit Seven?

3     A.   No, sir.

4     Q.   Were you aware of any quality problems with your

5  job performance?

6     A.   No, sir.

7     Q.   What significance did you attach to the language

8  in Exhibit Eight that said your quality of work is par at

9  best?

10     A.   That was written by -- exhibit -- which one?

11  What exhibit are we on?

12     Q.   Eight.

13     A.   What was your question?

14     Q.   Did you see where Mr. Chapman wrote your quality

15  of work is par at best?

16     A.   Yes.

17     Q.   What discussions did you have with him about

18  that?

19     A.   We didn't.  He didn't elaborate.  And I didn't

20  ask any questions.  If this is what he had done, that was

21  his -- that was what he thought.

22     Q.   Is this the same guy you went to the shag

23  festival with?

24     A.   Yes, sir.

25     Q.   Was this before or after the shag festival?

1     A.   Well, not David.

2     Q.   So did you work in the same department with

3 David?

4     A.   We were classified as QC1 and QC2.  I was QC2 in

5 the latter years after '02.

6     Q.   Are you unaware that David Trammel is a QC

7 manager and Travis Hyman was the QC assistant manager?

8     A.   He had a promotion.  He's a manager.

9     Q.   I am asking though, are you unaware -- so in your

10 mind Travis Hyman and David Trammel are the same rank or

11 level in the company?

12     A.   Yes.  I always report to Travis.  I never

13 reported to David.

14     Q.   But yet Travis has never evaluated you, has he?

15     A.   No.

16     Q.   Do you know anything about the evaluation process

17 about how they go about gathering the information for the

18 evaluation?

19     MR. MABRY:  Object to the form.

20     A.   I do not know how they got -- would you repeat

21 that, please.

22     Q.   Do you know how the evaluating manager gets the

23 information that goes in your evaluation?

24     A.   I would hope that they---

25     Q.   Not what you hope.  Do you know how they do it?

1    A.   They would review my work.

2    Q.   Do you know that?

3    A.   No.  I really don't.

4    Q.   I'm not asking you what you hope.  I am asking

5  you do you know the process that the evaluating manager

6  goes through to gather information for your evaluation?

7    A.   That the evaluating manager?

8    Q.   Yes.

9    A.   Which we're saying David Trammel?

10   Q.   Or whoever is evaluating you.

11   A.   I do not know how he got his information.

12                    (Lunch break at 1 to 1:45 p.m.)

13                    (Back on the record.)

14                    (Defendant's Exhibit No. 11 was

15                     marked for identification.)

16  BY MR. PEARSON:

17   Q.   Can you identify what we have marked for

18  identification as Exhibit Number 11?

19   A.   February 17?

20   Q.   The one I am looking at says February 21.

21   A.   Okay, the date of the warning was February 21,

22  the date of the incident he is speaking of is February 15.

23   Q.   Do you remember receiving a written warning from

24  David Trammel on this date, on February 21?

25   A.   Let me go through this a second, please.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990

1  (Reading document.)  From David Trammel, February of '07?

2     Q.   Yes.

3     A.   Yes.  That I wasn't at my desk at 7:55.

4     Q.   Where does it say 7:55 on here?

5     A.   Down at the bottom.  That is whenever they told

6  me I needed to come in and do coffee and then be at my desk

7  at eight o'clock.  This was sometime after -- I mean before

8  I was written up on the 15th.

9     Q.   You said the QC Director observed you were late

10  by four minutes.  Is that Mr. Chen?

11     A.   Mr. Chen at this time.

12     Q.   Bruce Chen?

13     A.   (Nodding yes.)

14     Q.   Did you get this warning, where, in the

15  conference room there, is that where you all met?

16     A.   In a little office.

17     Q.   Where is that office?

18     A.   There's two.  It would be the one right -- okay,

19  right in front of Mr. Chen-fu Lin's office.

20     Q.   Across the hall?

21     A.   From Mr. Chen-fu Lin.

22     Q.   What's in there, like a table and some chairs?

23     A.   Yes, sir.

24     Q.   Who was there besides David?

25     A.   I don't recall.

1     Q.   Do you remember whether Mr. Hyman was there?

2     A.   I don't recall who was there at this time.

3     Q.   So you don't recall whether Steve was there or

4 Mr. Chen?  You have to answer.

5     A.   No, sir.  I know Mr. Chen was not there.

6     Q.   And you know Mr. Trammel was there?

7     A.   Well, he signed it.

8     Q.   Do you have any recollection as to who was at

9 that meeting?

10    A.   No, sir.  I'm sorry.

11    Q.   Can you read your comments and then we'll go back

12 and let you explain them?

13    A.   (Reading.) "Because of the 'lax' atmosphere in

14 the office I didn't think 5-4 minutes would really impair

15 my job work habits.  I will try to be more professional as

16 the other upper manager.  I know I am to be at my desk at

17 7:55 but I missed and didn't call in for two days.  It's

18 been a mad rush at work, lots of management and I'm late

19 for two days.  Years past I disputed my tardiness because

20 of false allegations."

21    Q.   After this particular warning, did you go talk to

22 Mr. Stevenson?

23    A.   On the 21st of -- I don't really know what day it

24 was.  That's the 15th, okay.  I don't recall the date.

25    Q.   Do you recall Mr. Stevenson asking you to come to

1     him and he said well now is a good time.  And I went up to

2     his office.  And he -- let's see, I don't really recall --

3     it was he and Christian or someone else in personnel, I'm

4     not really sure if it was Christian.

5         Q.    Was Christian one of Mr. Stevenson's assistants?

6         A.    Yes, sir.

7         Q.    Go ahead.

8         A.    And then I asked for a representative from the

9     sales department that I knew to go in with me.  I think

10    this is the occasion you're talking about.

11        Q.    I want to know the first time you went to talk to

12    Mr. Stevenson after you received this warning.

13        A.    Yes.  I am pretty sure this is it.

14        Q.    So who was the representative from the sales

15    department?

16        A.    Annie Tsai.

17        Q.    Had you known her for some time?

18        A.    Ever since the accident.

19        Q.    Was she a friend of Mr. Huang's too?

20        A.    Oh, yes.

21        Q.    Why did you want her to come in?

22        A.    Because she was a woman.

23        Q.    Is that it?  So did the four of you meet?

24        A.    I know there was us four.  There may have been

25    another personnel administrative.  I'm not real sure.

1       Q.    What happened in the meeting, what did you want

2   to meet with Mr. Stevenson about?

3       A.    I wanted to tell him that I was being written up

4   for being late and tardy and whenever -- that they were

5   acting the way they had been acting and they considered me

6   unprofessional and I was being around at what I was having

7   to put up with in that office.

8       Q.    Were the other people in your office doing things

9   that you considered weren't professional?

10      A.    Very much.

11      Q.    Tell me what you told Mr. Stevenson about their

12  behavior.

13      A.    I told him to please ask them to stop.

14      Q.    Let me rephrase the question.  Did you describe

15  their behavior to Mr. Stevenson?

16      A.    I told them---

17      Q.    Yes or no first.  Did you tell Mr. Stevenson what

18  they were doing that you considered unprofessional?

19      A.    Yes.

20      Q.    What did you tell him?

21      A.    That they talked about you can get a promotion if

22  you get underneath the boss's desk.

23      Q.    When you said they said that, who is they?

24      A.    Travis Hyman, Steve Page, Brent Cutright, in my

25  office.  And then Will Evans and Devin Baxley.  And I named

1   you know, you've been in there under the boss's desk or

2   something along those lines?

