```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF SOUTH CAROLINA
 3                   FLORENCE DIVISION
 4
    CHERYL H. POWELL,
 5
         Plaintiff,
 6
      vs              Case No.:   4:08-cv-2482-RBH-TER
 7
    NAN YA PLASTICS AMERICA,
 8
         Defendant.
 9
                   D E P O S I T I O N
10
    WITNESS:          STEPHEN PAGE
11
    DATE:             Thursday, April 16, 2009
12
    TIME:             11:00 a.m.
13
    LOCATION:         Law Offices of
14                    Cromer & Mabry
                      300 Candi Lane
15                    Columbia, South Carolina

16  TAKEN BY:         Attorneys for the Plaintiff

17  REPORTED BY:      GINA M. SMITH
                      Certified Shorthand Reporter
18                    Registered Professional Reporter

19  -----------------------------------------------

20
21
22
23
                   Gina M. Smith, CSR, RPR
24                  117 Harmon Creek Court
                     Lexington, SC 29072
25                      803-359-5705
```

1  section manager.
2      Q.  And how long have you held that position?
3      A.  Section manager about eight years.
4      Q.  So during the relevant time period or the
5  time leading -- 2007, that was your job?
6      A.  Yes.
7      Q.  Was Ms. Powell in your chain of command?
8      A.  Yes.
9      Q.  And were you her immediate supervisor or
10 were you over Mr. Hyman or how did that work?  Give
11 me the chain of command.
12     A.  Chain of command, okay.  Our chain of
13 command, Mr. Bruce Chen is director of quality
14 control.  And normally there are two section
15 managers for QC department:  the QC section and the
16 packing section.  I'm over the packing section.
17         Under the direct responsibility for the
18 director are three admin assistants.  From his
19 direction, he gives us the authority to evaluate
20 the admin assistants and supervisors that are under
21 us.
22         There are numerous -- numerous supervisors
23 and numerous assistant supervisors and then of
24 course the operators.
25     Q.  Take me, you know, with Ms. Powell --

```
 1   where she falls in this.
 2        A.   She's an admin assistant for the QC
 3   department.
 4        Q.   And her direct supervisor would be
 5   Mr. Hyman or am I wrong?
 6        A.   Would be -- would actually have several
 7   people who would be in charge of her.
 8        Q.   And who would those have been at the time
 9   of her termination?
10        A.   At the time of her termination would have
11   been myself, David Trammel and of course Travis.
12   And also Mr. Bruce Chen would have final authority
13   reporting to the plant manager.
14        Q.   Excuse me one second.
15             (Off-the-record discussion.)
16   BY MR. MABRY:
17        Q.   Do you recall that you invited Ms. Powell
18   and her son to go to a shooting range?
19        A.   I didn't invite them.  Ms. Powell inquired
20   about someone teaching her son to shoot.  At the
21   time, I was a safety officer for the wildlife
22   action.  I'm a certified range safety officer.  And
23   I was having volunteer duty on a Saturday, and she
24   wanted to know if she could attend.
25             I said that would be fine.  It's $5.  You
```

```
 1   can come and you can shoot.  I'll be here from
 2   about nine until one.  And they came and they shot
 3   and they left.
 4        Q.   So it wasn't your idea?
 5        A.   Uh-uh.
 6        Q.   Is that no?
 7        A.   I told them the range was open from that
 8   time when I was there.
 9        Q.   Do you know Chastity Chastain?
10        A.   Yes.
11        Q.   Do you recall speaking about the fact or
12   allegation that she lost custody of her children
13   because her husband hired a private detective to
14   watch her and an employee at Nan Ya?
15        A.   No, I don't.
16        Q.   Would you ask Ms. Powell to make coffee
17   and bring you a cup on occasion?
18        A.   I rarely would, yes.
19        Q.   Do you ever -- did you ever tell
20   Ms. Powell that she looked good in the jeans she
21   was wearing the day she was cleaning the file
22   cabinets?
23        A.   I think -- I thought after a while I
24   probably made that compliment that she looked good.
25        Q.   Do you recall Mr. Palmer and Ms. Powell
```

```
 1    going in the golf cart somewhere for lunch?
 2         A.   Yes.
 3         Q.   And do you know the reason that she and
 4    Mr. Palmer went over to a tree in the woods for
 5    lunch?
 6         A.   When I came here to lunch, I saw two
 7    people in a golf cart off the road in the edge of
 8    the woods, and I saw Ms. Powell and the maintenance
 9    technician, Mr. Palmer Lane.
10              When I got back in, I called the
11    maintenance manager and told him that they were off
12    the road in the golf cart, and we're not allowed to
13    use the golf cart that way.  It's for nonpersonal
14    use, business use only.  And I also mentioned it to
15    Ms. Powell, and that was it.  There was no write-up
16    or anything, just don't use it that way.
