1     UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF SOUTH CAROLINA

3       FLORENCE DIVISION

4

 CHERYL H. POWELL,

5

   Plaintiff,

6

  vs      Case No.:  4:08-cv-2482-RBH-TER

7

 NAN YA PLASTICS AMERICA,

8

   Defendant.

9     D E P O S I T I O N

10

 WITNESS:   TRAVIS HYMAN

11

 DATE:    Thursday, April 16, 2009

12

 TIME:    10:42 a.m.

13

 LOCATION:   Law Offices of

14         Cromer & Mabry
          300 Candi Lane

15         Columbia, South Carolina

16 TAKEN BY:   Attorneys for the Plaintiff

17 REPORTED BY:  GINA M. SMITH
         Certified Shorthand Reporter

18         Registered Professional Reporter

19

20   -------------------------------------------------

21

22

23

24      Gina M. Smith, CSR, RPR
       117 Harmon Creek Court

25       Lexington, SC 29072
        803-359-5705

1    reasons that you believe she was a marginal

2    employee?

3         A.   Yes.   Tardiness in getting to work.   When

4    you come to work, you should be on time so you can

5    start when you're supposed to start.   If you're not

6    there -- I mean, you can be the best employee in

7    the world, but if you're not there on time, you're

8    not doing your job.

9         Q.   How does Nan Ya determine whether or not

10   an employee is arriving on time or not?

11        A.   Well, for a salaried employee like

12   Ms. Powell, it's if somebody sees you coming in the

13   gate.   Now we have cameras that indicate -- that we

14   can look back at and see if this person was there

15   at eight o'clock or if they weren't.

16        Q.   But back then when Ms. Powell was working,

17   before she was terminated, as a salaried employee,

18   how would it be determined if she was late or not?

19        A.   If your boss saw you.   If you came in

20   late, your boss saw you, and in Ms. Powell's case,

21   if my boss saw her, then she's late.   She wasn't in

22   the work area.

23        Q.   So are you telling me that there's not a

24   set policy or set mechanism to determine if a

25   salaried employee is late, it's just whether or not

1          A.   It does not have the connotation of what
2     you just said before.  All it was was brown-nosing,
3     kissing up to the boss.
4          Q.   Well, I understand that's your testimony,
5     but I'm asking you to explain to me how a comment
6     about getting under someone's desk would lead you
7     to believe that meant brown-nosing if it's not oral
8     sex.
9          A.   Not oral sex, no.
10         Q.   Some other kind of sex?
11         A.   Not any kind of sex.
12         Q.   Well, explain to me how -- I mean, if
13    you're able to -- getting under someone's desk
14    suggests that that person is trying to gain favor
15    from the boss.
16         A.   When you're trying to gain favor because
17    you're trying to say or whatever and make the boss
18    happy.
19         Q.   Well, what's that got to do with getting
20    under a desk?
21         A.   I don't know.
22         Q.   Do you recall when Steve Page asked
23    Ms. Powell to hook up his computer under his desk?
24         A.   I do not.
25         Q.   So are you saying that you -- well, you

1     just don't remember it?

2          A.   I don't remember it.

3               MR. MABRY:  Let me take a break.

4               (A recess transpired.)

5     BY MR. MABRY:

6          Q.   Were you involved at all in the decision

7     to terminate Ms. Powell?

8          A.   I had nothing to do with that.

9          Q.   You were just told about it?

10         A.   Yes.

11         Q.   You were told by whom?

12         A.   Talked to Mr. Page.

13         Q.   And what were you told by Mr. Page?

14         A.   That she was terminated for

15    insubordination.

16         Q.   Do you know whether or not she was given

17    something in writing at the time of her

18    termination?

19         A.   I don't know.

20         Q.   Is it standard procedure to give someone

21    who's being terminated something in writing at that

22    time?

23         A.   About the termination?

24         Q.   Yes.

25         A.   I know that Mr. Stevenson normally handles

1          SIGNATURE OF DEPONENT

2

3          I, the undersigned, TRAVIS HYMAN, have

4    read the foregoing deposition consisting of

5    15 pages which was reported by Gina M. Smith,

6    Notary Public in and for the State of South

7    Carolina on April 16, 2009.

8          I find the transcript of this deposition

9    to be a true and accurate transcript according to

10   my testimony on that date with the exception of the

11   corrections as listed on the attached correction

12   sheet, which was filled in by me.

13

14

15

16

17   _____

         TRAVIS HYMAN

18

19   _____5/12_____, 2009

20

21

22

23

24

25