3       A.   Well, I can't say what they were doing.  That's

4   what I heard.  I don't know if it was teasing.  This, if

5   they -- I do not know what they -- that is what I heard.

6       Q.   But who did you hear say that?  All of these

7   people?

8       A.   Steve Page, Travis Hyman, Will Evans, Devin

9   Baxley, and Brent Cutright and if Quinn Smith went over

10  there, he would, and. . . .

11      Q.   But what would prompt them to say this?

12      A.   I don't know.

13      Q.   When would they say it, like when someone came

14  out of their boss's office or something?

15      A.   That would be a time.

16      Q.   What would be another time?

17      A.   Just in conversation, you know, where have you

18  been, or if somebody is looking for somebody and---

19      Q.   Tell us what they would say.

20      MR. MABRY:  Let her finish.

21      MR. PEARSON:  No.  I want her to finish, Ben, I

22  want her to---

23      MR. MABRY:  For the record, you have got the tape

24  recording, correct (asking reporter)?  All right, we have a

25  tape recorder and we can play it back and you will hear

1  yourself interrupt her.

2         MR. PEARSON:  But---

3         MR. MABRY:  Listen, wait.  Let me finish.  I am

4  talking.  There is no judge here.  She may be answering a

5  completely different question than you asked.  She can

6  finish it and you can say you need to answer my question,

7  but you cannot interrupt her during her testimony.

8         MR. PEARSON:  I don't know when she stopped.

9         MR. MABRY:  Well, wait a minute, because you are

10 completely interrupting her rudely.

11        MR. PEARSON:  I'm talking sitting here and she's

12 giving completely, completely---

13        MR. MABRY:  She can do that.  There's no judge

14 here.

15        MR. PEARSON:  I don't care.  We can get a judge

16 here.

17        MR. MABRY:  We can do that.  You can call right

18 now.

19        MR. PEARSON:  We can get a judge here, but I want

20 my questions answered.

21        MR. MABRY:  But you have to let her answer.  You

22 can, ma'am, you didn't answer my question, you can answer

23 it again, but you cannot interrupt her testimony.  We will

24 stop this and we'll go get a judge.

25        MR. PEARSON:  Well, if we have to, we will.

1          MR. MABRY:  Well, let's do it.  I'm prepared

2    right now.

3    BY MR. PEARSON:

4          Q.    Let's see if you can answer my question now.

5    When, on what occasions would these individuals speak to

6    each other and say somebody is under the boss's desk trying

7    to get a promotion?

8          A.    Would you ask just one question as if it would be

9    when or what?

10         Q.    What, on what occasions, what would prompt one of

11   these gentlemen to say to the other you have been in there

12   under the boss's desk trying to get a promotion or so and

13   so's been in there in the boss's desk trying to get a

14   promotion?

15         A.    If one came into the office and one was sitting

16   at the desk, then the one sitting at the desk would ask

17   that one that walked in.

18         Q.    What would he ask him?

19         A.    Where have you been, underneath the boss's desk

20   trying to get that promotion?

21         Q.    So for example, Travis Hyman might say that to

22   Brent Cutright?

23         A.    Right.

24         Q.    Or Brent Cutright might say it to Devin Baxley?

25         A.    Right.

1    '02.

2        Q.   Is it your testimony that you heard all of these

3    gentlemen say that at least once?

4        A.   Oh, yes.

5        Q.   Do you believe you heard all of them say it more

6    than once?

7        A.   Oh, yes.

8        Q.   Were they pretty much saying this to each other

9    for the whole time you were there?

10       A.   Repeat that.

11       Q.   Were these people, assuming that some of them

12   changed over time, identities, but were they making this

13   comment about getting under the desk to each other pretty

14   much the whole time you were there?

15       A.   Yes, sir.

16       Q.   Let's go back to what you told Mr. Stevenson.

17   Tell us what you told Mr. Stevenson about this particular

18   comment.

19       A.   I told him that they were being very

20   unprofessional, that I wished that he would talk with them

21   and ask them to stop and especially Steve Page.

22       Q.   We have got this comment about the people getting

23   under the boss's desk to get a promotion.  And you told

24   Mr. Stevenson about that comment, correct?

25       A.   I am pretty sure I did.

1    Q.    What else did you tell Mr. Stevenson?

2    A.    That I wished it would stop.  They were not being

3    professional.

4    Q.    What else did you tell him?

5    A.    I told him that I was being written up for being

6    late, that I was not -- that they were saying I was not

7    being professional and how could this continue as being

8    management being so unprofessional whenever I thought that

9    they were being very unprofessional as being in management

10   and to please start with Steve Page.

11   Q.    Can you remember anything else you told

12   Mr. Stevenson in that meeting?

13   A.    Do you have some document that I could look at to

14   what I said?

15   Q.    No.  I mean I'm asking you today if you remember

16   telling Mr. Stevenson anything else in that meeting?

17   A.    Not anything else that I can remember, but it

18   could be something, but if you would show me something that

19   might jog my memory.

20   Q.    Did you keep notes of the meeting?

21   A.    No.  I did not.

22   Q.    What do you remember Mr. Stevenson saying in the

23   meeting?

24   A.    That he would talk to them.

25   Q.    Do you know if he did talk to them?

A.  I believe he did.

Q.  But do you know if he talked to them?

A.  I do not know.

Q.  No one ever told you that he talked to them, did they?

A.  No.

Q.  Did Annie Tsai say anything in the meeting?

A.  Not a thing.

Q.  Did Christian say anything?

A.  I don't think so.

Q.  Did Mr. Stevenson tell you that he thought what you were saying was serious and he would look into it?

A.  He told me that he would look into it.  I don't remember.

Q.  After this meeting, those comments stopped, didn't they?

A.  Oh, yes.

Q.  Did you have any other meetings with Mr. Stevenson between the meeting I believe you said was, you think it's in March, right?

A.  Yes, sir.

Q.  Did you have any other meetings with him between that date and the date that you were terminated?

A.  Yes, sir.  I told him about that Steve was not giving me the work that he normally had given me.  He was

1    ignoring me and he simply -- I told Mr. Stevenson that he

2    was not talking to me, that I was not getting the work.

3        Q.   Was that a separate meeting?

4        A.   That was a separate meeting.

5        Q.   But now Steve wasn't saying anything to you

6    improper, was he?

7        A.   He wasn't saying anything at all.

8        Q.   But he wasn't saying anything improper to you,

9    was he?

10       A.   Well, improper, no.

11      Q.   Did you say something to Mr. Stevenson at some

12    time about Steve having a knife?  What was that all about?

13       A.   That was that same occasion then, because I

14    talked with him I think twice.

15       Q.   Do you mean the occasion where you complained---

16       A.   That he wasn't talking to me, yes.

17       Q.   Do you remember when that conversation was?

18       A.   Probably in April, shortly after the first.

19       Q.   By shortly, do you mean weeks, days?

20       A.   Weeks.

21       Q.   What did you tell Mr. Stevenson about a knife?

22       A.   Well, we never, you know, he wasn't saying --

23    whenever Steve Page wasn't saying anything to me, he always

24    had a pocket knife that I could hear from my desk to his,

25    just opening and shutting it.

1    complaint about an employee driving a golf cart to an

2    unauthorized area?

3         A.   I didn't meet with Mr. Stevenson.  I spoke with

4    him on the telephone.

5         Q.   We'll go back through that issue later.  That

6    wasn't a face-to-face meeting?