17         Q.   Did you ask what they were doing there?
18         A.   It doesn't matter what they were doing.
19         Q.   Well, did you ask?
20         A.   No.  Wasn't necessary.
21         Q.   Do you know Ronnie Cox?
22         A.   Yes.
23         Q.   Did you know that he was either a fiance
24    or boyfriend to Ms. Powell?
25         A.   Yes.
```

```
 1        Q.  How did you know that?
 2        A.  She told me.  Numerous times.
 3        Q.  Numerous, you added that.  What was the
 4   context for telling me that?
 5        A.  She talked about it quite often.
 6        Q.  Do you know Hope Dennis?
 7        A.  Oh, yes.  It's a different name now.
 8        Q.  Tell me the incident that resulted in
 9   Ms. Powell's termination.  Tell me about that.
10        A.  That morning, I came in from -- back from
11   my meeting and went to get a cup of coffee.  I
12   observed Ms. Powell, Mr. Cox standing at Brandy
13   Morris' desk having a conversation and they weren't
14   working, and I asked them or told them to go back
15   to work.
16        Q.  And anything happen?
17        A.  Yes.
18        Q.  Tell me.
19        A.  Ms. Powell became loud, confrontational,
20   going to continue to argue with me about it.  I
21   told her to stop arguing multiple times.  She still
22   wanted to continue to argue.
23            She became confrontational, shoving papers
24   at me, telling me to sign these.  I told her these
25   are not my papers to sign.  She continued to argue
```

```
 1   that these are my papers.  I said, no, they are
 2   not.  Read your papers.  You need to pay attention
 3   to what you're doing and go back to your desk.
 4           I also told her that I need to fill out
 5   her AB card, to sign it, and she argued about that,
 6   and she argued why was I going to do her
 7   evaluation.
 8       Q.  The area where you went to get a cup of
 9   coffee, what area was that?
10       A.  The adjacent office.
11       Q.  And is it called something like PO II?
12       A.  POY, yes.
13       Q.  Say that again.
14       A.  POY.
15       Q.  What's that stand for?
16       A.  Partially oriented yarn.
17       Q.  And did you determine whether or not
18   Ms. Powell had a valid reason of being there?
19       A.  Not standing there socializing.  She
20   had -- her boyfriend, fiance, whatever, had a cup
21   of coffee.  She was standing there.  Brandy was at
22   her desk.  There's no reason to stand there and
23   talk.  You can go pick up papers and go back to her
24   desk.
25       Q.  My question was:  Did you determine -- did
```

1       A.    That's correct.
2       Q.    And this incident occurred the day that
3  Ms. Powell was terminated?
4       A.    Yes.
5       Q.    And so what did you do after the incident?
6       A.    After the incident occurred, I went and
7  reported it to the personnel department.
8       Q.    To whom?
9       A.    Eric Stevenson.
10      Q.    Did you do that orally?
11      A.    Yes, I did it in person.
12      Q.    Do you recall an investigation had taken
13 place back in February of '07 regarding allegations
14 that there was some sexual statements being made in
15 the QC area?
16      A.    Yes.  We had called Ms. Powell into the
17 meeting room to discuss her tardiness, and during
18 the course of that discussion, she said that we
19 were unprofessional, was the reason she was tardy,
20 and that she was -- that we were being
21 unprofessional.
22      Q.    What did she say specifically that was
23 unprofessional?
24      A.    She said we had unprofessional behavior
25 that caused her to be late.

```
 1          Q.   What was she complaining about that had
 2     been said?
 3          A.   That's what she said in the meeting, it
 4     was unprofessional behavior.
 5          Q.   Did she describe what that unprofessional
 6     behavior was?
 7          A.   No.  David Trammel called a meeting and
 8     said you need to go report that to personnel.
 9          Q.   So you were not present when Ms. Powell
10     said that she took offense at the under-the-desk
11     comments?
12          A.   No.
13          Q.   And you deny that Ms. Powell ever got
14     under your desk in your presence?
15          A.   That's correct.
16          Q.   And you deny saying to her, yeah, that's
17     the way to get a promotion?
18          A.   That is correct, I deny that, yes.
19               MR. MABRY:  Let's go to my office for a
20     second.
21               (A recess transpired.)
22     BY MR. MABRY:
23          Q.   Is it correct that Mr. Ronnie Cox was not
24     interviewed regarding what he was doing in the room
25     with Ms. Powell before the termination?
```

```
 1                SIGNATURE OF DEPONENT
 2
 3         I, the undersigned, STEPHEN PAGE, have
 4   read the foregoing deposition consisting of
 5   21 pages which was reported by Gina M. Smith,
 6   Notary Public in and for the State of South
 7   Carolina on April 16, 2009.
 8         I find the transcript of this deposition
 9   to be a true and accurate transcript according to
10   my testimony on that date with the exception of the
11   corrections as listed on the attached correction
12   sheet, which was filled in by me.
13
14
15
16
17                           _____
                                  STEPHEN PAGE
18
19                           ___5/12_____, 2009
20
21
22
23
24
25
```