7         A.   That was not a face-to-face.

8         Q.   When you met with Mr. Stevenson, you never made

9    any allegations that Steve Page had requested a physical

10   relationship with you, did you?

11        A.   No.  I never have.

12        Q.   Or that Steve Page had sexually harassed you?

13        A.   Well, I assumed, there again, assumed, that

14   whenever I said specifically Steve Page that he would know

15   that he had, that Steve had personally talked to me that

16   way and asked me for that favor.

17        Q.   But you did not specifically tell Mr. Stevenson

18   at that time that Steve Page---

19        A.   No.  I did not.

20        Q.   And you never did tell Mr. Stevenson that until

21   much later, right?

22        A.   Right.

23        Q.   And later meaning after this lawsuit was fired?

24        A.   After that lawsuit was fired?

25        Q.   During your employment with Nan Ya you never told

1    Mr. Stevenson that Steve Page had requested a physical

2    relationship with you, did you?

3         A.   I did not state he did.  It was humiliating and

4    embarrassing, but by me telling him what I told him and by

5    stating especially Steve Page, then that is what I meant.

6         Q.   That is what you meant but not necessarily what

7    you said?

8         A.   That's right.

9         Q.   When you were talking about this physical

10   relationship, was that part of this statement or banter, or

11   whatever, between these guys in the office about going

12   under the desk and getting a promotion?

13        A.   Would you repeat that, please?

14        Q.   You said when you met with Mr. Stevenson you told

15   him about these guys for years telling you, joking with

16   each other about somebody being under the boss's desk to

17   get a promotion, right?

18             MR. MABRY:  Object to the form.

19        A.   Right.

20        Q.   And you asked Mr. Stevenson to talk to them about

21   that and stop it, right?

22        A.   Right.

23        Q.   And that did, in fact, stop, didn't it?

24        A.   For a short time.

25        Q.   For a short time?

1       A.   Yes, sir.

2       Q.   I think you said before that it stopped after you

3  met with Mr. Stevenson until after your termination.

4            MR. MABRY:  Object to the form.

5       A.   No.  No.  You asked me did it stop.  It did stop.

6  But there became another time.

7       Q.   There became another time?

8       A.   Right.

9       Q.   When?

10      A.   Whenever I asked Will -- Devin Baxley personally

11  after this has already happened when he came through the

12  office.

13      Q.   When did that happen?

14      A.   In between the time that I saw -- that I called

15  Mr. Stevenson about that golf cart thing.

16      Q.   In between that---

17      A.   It started starting back up.  It started starting

18  back up.

19      Q.   Go back to Devin Baxley.

20      A.   Yes, sir.

21      Q.   You started to say something about Devin Baxley.

22      A.   Yes, sir.

23      Q.   What were you going to say?

24      A.   He came in and asked -- well, I know where -- I

25  don't know who he said was, and he said underneath the

1   boss's desk, that is where he probably, and he's walking

2   through, and I said to him, I stood up, and I said, Devin,

3   please don't say anything like that in here anymore.  And

4   he then turns, keeps on walking and turns to Steve and he

5   says, "You need to get rid of her."  And he keeps on

6   walking.

7       Q.   Gosh, do you remember talking about this in your

8   unemployment hearing?

9       A.   About what?

10      Q.   About that conversation that you just related to

11  me?

12      A.   There was that particularly?

13      Q.   Yes.

14      A.   I do not -- I can't say that I remember when.

15      Q.   (Handing transcript.)  Why don't you take a look

16  at that?

17      A.   Do you know where it might---

18      Q.   It might be on page 92.  Mr. Stevenson is asking

19  you questions.

20          MR. MABRY:  92?

21          MR. PEARSON:  92.

22          MR. MABRY:  Bates stamp or regular page?

23          MR. PEARSON:  Regular page.

24  BY MR. PEARSON:

25      Q.   Look halfway down.  EW1 is Mr. Stevenson.  He

1  asked you, "Ms. Powell, on February 22 did Mr. David

2  Trammel," which is misspelled, "give you a warning?"  And

3  what was your response?  You're the claimant.

4       A.   "Mr. Trammel, yes, I did."

5       Q.   Look further down.  EW1, which is Mr. Stevenson,

6  and says:  "Did you in fact, meet with me?"  What was your

7  answer?

8       A.   "Yes."

9       Q.   Mr. Stevenson said, "Did you complain that

10  sometimes people would make statements about where is so

11  and so, check under the boss's desk, she's probably trying

12  to get a promotion?"  What was your response?

13       A.   "I complained that it was a constant conversation

14  of play being very lax in the office, being very

15  unprofessional and that I would be wanting it to stop and

16  being that it was told to you was to stop it.  I wanted it

17  stopped."

18       Q.   Mr. Stevenson said,  "Yes, did the conversations,

19  did those conversations stop?"  What did you say?

20       A.   "Yes.  The first few days but then when -- okay,

21  go ahead."

22            "And are you saying that it continued?"

23            "Yes, sir."

24       Q.   Then he said, "When it continued, did you come

25  and complain to me about it?"

1     A.   "No.  I directed it to the person."

2     Q.   And he said, "And did that resolve it?"

3     A.   "It was the same day that I was fired.  I didn't

4 have a chance to go back to talk to you."

5     Q.   (Reading.)  "What day were you separated?"

6     A.   "The 24th of May."

7     Q.   Go ahead and read the rest of it.

8     A.   "That same day."

9     Q.   Let me read that.  That is Mr. Stevenson.  He is

10 saying, "So the problem from that February when you spoke

11 to me until the day you were fired you're saying the

12 problem was resolved, there was no longer a problem until

13 that one day?"  What was your answer?

14     A.   I said "right."

15     Q.   So this conversation with Devin Baxley where you

16 got up and told him it offended you was the day you were

17 terminated?

18     A.   It was not the day that I was terminated.

19     Q.   That is what you said under oath in your

20 Employment Security Commission testimony.

21     MR. MABRY:  Object to the form.

22 BY MR. PEARSON:

23     Q.   Isn't it?

24     A.   That is what I said.

25     Q.   So are you changing that testimony now?

1    A.   Am I changing that?

2    Q.   Yes.

3    A.   Well, it was not that same day.  That same -- no.

4  I don't believe it was.

5    Q.   But is it correct that you testified before the

6  Employment Security Commission that it was that day?

7    A.   That the problem arose again?

8    Q.   Uh-huh.

9    A.   Well---

10   Q.   Let me go back and---

11        MR. MABRY:  I think she's still answering the

12  question.

13   A.   I am trying to -- see, it came back.  You know,

14  the continuing talk of the -- this was very humiliating.

15  This was something that I thought I would lose my job over.

16  I, if I went to him every time something that, like that,

17  complained about, about this, I probably would have gone

18  before May 24th.

19   Q.   Are you finished?

20   A.   Yes, sir.

21   Q.   Go back to page 93.  On page 93 of the Employment

22  Security Commission testimony you said it was the same day

23  that I was fired.  Do you see that where you said that?

24        MR. MABRY:  Object to the form.

25   A.   Is it at the bottom?

1    Q.   Yes, it's at the bottom.

2    A.   Okay.  And it was the same day that I was fired.

3  What are we talking about there?

4    Q.   We're talking about the complaint that---

5    A.   That I complained to him again?

6    Q.   No, we're talking about Mr. Stevenson -- maybe we

7  will have to read all three pages again.  Up at the top you

8  said "I wanted it stopped."  Mr. Stevenson asked you had

9  the conversation stopped, and you said yes, the first few

10  days, and then when Mr. Stevenson said "Are you saying it

11  continued?"

12              "Yes, sir."

13              "When it continued, did you come and

14  complain about it?"

15              "No, I directed it to the persons."

16              "And did that resolve it?"

17              "It was the last day, the same day I was

18  fired."

19          Okay?  "The same day I was fired."

20    A.   Well, that's the same day that he said "Get rid

21  of her."  It could have been the same day.  I am not sure

22  because there was so many incidences that they were

23  talking, but then when he walked through and he did say

24  "You may as well go ahead and get rid of her," it was

25  within, I don't know, ten o'clock that I was let go (asking

COLUMBIA TRANSCRIPTS, INC.
803/356-1990

1    Mr. Stevenson)?

2         MR. MABRY:  You can't ask him anything.

3    A.   Oh, okay.

4    Q.   Turn to the top of page 94.  Mr. Stevenson asked

5    you, "So the problem from that February when you spoke to

6    me until the day you were fired you are saying that the

7    problem was resolved, there was no longer a problem until

8    that one day?"  And you said "right."

9         MR. MABRY:  Object to form.

10   BY MR. PEARSON:

11   Q.   Is that correct?

12   A.   That's right.  That is what I said.

13   Q.   Was that a correct statement under oath before

14   the Employment Security Commission?

15   A.   Was there no longer a problem until that one day?

16   It was a problem to me that one day.

17   Q.   Let's go back and see if you can answer my

18   question.

19   A.   Okay.

20   Q.   And we ain't going anywhere this afternoon, we

21   can come back tomorrow morning if you want to sit here and

22   ask it over and over again.

23        MR. MABRY:  Object to the form.  It's not a

24   question.

25

BY MR. PEARSON:

    Q.   Did Mr. Stevenson ask you under oath, so the problem from the February when you spoke to him until the day you were fired, you're saying the problem was resolved, it was no longer a problem until that one day? Now look at that transcript. My question to you is: Was your answer on that day, quote, right, end of quote?

    A.   That it ended on that day. That there was no longer a problem. I could handle what I was having to deal with. It was no problem anymore.

    Q.   Was that your testimony is my question?

    A.   That is my testimony.

                 (Defendant's Exhibit No. 12 was

                 marked for identification.)

    Q.   Can you identify what we have marked as Exhibit 12?

    A.   Yes, sir.

    Q.   Can you tell me about this counseling?

    A.   It's another tardiness issue.

    Q.   When did you get this letter?

    A.   It says March 1st.

    Q.   Did you have a meeting when you got this letter with Mr. Trammel?

    A.   I believe so. He signed it.

    Q.   But do you specifically remember having a meeting

1    with him?

2        A.    It would most likely be in the office and the

3    little meeting room.  I remember this, yes.

4        Q.    Who was there?

5        A.    Now that I do not know.  If it was a room full,

6    it could have been, the 7th of March, Brent Cutright may or

7    may not have been there.  But then maybe Travis and maybe

8    Steve, because I don't believe I have ever had a meeting

9    with just David Trammel alone.

10       Q.    You just said March 7, didn't you?

11       A.    March 1st.

12       Q.    Would it be fair to say that you really don't

13   remember who was at that meeting?

14       A.    Right.

15       Q.    Could you answer that yes or no?

16       A.    Yes.

17       Q.    You made some notes down at the bottom, is that

18   correct?

19       A.    Yes, sir.

20       Q.    Was it your concern that this letter of

21   counseling might impact your evaluation?

22       A.    Before I wrote or after I wrote my comment?

23       Q.    Your comment says the closer it gets to

24   evaluations it seems that tardiness becomes an issue, is

25   that right?

1    A.    That's right.

2    Q.    Had that happened in years past?

3    A.    It seemed to be, yes.

4    Q.    So was it your concern when you wrote this, that

5    this warning about tardiness may impact your evaluation?

6    A.    Yes.  I expect to be evaluated on quality of

7    work, not just time of a minute or two late.  Right.

8    Q.    Did you get an evaluation from Mr. Page after

9    receiving this counseling?

10   A.    No.  I was fired before then.

11                   (Defendant's Exhibit No. 13 was

12                    marked for identification.)

13   Q.    Can you look at what we have marked for

14   identification as Exhibit 13?

15              MR. MABRY:  Has she seen this before?

16              MR. PEARSON:  Has she seen it before?  How about

17   let her answer the question?

18              MR. MABRY:  Under the rules I get to talk to her

19   about if you haven't produced this before prior to the

20   deposition, I can talk to her about it.

21              MR. PEARSON:  We have produced all this to you.

22              MR. MABRY:  No, you haven't.

23              MR. PEARSON:  Yes.  We have.  We have given all

24   this to you.

25              MR. MABRY:  I don't have documents yet.

1    remember seeing this document.

2         Q.   So you're saying you did not get this document

3    while you were employed?

4         A.   I just do not remember having an evaluation

5    before I was fired.  I do not recall this last.

6         Q.   Did you sign it?

7         A.   It looks like my signature.

8         Q.   Could you have received this and just not

9    remember?

10        A.   Evaluations are pretty important.  I just could

11   have.  I just do not remember ever receiving it.

12        Q.   Does this evaluation give you a pay raise?

13        A.   No, sir.

14        Q.   That is because you got a improvement needed?

15        A.   Improvement needed.

16        Q.   What was Mr. Page's comments about your

17   performance?

18        A.   See, I don't remember this.

19        Q.   Did he write:  "Ms. Powell has a good attitude.

20   The major issues being late to work and seeking out work

21   when caught up on routine items.  Ms. Powell received two

22   warnings for being late this evaluation period."  You have

23   no recollection of that?

24        A.   No, sir.

25        Q.   You have no recollection of him saying your

1　particular strength is a good attitude?

2　　A.　No, sir.

3　　Q.　And your areas of further development is

4　punctuality?　Is it fair to say that you have no

5　independent recollection of this document at all?

6　　A.　Right.

7　　Q.　But I believe you testified that it looks like

8　your signature?

9　　A.　That looks like my signature.

10　　Q.　And I believe you testified that you could have

11　received it and just not remember it?

12　　A.　Right.

13　　Q.　Do you remember the date of your termination?

14　　A.　I do.

15　　Q.　Can you tell me what happened on that day?

16　　A.　What happened on that day was the usual morning

17　coffee, going to the desk, and this date was to start the

18　payroll balance.　I go to POY2 and get the paperwork, and

19　as I was standing there waiting for it to come off the

20　printer, my boyfriend, Ronny Cox, was coming in from the

21　entrance of the POY2 office area where the kitchen is.　He

22　comes in to order finish oil from the secretary where I was

23　picking up my paperwork.　And Steve Page walks in from the

24　QC Department hallway, and he went to me and he fussed and

25　he said "Get back to work."　And I said, "What?　What?"

1    And he said, "Get back to work, I said."  And he looked at

2    Ronny and he pointed his finger at Ronny and he said, "And

3    you go back upstairs."  And I turned away and walked down

4    the hall and Steve had already come back from getting his

5    coffee and he went to his desk.  And then I was completing

6    some payroll that needed his signature and I put on his

7    desk, and then he brings one document back to me which was

8    his assistant supervisor's AV and said, "Pay attention,

9    this is not mine."  I said "It is, it's Carl Honeycutt's

10   and that is his assistant supervisor."

11              And then while he was at my desk I asked

12   him, I said, "Steve why didn't you ask me what I was doing

13   over in POY2?  If you would have asked me I would have told

14   you I was working."  He said "you were socializing."  I

15   said, "I was getting my work, that's what I do every

16   morning on this day is to get my payroll printout."  And he

17   said something to the effect like don't holler or yell or

18   don't fuss with me.  You know, but neither one of us were

19   yelling.  And when I look at this and I think I know why,

20   going back to this item (indicating document)---

21         MR. MABRY:  Thirteen?

22     A.    Thirteen.  What is puzzling is why he would even

23   give me an evaluation and tell me that I had a good

24   attitude after he and I had already -- after he had already

25   told me to unhook his cables from underneath his desk and

1  there.

2      Q.   So are you saying he asked you to go to Personnel

3  at 10:45?

4      A.   It could have been a little later because it was

5  at lunch time whenever Mr. Stevenson told me to go get my

6  things.

7      Q.   When you had the conversation with Mr. Steve Page

8  in the POY office, who was there besides Ronald Cox and

9  Brandi Morris?

10     A.   We were the only ones along with Steve Page.

11     Q.   It was those four people?

12     A.   Yes.

13     Q.   When you went back to your office and it was

14  Steve Page, who was in that office?

15     A.   Jim Liu, Steve Page, and myself.

16     Q.   Anybody else?

17     A.   No, sir.

18     Q.   When you went to Mr. Stevenson's office, what

19  happened there?

20     A.   He gave me the news that it had been decided from

21  the management team that because I was socializing on the

22  job that I was terminated.

23     Q.   Did you receive any paperwork at that time?

24     A.   No, sir.

25     Q.   How long did the meeting last?

1    the computer up, remember that one?

2         A.   Yes, sir.

3         Q.   You never told Mr. Stevenson about that, did you?

4         A.   No, sir.

5                        (Defendant's Exhibit No. 15 was

6                        marked for identification.)

7         Q.   Let me ask you to identify what we have marked as

8    15.  Take a look at what we have marked as Exhibit 15.

9         A.   (Reading document.)

10        Q.   Can you identify this?

11        A.   The top page 15?

12        Q.   The whole thing.

13             MR. MABRY:  Object to the form.

14        A.   Yes, sir.

15        Q.   Was this top page a Charge of Discrimination you

16   filed with the South Carolina Human Affairs Commission?

17        A.   Yes, sir.

18        Q.   How did you file that charge?

19        A.   With the Department of Unemployment Services.

20        Q.   With the Department of Unemployment Services?

21        A.   That's where I was.

22        Q.   Did you have this charge form there?

23        A.   I'm not really sure.  I'm not really sure where I

24   was where I filled this out.

25        Q.   Did you ever go to the Human Affairs Commission

1    Q.    What is not listed here?

2    A.    The part with Steve Page underneath his desk, the

3    times that I would give him a ride in the golf cart and he

4    would tell me how beautiful I was, and that he would single

5    me out to take him to go give him a ride to a destination,

6    and how what he said to me that offended me.   Those things

7    were left out.

8    Q.    Were left out of this charge?

9    A.    Yes.

10    Q.    Why don't we go through them one by one and see

11    if -- let's start with this first one, 8/1/06.  Read this

12    and tell me what you are talking about.

13    A.    (Reading.)  "I, Cheryl Powell, Administrative

14    Assistant, white, female, 48 years old, was told by Travis

15    Hyman, my manager of QC2, black, male, 40 years old to go

16    by Bruce Chen, QC Director, Asian, male, approximately 46

17    years old desk each morning.   I did not have to say good

18    morning but just be sure he sees me."

19    Q.    Did Mr. Hyman tell you why he wanted you to do

20    that?

21    A.    No, sir.

22    Q.    Do you know why he wanted you to do that?

23    A.    I don't know why.

24    Q.    Throughout here you keep putting people's races

25    in here.   Does race have anything to do with this case?

1    A.   Well, it kept saying race and age, the

2    questionnaire.  It had, you know, name, age, white, you

3    know, and I---

4    Q.   I understand.  Go back to the next one.  August

5    1, 2006, tell me what you're talking about here.

6    A.   (Reading.)  "In my office it was very

7    unprofessional by the management.  I am the only female in

8    the office.  At some point of the day, more than others,

9    were comments and sometimes conversations as to who has

10   been under the desk of Bruce Chen, QC Director, Asian,

11   male, approximately 46 years old, trying to get that

12   promotion.  'Oh, I know where you have been, your knees are

13   dirty.'  Just laughing and carrying on.  Steve Page,

14   manager of QCAP, white, male, approximately 46 years old.

15   Travis Hyman, my manager, QC2, black, male, 40 years old,

16   Brent Cutright, my supervisor, QC2, white, male,

17   approximately 31 years old.  Greg Morris, Assistant

18   Supervisor for QCAP, white, male, approximately 31 years

19   old."

20   Q.   Is this the same under-the-desk comment that we

21   talked about at length earlier this afternoon?

22   A.   This is basically, yes.

23   Q.   In this statement you say approximately August of

24   '06, right?

25   A.   Yes, sir.

1    Q.   But I think you testified earlier that this had

2    been going on off and on the whole time you were there?

3    A.   Right.  It got more and more when they all come

4    in from different areas of the departments, yes.

5    Q.   Did they say that to you or is this them saying

6    it to each other?

7    A.   No.  They have never said that to me.  They were

8    saying that within the -- within our office.

9    Q.   But they weren't saying it to you, they were

10    saying it to each other where you could hear it?

11    A.   Right.

12    Q.   Let's go to 11/11/06.  How about read that and

13    when I say read it, I don't necessarily mean read it aloud.

14    You can read it to yourself and then explain what you are

15    talking about.

16    A.   (Reading.)  Yes, sir.  About the SQC system.

17    Q.   Is that what we talked about earlier this

18    afternoon when you were explaining that the SQC system

19    really wasn't working and you all quit putting data in it?

20    A.   Right.  And also, like I said, told me to keep

21    busy and that was not hard to do.  The 5S Program.

22    Q.   What part of this entry, 11/11/06, it says

23    Intimidation - Harassed.  What part of this made you feel

24    intimidated and harassed?

25    A.   Because when he told me or else, well, I just

1   sorry, tell me what happened on that occasion.

2       A.   Well, we were preparing for the cleanup for

3   Mr. Lin's arrival, and I normally didn't wear jeans, but I

4   was going to have to be washing the walls and painting and

5   cleaning file cabinets and I wore a pair of jeans.  And I

6   was cleaning the file cabinet, and he came over to me where

7   I had to turn because I was facing the cabinets and when I

8   turned he was there looking at me staring and smiling and

9   had a paper in his hand and he and I were the only ones in

10  the office, and he said, "You sure look good in those jeans

11  today," and just smiled and to where that I just turned

12  back to the file cabinet and kept wiping.

13      Q.   What did he do?

14      A.   He didn't stand there any longer.  I don't know

15  where he went or what he did.

16      Q.   Is that all that happened?

17      A.   Yes, sir.

18      Q.   Are you sure of that date?

19      A.   No, sir.  I am not sure.  But we normally

20  prepared for his arrival, he comes right after March or --

21  let's see, it's a Chinese Holiday we start cleaning and

22  this is what -- that is why I'm thinking it was right after

23  our Christmas.

24      Q.   Read this 1/29/07 entry and tell me what happened

25  there.

1    A.   It was like I said, eight o'clock that morning,

2  and Travis's mother was sick and he went into Bruce Chen's

3  office and came out and he was just squalling and I mean,

4  you know, a baby's cry, a man crying, and I walked outside,

5  and I said "are you okay?  Are you okay?"  And he said "my

6  mother is dying."  And I put my arms around him and I said

7  "I am so sorry."  And that was that.  He left on.  Then

8  when he came back a few days later, he told me that he

9  shouldn't have felt that way but when I had hugged him that

10  he had different feelings than for that sympathy hug.

11    Q.   Is that the only thing that you are saying that

12  Mr. Hyman ever told you that you thought was inappropriate?

13    A.   Yes, sir.

14    Q.   Look at 2/5/07.  Tell me what is going on 2/5/07.

15    A.   Being that Travis Hyman was my manager that he

16  had to sign off on me being recommended for a transfer.

17    Q.   Where did you want to transfer?

18    A.   To the front desk at General Affairs at the

19  receptionist desk.

20    Q.   Who was the manager of General Affairs?

21    A.   Mr. Harvey.

22    Q.   Do you know who Mr. Harvey's boss is?

23    A.   Andy Chen.

24    Q.   Did you get a transfer over to General Affairs?

25    A.   No.  I did not.

1     Q.   Do you know why you didn't get a transfer?

2     A.   They wanted to hire someone from outside of the

3 company.

4     Q.   Who told you that?

5     A.   Mr. Harvey.  Or Mr. Stevenson.  I am not really

6 sure which one.

7     Q.   Did anyone ever tell you that Travis Hyman

8 blocked you from moving?

9     A.   No, sir.  Didn't hear that.

10    Q.   The next entry is 2/19/07.  What happened on that

11 time?

12    A.   Oh, yes.  Eating at my desk, which I think I was

13 one of the ones that, if there were any ones that didn't

14 eat, I didn't eat at my desk.  If it was, it was what they

15 brought in as sharing a birthday cake.  I didn't even eat

16 my lunch at my desk.

17    Q.   Did anyone mention this to you other than

18 Mr. Cutright?

19    A.   No, sir.

20    Q.   Was he your supervisor?

21    A.   He was a supervisor, one of the supervisors.

22    Q.   Did you ever receive any kind of reprimand for

23 this?

24    A.   No, sir.

25    Q.   Did it ever appear on any of your evaluations?

1     A.   I don't recall that.  I was just insulted and I

2  couldn't believe that this was happening.

3     Q.   Do you know why he asked you to not eat at your

4  desk?

5     A.   It says because Bruce Chen said not to eat at the

6  desk, I believe.  Let me look at that.  Yes, that is who

7  said it.

8     Q.   Look at the 3/21/07 entry that you put in here

9  and read that carefully and then tell me what happened.

10     A.   Our office was preparing for the visit from

11  Mr. Lin.  Okay, I will be quiet and read it to myself.

12  (Reading.)  I said that just earlier ago.

13     Q.   So you were connecting Steve's computer -- let me

14  go back.  Were all the computers disconnected and put on

15  desk tops to have the floor waxed?

16     A.   The day before.

17     Q.   So here you are saying that you were connecting

18  Steve Page's computer, right?

19     A.   (Nodding.)

20     Q.   Did you connect your own computer?

21     A.   Oh, yes.  I connected my own computer.

22     Q.   Did you connect anyone else's besides yours?

23     A.   No.  Greg Morris helped.  He did his own.  Steve

24  never did his own and he asked me to do it.

25     Q.   So you're saying that when you were doing it

1     Steve said to you, "This is the way to get a promotion?"

2          A.    Yes.

3          Q.    Then everybody, Brent, Gregg and Travis were all

4     in there and they all chimed in and said, "She's under the

5     desk now?"

6          A.    Laughing and, you know, leaning back in their

7     chairs just laughing.

8          Q.    So they basically made a big joke about it?

9          MR. MABRY:  Object to the form.

10         A.    Made a big joke about it laughing?

11         Q.    Yes.

12         A.    Yes.

13         Q.    Did you finish connecting the computer?

14         A.    Definitely.

15         Q.    Is that the only time that Steve Page ever made a

16    comment about you being under the desk to get a promotion?

17         A.    To me face-to-face eye-to-eye, yes.

18         Q.    Look at 3/21/07.

19         A.    That is what we just read.

20         Q.    Excuse me.  3/27/07.

21         MR. MABRY:  Two of them are the same date.

22    BY MR. PEARSON:

23         Q.    I'm sorry.  The first one.  The next one in

24    sequence.

25         MR. MABRY:  Last on the page?

1          MR. PEARSON:  No.  The next to last one on the

2     page.  The one says 3/27/07 -- Harassed - Disciplined.

3          A.   Yes, sir.

4          Q.   What are you talking about here?

5          A.   As it states, that they had been repeatedly

6     saying that I was late, and at this time they were all in

7     the meeting room and they were all saying that I had been

8     being a minute late.

9          Q.   Is this the same disciplinary situation we talked

10    about earlier?

11         A.   On an Exhibit?  I think it's one of the exhibits.

12         Q.   Look back and tell me which exhibit it is.

13         A.   Maybe March 1st.

14         Q.   Give me a number of the exhibit.

15         A.   Twelve?

16         Q.   Twelve or is it Eleven?

17         A.   It could be both.  One was dated February 21st

18    and March 1st.  I don't know.  I have those.  I have to

19    read more into detail into what they have stressed and what

20    I responded to, but it's basically the timeliness and

21    importance of tardiness.  And then I did show, yes, on the

22    21st of how the atmosphere was in the office of the

23    professionals.

24         Q.   Whatever that means, if you look at Eleven, do

25    you have Exhibit 11?

1    A.   Yes, sir.

2    Q.   Do you see where that refers to absences on

3  2/15/07?

4    A.   Absences?

5    Q.   Tardiness, excuse me.

6    A.   Right.

7    Q.   Go back to Exhibit 15, Bates stamp, the larger

8  one, 13, that we were just talking about, it's one that you

9  said approximately March 27, '07.  Have you gone back to

10 that one?

11   A.   To Exhibit 15, March 27, '07?

12   Q.   Yes.

13   A.   The first one, yes.

14   Q.   It appears to be referring to a warning for a

15 tardy on February 15, right?

16   A.   That was right.

17   Q.   So I am trying to figure out whether you are

18 talking about Exhibit 11 or Exhibit 12?

19   A.   Okay.  I think that is the day Travis's mother

20 died.  Wait a minute.  I am getting confused with the

21 closeness of dates and the warnings of this Exhibit 12 and

22 14.

23   Q.   Let me---

24   A.   February 28th and then March 1st, I mean it got

25 to be, you know, I mean.

1     Q.   Let me ask you a question to simplify this.  You

2 didn't receive any type of warning of any kind on March 27,

3 '07, did you?

4     A.   On 2/15, I have to go back before the 12th.  That

5 was on the 11th I got a warning.

6     Q.   The 11th of March?

7     A.   11th.

8     Q.   But you didn't get one on March 27, did you?

9     A.   I said approximately.  I mean I wasn't keeping a

10 copy of these.  As a matter of fact, I wasn't allowed to

11 get a copy of these.  They would not give me a copy of

12 these.

13     MR. MABRY:  John, at some point could we take a

14 break at some point?

15     MR. PEARSON:  Let me get past this one right

16 here.

17     MR. MABRY:  Sure.

18 BY MR. PEARSON:

19     Q.   Number one, will you admit that you didn't get a

20 warning on March 27, 2007?

21     A.   I can't say that I did or not.

22     Q.   Do you have a warning with that date on it?

23     A.   On March 1st?

24     Q.   The 27th.

25     A.   I do not see one at this point for March 27.  I

1    Q.   Do you not know?

2    A.   I do not know approximately what date that was.

3  If it was February 21st or February 28th or March 1st or

4  March 27th.

5    Q.   Look back down to what you told SHAC on March 27,

6  '07. It says David Trammel said that had nothing to do

7  with what we were in there for and he would have to let

8  Personnel know what you had just told him. (Reading.) "I

9  told him I did not want this to go to Personnel, being that

10  you all are in here at one time I just want to let you all

11  know you all are very unprofessional and do not care about

12  the real issues here." Do you remember that conversation?

13    A.   Yes.

14    Q.   After that conversation, is that when you went to

15  talk to Mr. Stevenson?

16    A.   Yes.

17    Q.   And that is what you related in this next entry

18  down here, March 27, 2007, Disciplined - Intimidation?

19    A.   Yes.

20    Q.   Is this the meeting that you previously discussed

21  with us with Anny Tsai and---

22    A.   Yes.

23    Q.   Skip down to 4/5/07 - Intimidation. How about

24  reading that and I want to ask you a couple of questions

25  about it.

1    A.   Okay.

2    Q.   Is that the conversation that we had this

3  afternoon when you were talking about complaining to

4  Mr. Stevenson that Mr. Page was opening and shutting his

5  pocket knife?

6    A.   Yes.  And not giving me the work.  And treating

7  me quite differently after I reported the issue.

8                      (Break from 3:50 to 4:05 p.m.)

9                      (Back on the record.)

10  BY MR. PEARSON:

11    Q.   Look down at the bottom of page -- we're back on

12  Exhibit 15, we are back on page 14, which is the top

13  number, and we are on date April 9, 2007.

14    A.   Would you like for me to tell you what this is

15  about?

16    Q.   Before we do, let me run through some stuff real

17  quick.  I think you said the time that you hugged Mr. Hyman

18  was really the only time that he made a comment to you that

19  you felt was inappropriate, is that right?

20    A.   Yes.

21    Q.   And then the time that -- there was only one

22  occasion when Mr. Page said something to you about getting

23  under the desk to get a promotion and that was when you

24  were hooking up the computer?

25    A.   Yes.  That was personally.

1    Q.   That was the only time he said it to you, right?

2    A.   That was to me.

3    Q.   But you heard him say it to others a lot of

4 times?

5    A.   Yes.

6    Q.   Mr. Page told you you looked good in blue jeans,

7 one day when you were wearing blue jeans, is that right?

8    A.   Yes.

9    Q.   Did Mr. Page over ask you out?

10    A.   He invited my son and I to go to a shooting range

11 and we went.

12    Q.   Is your son interested in shooting?

13    A.   Yes.  Target shoots.

14    Q.   Did he ever ask you to go out with him by

15 yourself?

16    A.   No.

17    Q.   Did he ever touch you inappropriately?

18    A.   No.

19    Q.   Go back to April 9, 2007, and read that and tell

20 me, and I believe that -- just go ahead and read through

21 April 10, think about it for a minute and then tell me what

22 happened and then I will ask you some questions.

23    A.   (Reading.)  Yes, sir.

24    Q.   Tell me what happened.

25    A.   I bring my lunch, Mr. Palmer had brought his

1  lunch, and we had been talking for some time about this

2  picnic table that Mr. Lin's boss, Mr. Mao (phonetic), said

3  he could build and put in an area for us to eat outside.

4  So Mr. Palmer asked me my opinion where did I think it

5  should go, and they, I say Mr. Mao was telling him he

6  thought it would be a good idea inside the fence but you

7  have to drive the golf cart all the way inside the fence,

8  and I said what about that big oak tree where we all could

9  go out of this Side Two Building and go right there and we

10  would still be on the property but it would be underneath

11  the big oak tree, so at lunch I drove the golf cart to

12  there and he was in the golf cart with me and we ate lunch

13  there and I came back. And on my way back, there's -- my

14  ramp goes up to my door, has lots of water coming down and

15  it was a steam valve, they say. And so I walked back down

16  and I saw Travis walking up the road and so I went on in to

17  the POY2 office to come in through the coffee room and to

18  POY, and when I got to my desk Steve Page was sitting

19  there, and so then the next day Mr. Palmer asked me did I

20  get in trouble for going out and having lunch with him at

21  the oak tree. I said no. He said, well, your boss has

22  called my boss and my boss has called me and asked me what

23  were you all two doing out there like we were having some,

24  a relationship, is what I thought, he didn't say that, and

25  so I called Eric and I asked him about it had he heard

1    anything because there was a rumor going around that we

2    were in the woods, and that's how that happened.

3        Q.   Did Mr. Page ever mention that to you?

4        A.   No.

5        Q.   Did Mr. Hyman mention it to you?

6        A.   No, sir.

7        Q.   Did any of your supervision ever mention to you

8    that you might have done something wrong that day?

9        A.   They told me not to use the golf cart anymore.

10       Q.   I understand, but you brought the subject up with

11   them, didn't you?

12       A.   I brought it up with Mr. Stevenson.

13       Q.   But before you brought it up with Mr. Stevenson,

14   none of your supervisors had mentioned anything to you

15   about it, had they?

16       A.   No.

17       Q.   You weren't reprimanded or disciplined in any way

18   for that event, were you?

19       A.   Not that I'm aware of.

20       Q.   Who told you later not to use the golf cart to go

21   to lunch?

22       A.   Steve Page.

23       Q.   Was that after you called Mr. Stevenson?

24       A.   That was after I called Stevenson.  I'm pretty

25   sure.

1    Q.   You testified that you thought it sounded like

2  you and Mr. Palmer were having some kind of relationship or

3  something?

4    A.   Well, when they said I was in the woods.

5    Q.   But nobody in your office talked to you about

6  being out there with Mr. Palmer, did they?

7    A.   No, sir.

8    Q.   Let's go back to the next entry, 4/25/07 -

9  Intimidation - Sexual Harassment.  Read that and tell me

10  what happened.

11    A.   2/27?

12    Q.   4/25/07.

13    A.   (Reading.)  Okay.  Do you want me to elaborate on

14  how I saw that?

15    Q.   I can ask you a few questions about it.  Do you

16  know Mr. Lin?

17    A.   I stand up every time he comes in.  We

18  acknowledge who he is.  I have seen him every year twice a

19  year since I have started there.

20    Q.   Why do you stand up when he comes in?

21    A.   Because I was told to stand up.

22    Q.   Do you know if Mr. Lin has a reputation for being

23  outspoken when he talks with managers at the plant?

24    A.   I don't know anything.

25    Q.   You don't know that, you don't know anything

1    about the meetings that Mr. Lin has with managers at the

2    plant?

3        A.    Except when I hear from Steve talk about a 20

4    percent reduction and we're getting cleaned up ready for

5    Mr. Lin and the banquets and, you know, he's the man and

6    you report to him, and we're doing reports, and yes.

7        Q.    So Mr. Lin is basically a very important man

8    within the company?

9        A.    Yes, sir.

10       Q.    When he comes to town you spend a month cleaning

11   the place up?

12       A.    Yes, sir.

13       Q.    And there are banquets and celebrations when he

14   comes to town?

15       A.    Yes, sir.

16       Q.    So Steve Page went to meet with Mr. Lin.  Do you

17   know why he met with Mr. Lin?

18       A.    I didn't even know he was there then at that time

19   that day.

20       Q.    Did he come back and say "I had just got my

21   sugar," is that what he said?

22       A.    Yes.

23       Q.    Who was in the room?

24       A.    Travis and I.

25       Q.    Who else?

1      A.   I am not sure right now who else was in the room,

2  but it was me and Travis and Steve.

3      Q.   And Steve said, "Well, I just got my sugar, I

4  knocked on Mr. Lin's door and walked right on in." Is that

5  what he said?

6      A.   I don't recall that.

7      Q.   That's what you put in this statement you gave to

8  SHAC.

9      A.   Where is this?

10     Q.   Page 15, Exhibit 15, on 4/25/07.

11     A.   Okay. Yes.

12     Q.   Did you know what he meant when he said, "I just

13  got my sugar?"

14     A.   I did not know what he meant.

15     Q.   Did Travis Hyman then say, "I guess it's time for

16  me to go get mine?"

17     A.   Yes.

18     Q.   Did he go over to talk to Mr. Lin?

19     A.   I don't know if he did or not.

20     Q.   But in sitting here today you don't know what

21  they were talking about, do you?

22     A.   Well, Steve comes in pulling his pants up and

23  shrugging it around and smiling, you know. I mean. And

24  after the others said, all I see them as not management.

25  They're talking this type of talk. I see it as sugar, I

1   see it as sexually, and that's what it seems like they are

2   portraying it to be.  If it was work, he would have said

3   work or if I got my ass chewed, I think he would have said

4   that.

5       Q.   Let me ask you this to go back again and I will

6   ask my question again and maybe this time you will answer

7   it.

8           MR. MABRY:  Object to the form.

9   BY MR. PEARSON:

10      Q.   Did you know what he meant when he said, "I just

11  got my sugar?"

12      A.   I believe I know what he meant.

13      Q.   I'm asking you do you know?

14      A.   No.

15      Q.   Could he have gotten chewed out by Mr. Lin and

16  made a sarcastic comment about it?

17      A.   Could have.

18      Q.   Could Mr. Hyman mean, "Well, I guess it's time

19  for me to go get mine," could he be referring to it's his

20  turn to go get chewed out?

21      A.   Could have.

22      Q.   Let's look at 5/22/07, next entry.

23      A.   You said 5/22, right?

24      Q.   Yes.

25      A.   Okay.  Do you want to ask me questions or should

I---

Q.   I want you to read the 5/22 and 5/23 and let's
talk about that.

A.   Okay.

Q.   Edward Graham, did you know Edward Graham?

A.   He worked in the QCAP Department.  I kept his
records of AV's.

Q.   Is that all you knew about Mr. Graham?

A.   I knew that he was an older man and he worked
very hard.

Q.   How did you know he worked hard?

A.   Because if you worked in QCOP production, you
worked very hard.

Q.   So all the people there worked hard?

A.   Yes.

Q.   Did you have any knowledge at all of his
personnel file?

A.   I had control of his personnel file.

Q.   Can you tell us today what his disciplinary
record was?

A.   He had to have been told of wearing a seatbelt
before, to wear a seatbelt on the forklift.

Q.   Was he found again without wearing a seatbelt on
the forklift?

A.   On that morning, 5/22, that I have dated.

1     Q.   Are you aware of other incidents, safety

2  incidents other than the two seatbelt incidents?

3     A.   No, sir.

4     Q.   So you are not aware of his entire disciplinary

5  record, are you?

6     A.   No, sir.

7     Q.   Was he terminated or was he allowed to retire?

8     A.   Well, at first he was terminated but once he got

9  in Mr. Stevenson's office he was allowed to resign.

10     Q.   Resign or retire?

11     A.   Not sure.

12     Q.   You don't know.  Do you know if he had planned to

13  retire anyway?

14     A.   Early retirement.

15     Q.   Do you know if the timing of this decision had

16  any impact at all on Mr. Graham's retirement benefits?

17     A.   Would you rephrase that?

18     Q.   Mr. Graham was planning to retire soon, is that

19  correct, is that your understanding?

20     A.   Yes, sir.

21     Q.   But he was discovered driving a forklift without

22  a seatbelt, is that your understanding?

23     A.   That's correct.

24     Q.   And it's your understanding he had had some

25  previous safety incidents, is that correct?

1     A.    This was the morning that he came in from medical

2    leave.

3     Q.    At 11 a.m. Kathy Lewis from Safety called --

4    Sharon, Steve's wife, called that morning and said Steve

5    needs to get his return to work release sent over here, is

6    that correct?

7     A.    Right.

8     Q.    You gave that message to Steve at 8:30?

9     A.    When Steve came in, because he went straight out

10   and fired the guy and brought the paperwork to me to type

11   up, and I gave him the message that they needed his -- he

12   had to have that return medical slip before he could come

13   back on plant, that he was no different than anybody else.

14   That's exactly what his wife said.

15    Q.    That medical release came in at 12:40 that day?

16    A.    Fax.  It was after lunch.

17    Q.    Did you send it over?

18    A.    Yes.  I did.

19    Q.    When you got that message about his medical

20   release from Safety, were you taking that message in your

21   capacity as the administrative assistant?

22    A.    Yes, sir.

23    Q.    Were you authorized to discuss Steve's medical

24   condition with anyone other than Steve?

25    A.    Was I authorized to discuss his medical condition

1  says approximately 10 a.m.

2      A.   Yes, sir.

3      Q.   How about just read the next several sentences

4  down to the bottom of the page.  Read it aloud if you will.

5      A.   (Reading.)  "Approximately 10 a.m. Eric Watson,

6  QCAP Assistant Supervisor, white, male, approximately 28

7  years old came over to our office and sat in Steve Page's

8  desk.  Automation Devin Baxley came into our office and the

9  conversation turned to the topic of homosexuality."

10     Q.   Stop.  What was that conversation?

11     A.   Eric and Devin talking about getting underneath

12  the boss's desk.

13     Q.   Go ahead.

14     A.   (Reading.)  Devin Baxley turned to leave, I stood

15  up, asked him to come back.  I looked at each man, Devin,

16  Travis and Eric, Brent Cutright and said I do not want to

17  hear any of this type of talk in this office, please.  This

18  offends me.  Devin Baxley apologized.  All the men left the

19  office.  Around 11:50, Steve Page came to the desk and told

20  me to get in the golf cart with him that we were going to

21  the administrative building, and I told him I choose to

22  walk.  I then went into the meeting room with Steve Page

23  and Mr. Stevenson and Mr. Stevenson said my boss had

24  decided to separate me from the company because of

25  socializing on the job.

1    Q.   What exactly did Eric Watson and Devin Baxley say

2  that you thought was about getting under the desk?

3    A.   Well, you know, when you hear this stuff, when I

4  hear this, I did not want to keep these things in my mind.

5  I cannot tell you exactly what was spoken and was said.

6  It's the -- I did not want to remember what they have to

7  say about this type of talk.  Once it starts, I try to shut

8  it out and do my work.

9    Q.   So you have no specific recollection of what Eric

10  Watson said that day?

11    A.   Eric Watson was relating back to Devin's

12  conversation.  Devin initiated and Eric was involved in the

13  conversation.

14    Q.   So you don't remember what Devin said?

15    A.   He wanted to know what was he doing sitting at

16  that desk, had he already gotten a promotion.

17    Q.   At Steve Page's desk?

18    A.   Whosoever desk.  It was at Steve Page's desk.

19    Q.   So Devin Baxley asked Eric Watson what are you

20  doing at that desk if you already got a promotion?

21    A.   (Nodding yes.)

22    Q.   How did the conversation go from there?

23    A.   I shut down.  And then Devin is, you know, cool,

24  and I asked him, well, I stood up and asked him not to talk

25  like this anymore, that it offended me.  He had already