## WITNESS STATEMENT OF ERIC STEVENSON

PERSONALLY APPEARED, Eric Stevenson, who, being duly sworn, stated as follows:

1. My name is Eric Stevenson. I began working at Nan Ya in May of 1992.

2. I am currently the Assistant Director and Personnel Manager at Nan Ya Plastics Corporation, America.

3. At the time of the allegations in this lawsuit, I was the Section Manager of the Personnel Section.

4. Part of my job as Section Manager was to handle duties and tasks typically associated with a human resources' department.

5. In early 2007, David Trammel informed me that an employee, Cheryl Powell, told him that members of management in the Quality Control Department, where Ms. Powell worked, were making unprofessional comments.

6. I told David Trammel that Ms. Powell needed to come talk to me about such matters, and insisted she do so since Ms. Powell was reluctant to talk with me.

7. Ms. Powell met with Christian Mann (Personnel Supervisor), Annie Tsai (Senior Account Manager), and me. Ms. Powell requested that a female be present in the meeting: she requested Ms. Tsai.

8. Ms. Powell told me that members of the management team in the Quality Control Department were making unprofessional comments consisting of how various people would have to get down on their knees or get under the supervisor's desk in order to get a promotion.

9. Ms. Powell stated that the comments were joking and that she would laugh and actively join in the conversation when the comments were made. She also stated that she never gave anybody any indication that she was uncomfortable with the comments.

10. I asked Ms. Powell if she felt she was being sexually harassed, and she stated that she did not feel harassed, but did not like the comments.

11. I did not think the comments were appropriate or professional, and I spoke with members of management and told them to cease making such comments.

12. Ms. Powell did not indicate that Stephen Page was more to blame for the inappropriate banter than other participants that were named.

13. I followed up with Ms. Powell at a later date and she told me the inappropriate comments had stopped.

14. Nan Ya has an anti-harassment policy. Ms. Powell received a copy of the policy when she began her employment with Nan Ya. (Ex. 1, Cheryl's Acceptance).

15. I also attended a hearing for the Employment Security Commission on September 14, 2007. A copy of the transcript from this hearing is attached. (Ex. 2, ESC Transcript.)

16. Cheryl stated at the Employment Security Commission hearing that she felt it was unfair that Travis Hyman, Stephen Page, and Greg Morris did not have to record absences and when they were tardy on their Attendance Records. (Ex. 2, ESC Transcript, p. 89-90.)

17. Travis Hyman, Stephen Page and Greg Morris are all salaried-exempt members of management and they do not necessarily work set hours.

18. Ms. Powell was employed as a salaried-nonexempt employee, and she worked set hours. She received overtime payment for any additional time that she worked.

19. Our salaried non-exempt employees receive a specific hour lunch break and two, ten-minute breaks during the day.

20. Ms. Powell appears to believe that members of management should have to report when they were tardy and absent from work like she did. She did not appear to understand that management personnel are paid differently and generally worked longer hours than she did.

21. Moreover, in spite of her beliefs and depending on the circumstances, member of management routinely record their own tardies and absences on their own attendance records.

22. Last, Ms. Powell has alleged that she was denied a transfer to the position of Administrative Assistant in February of 2007. Nan Ya hired Danielle Miles for that position in April of 2007 when it became vacant in March of 2007.

Pursuant to 28 U.S.C. §1746, I declare under penalty and perjury that the foregoing is true and correct.

5/19/09

Eric Stevenson

Dated this 19 day of May.



# NAN YA PLASTICS CORPORATION, AMERICA
# SOUTH CAROLINA PLANT

140 E BEULAH ROAD, LAKE CITY, SOUTH CAROLINA
P.O. BOX 939, LAKE CITY, SC 29560
TEL 843-389-7800    FAX 843-389-6993

## EMPLOYEE ACKNOWLEDGEMENT OF NEW HANDBOOK

The company is issuing an updated handbook on September 20, 2004 in response to changes in the laws of South Carolina. Listed below are any of the sections of the handbook that have been modified or added as well as sections the company considers especially important. All employees hired prior to September 20, 2004 are required to sign this sheet, in addition to signing the new handbook. The new handbook supercedes any previous handbook.

### Changes

1. Format – This handbook is booklet size; the order and flow of some information has been improved.
2. **Disclaimer – We modified this section. The new disclaimer clearly states that the handbook is not a contract and does not change the at-will employment relationship of any employee.**
3. Welcome – We modified this section.
4. Quality Policy – We added the current ISO 9000 quality policy.
5. 10 "S" – We added the 10 "S" synopsis.
6. We modified the Safety statements.
7. EEO – We modified the EEO statement.
8. **Discrimination and Harassment – We modified the old Sexual Harassment statement to include all discrimination and harassment.**
9. Business Ethics – We added this section.
10. Teamwork – We added this section.
11. Activities (Committee) – We added this section.
12. Pay Procedure – We modified this section.
13. Direct Deposit – We added this section.
14. Payroll Deductions – We modified this section.
15. Benefits – We combined and modified the old "Insurance, Pension Plan and 401 (K) Savings Plan" sections.
16. Holidays – We modified this section.
17. Vacation – We modified this section.
18. Military Leave – We modified this section.
19. Funeral Leave – We modified this section.
20. Jury Duty – We modified this section.
21. Break and Lunch Periods – We modified this section.
22. Attendance – We modified this section.
23. Hours of Work – We modified this section.
24. Sick Leave – We modified this section.
25. Family Leave – We added this section.
26. Overtime – We modified this section.
27. On Call – We added this section.
28. Time Clock – We modified this section.
29. Job Bidding – We added this section.



# NAN YA PLASTICS CORPORATION, AMERICA
# SOUTH CAROLINA PLANT

140 E BEULAH ROAD, LAKE CITY, SOUTH CAROLINA
P.O. BOX 939, LAKE CITY, SC 29560
TEL 843-389-7800    FAX 843-389-6993

30. Dress Code – We modified this section.
31. Personnel Records – We modified this section.
32. Bulletin Boards – We modified this section.
33. Open-Door Policy – We added this section.
34. No Solicitation/Distribution – We modified and renamed this section.
35. Smoking Policy – We modified this section.
36. Substance Abuse – We modified this section.
37. **Rules and Regulations – We modified this section. We deleted any references to normal or progressive disciplinary steps and modified or added rules. Significant changes include rules number: 7, 8, 11, 13, 15, 16, 21, 25, 28, 29, 30, 31, 38, 47, 48, 49, 50, 52, 54, 55 and 63.**
38. Contact Information – We added this section.
39. Deletions – The following sections were deleted from the old handbook: Leave of Absence, Rates of Pay, Suggestions.

## EMPLOYEE ACKNOWLEDGEMENT

I acknowledge that I have received a copy of the Nan Ya Plastics Corporation, America, South Carolina Plant Employee Handbook. Further, I acknowledge that I understand the following significant points:
1. **It is my responsibility to read and understand the information in the handbook.**
2. **The disclaimer on page two clearly states that the new handbook is not a contract, it supercedes previous handbooks and does not change my at-will employment relationship.**
3. **Neither this handbook, nor any policy or guideline, nor any combinations thereof, create a contract.**
4. **The handbook, and any other policy or guideline is subject to change with or without notice.**
5. **The Company strictly prohibits all unlawful discrimination and harassment.**
6. **Any concerns regarding discrimination or harassment should be brought to Personnel; concerns may also be addressed to the Plant Manager's Office.**

*Cheryl H. Powell   2201462*

Employee Name and ID Number

*Cheryl H. Powell  11/2/04*

Employee Signature and Date

SCANNED

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

# NAN YA PLASTICS CORPORATION, AMERICA, SOUTH CAROLINA PLANT

# EMPLOYEE HANDBOOK

**THIS HANDBOOK IS NOT A CONTRACT, DOES NOT CHANGE ANY AT-WILL EMPLOYMENT RELATIONSHIP AND IS SUBJECT TO THE FULL DISCLAIMER ON PAGE 2.**

*[signature]*

Employee Signature

(Supercedes previous copies). Revised October, 2004

SCANNED

BOOK SHALL HAVE ANY FORCE AND EFFECT UNLESS IT IS IN WRITING AND SIGNED BY THE PLANT MANAGER AND THE PERSONNEL MANAGER.

NEITHER THIS HANDBOOK, NOR ANY OTHER POLICY OR GUIDELINE, SINGLY OR COMBINED, SHOULD IN ANY WAY BE CONSTRUED AS AN EMPLOYMENT CONTRACT OR INTERPRETED AS A GUARANTEE OF INITIAL OR CONTINUED EMPLOYMENT. THE COMPANY RESERVES THE RIGHT TO AMEND, ALTER, OR MAKE EXCEPTIONS TO OR CHANGE POLICIES, PRACTICES, PROCEDURES, OR THIS HANDBOOK WITH OR WITHOUT NOTICE OR REVISION, BASED ON CHANGES IN THE BUSINESS ENVIRONMENT AND THE EVOLVING NEEDS OF THE COMPANY.

SCANNED

Cheryl H. Powell  220462
Printed Name and Employee ID Number

Cheryl H. Powell  11/2/04
Employee Signature and Date

# SOUTH CAROLINA EMPLOYMENT SECURITY COMMISSION
## Columbia, South Carolina

### Transcript of Testimony

### Before

### Daniel C. Beach, Administrative Hearing Officer

| | | |
|---|---|---|
| Cheryl H. Powell | ) | **CLAIMANT** |
| P. O. Box 1568 | ) | |
| Lake City, SC 29560 | ) | |
| Claimant SSN: XXX-XX-3244 | ) | |
| | | |
| Nan Ya Plastics Corporation America | ) | **LIAVLE EMPLOYER** |
| P. O. Box 939 | ) | |
| Lake City, SC 29560 | ) | |

**PLACE OF HEARING:**  Hearing Conducted at:
SC Employment Security Commission
1558 W. Evans Street
Florence, SC 29501

**DATE OF HEARING:**  July 19, 2007

## APPEARANCES

For Claimant                    Cheryl Powell/ Claimant
                                Ronald D. Cox/ Claimant Witness

For Employer                    Eric Stevenson/ Personnel Manager
                                Steven Page/ Section Manager
                                Brandy Morris/ Administrative Asst.

01AE000004
18502.0019

Before:        Daniel C. Beach, Administrative Hearing Officer

**HEARING OFFICER'S PREAMBLE.**

**ALL WITNESSES SWORN.**

A.H.O.:        Please let the record reflect all parties have answered in the

               affirmative. At this time, Ms. Powell, if you would please state your

               name for the record, spelling your last name for me.

CLAIMANT: Cheryl H. Powell. P-O-W-E-L-L.

A.H.O.:        And Ms. Powell, I have in front of me a copy of a document ... well,

               we'll identify that with regard to the issue on timeliness, but let me

               just identify for the record that this is the decision that you are

               appealing. Is that correct? It was mailed to you on June 12, 2006?

               2007, excuse me.

CLAIMANT: That is correct. This is what I am appealing.

A.H.O.:        Okay. And for the purposes of this hearing on the issue of

               separation, would you have an objection to me entering it into the

               record as an exhibit?

CLAIMANT: As an exhibit? Sure.

01AE000005
18502.0019

A.H.O.:    Alright. I'll lAVel it into the record as Employer, excuse me, as

            Agency Exhibit #1, entered into the record for that purpose. Mr.

            Stevenson, if you would please state your name for the record,

            spelling your last name.

EW-1:      Eric L. Stevenson. S-T-E-V-E-N-S-O-N.

A.H.O.:    And your position out there.

EW-1:      Personnel Manager at Nan Ya Plastics.

A.H.O.:    I have that Ms. Powell was employed with you from March 10, 1999

            through May 24, 2007. Does that sound accurate?

EW-1:      March 8th, yes, of '99.

A.H.O.:    Okay, and she was last employed as an Administrative Assistant?

EW-1:      Yes sir.

A.H.O.:    Was she terminated from her employment?

EW-1:      Yes she was, sir.

A.H.O.:    Who notified her of that termination?

EW-1:      I ... it would have been myself and Mr. Steve Page conducted the

            exit interview.

A.H.O.:    Alright. What was the reason relayed to Ms. Powell for her

4

18502.0019

termination?

EW-1:     Ms. Powell had a history of some poor performance issues, having
          received some bad evaluations for that and had received some
          warnings as well. Some of them were tardiness issues, attendance
          issues. On the day of separation, Mr. Steve Page had come into a ...
          Ms. Powell worked for Mr. Steven Page. She was in a different
          office having a conversation and Mr. Page walked in as the Section
          Manager, he asked her to go back to her own section and begin to
          get her job done, to do her work there in her office. She became
          loud, confrontational and insubordinate; went back to the office
          ultimately and continued to argue with her manager about some
          different things. And based on the previous disciplinary history that
          she had and that incident the decision was made to separate her from
          the company.

A.H.O.:   Had this incident not occurred on this day in question would she
          have been separated based upon previous counselings and/or
          warnings?

EW-1:     The other previous counselings had taken place and they had given

5

her a plan to improve her performance. I have ... I have nothing that says that AVsent that outburst she would have been terminated on that day. Obviously, if her performance continued to be poor or substandard that may have occurred. But on that date, the incident that was the trigger, so to speak, was the confrontational conduct on the part of Ms. Powell.

A.H.O.: Alright. Had Ms. ... you indicated that she had been previously counseled and/or warned, was there ever a point and time that she was placed on some sort of final warning which notified her that any future incident, either performance or attendance, would result in her termination?

EW-1: On March 1, 2007, we told her again "be advised that additional problems including attendance may result in further disciplinary action up to and including termination."

A.H.O.: Was that verbally or was that in writing?

EW-1: That was in writing, sir.

A.H.O.: Do you have a copy of that here today?

EW-1: Yes I do. I have copies of the previous warnings that she had

6

received. Would you like me to enter them all in at this time?

A.H.O.:    Yes, if you want to submit them.

EW-1:    Here are one set of copies for you, sir.

A.H.O.:    Provide those to you, Ms. Powell.

EW-1:    And these are the originals. Do you want to peruse these? Please note that one of your copies is a front and back.

A.H.O.:    Look through them and make sure we have --

EW-1:    The first page here is not a warning that issued to her, that's the final event.

A.H.O.:    I'll return these back to you. Ms. Powell, you have copies of those documents. Just let me know when you're finished reviewing them.

EW-1:    I believe this is where --

A.H.O.:    Oh, I'm sorry. Just let me know when you are finished reviewing those documents.

EW-1:    I apologize. I don't think that Ms. Powell has a copy of this. That is the final incident write-up form.

A.H.O.:    Do you have an additional copy of this or is this the only one?

EW-1:    You have your copy. I presented the original but in the first group

7

of copies I gave I don't think I presented that.

A.H.O.:     Alright, well then she has that. Well, I mean I'm looking at it. I
            don't have that in this batch.

CLAIMANT: Is that the involuntary termination?

A.H.O.:     That is correct.

EW-1:      Those are your copies. I apologize for that, sir.

CLAIMANT: Okay. I've read it.

A.H.O.:     Any objection to me entering the documents set forth by Mr.
            Stevenson here today as an exhibit?

CLAIMANT: Well, one warning dated January 21, '03, as you can see in my
            explanation, this was a false accusation. I was told just to drop it in
            the mail.

A.H.O.:     Well, I'm not going to get into your disagreement with the
            document. The document states your comments on it itself so other
            than you saying that you disagree with it, any other objections to the
            packet?

CLAIMANT: Okay. May I add additional information to the Letter of Counseling
            dated September 15, '04?

8

A.H.O.:          You can do that once I move to you to get your testimony.  But at

                 this point and time, if these documents have been forged, you have

                 not seen them, they've been altered, those are valid objections.  Just

                 the fact that you disagree with them is not a valid objection.

CLAIMANT: Okay.  Yes, I don't agree with these.

A.H.O.:          Okay.  And again I understand that you may disagree with them.  I

                 understand that and we'll get your testimony with regard to the

                 matter once we finish with the employer.  I will (inaudible) into the

                 record the documents so described that it being the involuntary

                 termination authorization dated 5/24/07, a letter of counseling dated

                 March 1, 2007, a memorandum warning dated 2/21/07 which

                 consists of two pages, a letter of counseling 9/15/04, and a warning

                 dated 1/21/03.  They will be entered into the record collectively as

                 Employer's Exhibit #1.  With regard to this last incident which

                 caused the separation, Ms. Stevenson, did Ms. Powell provide any

                 response or comments as it relates to what the incident was at the

                 time of termination?

EW-1:            At the exit interview she had made some statements that she was

9

doing her work in that area. But again, basically when her Manager came in, she was in a different office with Administrative Assistant, Ms. Brandy Morris, here, and her boyfriend, fiancé, I'm not sure what the relationship is there. That part was ... after looking into it, after listening to what she said and considering it in context of what else we knew, we still made the decision to separate her.

A.H.O.:     So you're saying that Ms. Morris was a witness of the conversation between Mr. Page and Ms. Powell?

EW-1:       Yes sir.

A.H.O.:     Any other information that you would like to provide?

EW-1:       I also have the evaluations where she was evaluated as "improvement needed." Two evaluations. And get the next set of copies. These are photocopies and I will pull the originals for you in just a moment.

A.H.O.:     A copy of those at this time, Ms. Powell. I'll return the originals back to you.

EW-1:       Thank you, sir. Mr. Beach, I also have copies of the originals that we sent in our first response about the employee handbook rules that

10

were violated if you need those, as much as that was previously

turned in with our first response which may be presented again.

A.H.O.: Well, if I have them, I'll be more than happy to use the ones I have.

EW-1: Those are them right there.

A.H.O.: Is it just three pages?

EW-1: Yes. Where she signed for her handbook and some highlighted

rules.

A.H.O.: Have you had an opportunity to review over those documents, Ms.

Powell?

CLAIMANT: I have.

A.H.O.: Any objection to me entering the evaluations, looks like you have a

2007 evaluation and a 2004 evaluation?

CLAIMANT: I have had more evaluations.

A.H.O.: Well, with regard to what has been presented, did you have an

objection?

CLAIMANT: No.

A.H.O.: I will (inaudible) the two-page, or excuse me, the two evaluations

into the record as Employer's Exhibit #2, entered into the record

11

without objection. And with regard to the policy or the handbook, is there a specific portion that you are bringing our attention to … there's some asterisks?

EW-1:     Yes sir. To these 26, 38, 37.

A.H.O.:    This is the copy that was originally provided, Ms. Powell. Again, I'm going to let you look over at this time. And once you finish reviewing them just provide them back to me and I'll have just a couple of additional questions for you. Any objection to me entering those three pages into the record as an exhibit?

CLAIMANT: No.

A.H.O.:    The three pages, the employee handbook with the signature of Ms. Powell, as well as … looks like the acknowledgement and page 38 and 39 out of the handbook addressing 26, 37, and 38, will be entered into the record collectively, without objection, as Employer's Exhibit #3. Alright, any additional information at this time, Mr. Stevenson?

EW-1:     Not at this time, sir.

A.H.O.:    Ms. Powell, at the conclusion of each employer witness's testimony,

12

you have an opportunity to ask questions of that witness. Do you have any questions for Mr. Stevenson regarding his testimony and/or the exhibits that we've entered into the record here today?

CLAIMANT: The last exhibit, the handbook, for what I was terminated for. Where does it show "socializing?" I mean that was an important issue as being separated. I don't see that highlighted ... socializing on company policy.

A.H.O.: Alright, is it covered in the policy, Mr. Stevenson?

EW-1: That is not what she was terminated for. I do not have a complete copy of the handbook. The rules in the employee handbook do state that you should stay busy and do your job. However, she was not terminated for socializing. It was not a consideration in the decision to separate her from the company.

CLAIMANT: I have another question. Mr. Stevenson, the day of termination, I was separated for socializing and that is against company policy. I knew nothing about the argumentative statement that is with Section 4135-120 until I read this from the Employment Security. That was false information. --

13

A.H.O.:        Ms. Powell ... Ms. Powell, all you're doing is responding to his

               testimony. If you have a question by all means ask the question but

               I can't allow you to make statements at this point and time.

CLAIMANT: Okay. Why did it become argumentative termination instead of

               what you told me about socializing against company policy?

EW-1:          It is very possible that I said that when Mr. Steve Page walked into

               the office and saw you socializing and asked you to go back to your

               section and do your work I may have said "socializing" in the

               preamble. The issue was being argumentative and confrontational to

               the point of being insubordinate with your manager.

CLAIMANT: Why would you say that? You know that's not true.

A.H.O.:        Well, he's responded to your question. That's not an appropriate

               question. You can rephrase a different question or ask him a

               different question but that's not an appropriate question.

CLAIMANT: Okay. The question is did you find that it was not a justifiable

               reason to fire me on the allegation of socializing on company policy

               and then that's why you changed your mind?

EW-1:          The answer is that I did not change my mind. The initial issue that

14

was of concern to your management team was being confrontational and insubordinate, being argumentative with your Section Manager.

CLAIMANT: Why wasn't I told that in the interview .. in the separation whenever I was called to your office? Why wasn't I told that it was because of being argumentative?

EW-1: Ms. Powell, you were told that but if you remember you cut the initial meeting short, said you had other things that you wanted to do, and you left. You came back the next day and said that you didn't have any other questions and proceeded to cover some logistical issues regarding insurance, vacation benefits, etc., but the initial interview, you abbreviated it. You said you wanted to leave and that's what happened.

CLAIMANT: Okay. What time was the initial interview?

EW-1: Sometime before lunch.

CLAIMANT: You agree that it was ten minutes before twelve?

EW-1: That would ... fifteen to quarter till, ten till. That sounds reasonable. Yes.

CLAIMANT: Okay. Do you agree that I said that this was much too ... too much

15

to digest and I would like to come back and discuss these termination papers at another time?

EW-1:       Yes.

CLAIMANT: Okay.  Do you agree that you said that you wanted me to complete this now so that I would not be embarrassed by the other workers so I could go get my things during lunch time?

EW-1:       No.  I said that if you wanted to go back and clean out your desk we could ... if you wanted to come back after lunch and do that during regular business hours we could make those arrangements.  If you wanted to come back after 5:00 that would be fine.  But that was separate from the exit interview itself.  The question of cleaning out your personal items that you may have had in your desk. The exit interview was being conducted by myself and Mr. Steve Page.  We explained the issue.  You were presenting your views and then you said that you had someplace to be, wanted to leave at 12:00, and that you would come back the next day. When you came back the next day you said that you didn't want to discuss the issues anymore. You just wanted to go through the logistics of the insurance, etc.

16

CLAIMANT: Do you agree that you told me this would be the procedure? I did not ask. I did not know what to expect in the interview.

A.H.O.: Well, let me ... why are we, I guess, delving into whether or not you had an opportunity to respond or not? The fact that you were terminated ten or fifteen minutes before lunch, what happened after you were notified of termination is not relevant to me. I'm here to find out why you were terminated so I think we need to move along with regard to these questions. I'm finding that they're not relevant to the issue of separation. They're after separation.

CLAIMANT: The question still remains to Mr. Stevenson, why wasn't I told that I was being terminated for being argumentative?

EW-1: We did tell you that. You said that you did not have time to digest all this. You wanted to come back and when you came back you said that you didn't want to discuss the issues.

CLAIMANT: Do you agree that the reason I said that I did not have time to digest was for the answer to filling out paperwork to decide where my life insurance would go, you know, COBRA insurance, that's ... is that not what you wanted me to do then and leave? Do you agree that

17

that's what that statement was?

EW-1:    No. We did tell you you had the opportunity to come back. You specifically said you didn't want to discuss the issues when you returned the next day. And that is my ... that is my position of what happened.

CLAIMANT: Do you agree that it would be a fair statement if you were in my situation if you were told that you were being terminated, separated by my supervisor, because he has decided that I was socializing on company policy, that that was a plain statement that I should not have any more discussion about that? It was plain and simple. Do you agree that you know what that would mean to you if you were told that you were separated by the company because of socializing is against company policy? Would you have any questions more to ask?

A.H.O.:   Well, first of all, I don't understand the question. Do you understand?

EW-1:    Not really.

A.H.O.:   Alright. You'll have to restate or rephrase your question.

18

CLAIMANT: If you were in the same position as I --

A.H.O.:    We're not asking what his position is with regard to that. We're

here discussing your separation. If there are certain aspects or items

that you disagree with the way that he conveyed that information to

you, by all means, ask the question, but I'm not getting into what his

interpretation is or what you thought you should have not or should

have known. I'm not concerned with that. Okay? If you disagree

with whether or not he told you you were being terminated for being

argumentative is one thing and that's fine, you've asked the

question. I think that any reasonable person would observe from

that that you disagree with that. So he's steadfast in his position that

he told you that. So I don't see why we need to keep asking the

same question or allowing the same question again and again and

again.

CLAIMANT: Can I direct this statement to you?

A.H.O.:    Certainly.

CLAIMANT: Because it's false --

A.H.O.:    I understand that. --

19

CLAIMANT: Information.

A.H.O.:    You may think it's false but he's responded and once we move to

you then you can say everything he said is false. This is what

happened.

CLAIMANT: I've never been to --

A.H.O.:    But I mean --

CLAIMANT: A hearing so I was just describing and asking to get UNCLEAR

more detail.

A.H.O.:    Well, you can ask any and all questions but I ... I don't see the

importance of what you're asking right now. Now we're asking

questions about whether or not that he actually said what he did.

He's responded and now you're questioning whether or not how you

would feel if this type of situation occurred and he was in your

shoes. That doesn't matter to me.

CLAIMANT: Okay.

A.H.O.:    Doesn't matter to me.

CLAIMANT: Okay.

A.H.O.:    At the time that you were notified of your separation, that's when

20

my ... my consideration of the facts stop. Up to that point is what
I'm making my decision on so when you were notified of your
separation, I understand that your position is that he gave you
different reasons for separation. And I'll question Mr. Page. He
was there and I'll get Mr. Page's testimony as well. And then I'll
come to you and I'll ask you what was told to you. So I have to get
everybody's testimony on what the position is regarding separation
but the questions that you're asking are not relevant. Any other
questions for Mr. Stevenson regarding the reasons for separation?

CLAIMANT: Yes sir. When you back up to the evaluations of "poor
performance," there again, how did that determine after I had been
told of excellent performance by Mr. Steve Page on the last
performance evaluation dated March, '07?

EW-1: In March, '07, you were evaluated as "improvement needed."

CLAIMANT: As always, isn't that the way it has been? We have ... don't you
agree we have three percent to distribute among three
Administrative Assistants and do you agree that the UNCLEAR wife
would be ... get UNCLEAR money and Steve's best friend would

21

get the other part of the evaluation so that leaves me with zero?

EW-1:     I would not agree with that.

CLAIMANT: Okay.  Do you agree that the warning that has been against me has

been tardiness?  There has been no poor performance?

EW-1:     I would not agree with that.

CLAIMANT: Could you tell me when the last time it was that I did get a raise?

EW-1:     I believe it was in '06, in March of '06.

CLAIMANT: And what was that yearly amount to?

EW-1:     I don't know if I have it with me right now.  In March of '06, you

got a 2.5% increase going from $22,511 to $23,074.  On the recent

evaluation for '07, the company could have decided to give you a

"B" which would have given you another 2.5% and they chose to

give you a "C".  That percentage and that money didn't go to

anybody else. They just chose to give you a "C," no financial

increase for you because they determined that there was

improvement needed.

CLAIMANT: Okay.  Who has always done my evaluations before this year, before

Steve Page did my evaluation?

22

EW-1:    Steve Page and David Tramble to the best of my knowledge.

CLAIMANT: Let's look at what we have here.  Okay. I see one in '99 that Steve

            Page signed off on and then he did not sign off on --

A.H.O.:    Alright, I don't have a '99 in evidence.

CLAIMANT: Wait, wait, wait.  Excuse me.  Okay, Steve Page signed off on '07

            ... '07.

EW-1:    Yes.

CLAIMANT: Okay. Steve Page ... that is the first time he's ever done an

            evaluation for me.  If you will go back to '99 and present all

            evaluations, you would see that Mr. Page --

A.H.O.:    We need to direct your question as it relates to issue of separation,

            Ms. Powell, and --

CLAIMANT: Okay, I will.

A.H.O.:    Hold on.  And so I understand you want to present your side of the

            position here today but again, you need to understand Mr. Stevenson

            told me you were terminated based upon previous warnings which

            addressed attendance and then your .. the incident that occurred to

            which he has described that occurred with Mr. Page.  Again, that's

23

what I'm making my decision on. So questions that are being asked relevant to a evaluation, although they are in the record, I mean, ask questions about the evaluations I have in front of me. I think the record will reflect that Mr. Page's signature is not on the first one. I mean it's there. It's in black and white so I mean I don't understand the question.

CLAIMANT: The question is going back to why I was terminated.

A.H.O.: Which is stated by him today … attendance leading up to this final incident. That's what I'm looking at here today.

CLAIMANT: Okay. What I see is if you were discharged from you job … on your most recent bonafide employee for arguing with a co-worker.

A.H.O.: Well, that's the Employment Security Commission's take on why you were separated. We take information from you. We take information from the employer. And then we regurgitate for lack of better terms, gurgitate information as to why you were separated. And that's the Employment Security Commission's wording. It's not the employer's wording as to why you were separated or why you were disqualified. You've appealed that. We're here to discuss

24

why you were separated. He has testified under oath you were separated because of your actions on this day in question which also included counselings leading up to that last incident. The counselings that I have in the record here today address nothing more than attendance from what I can tell. So attendance and the issue between you and Mr. Page. That's what I'm concerned about here today.

CLAIMANT: Okay.

A.H.O.: It's not that hard. I mean we need to make it as easy as we can and that's what I'm looking at here today.

CLAIMANT: Well, do I go to Steve Page and ask him --

A.H.O.: I haven't moved to him yet. I haven't ... I haven't even asked him a question yet. Once we finish with Mr. Stevenson, you ask him questions, I'll then move to Mr. Page. Then Mr. Stevenson will have an opportunity to ask him questions. And then you'll have an opportunity to ask him questions. And then I'll go to Ms. Morris and we'll ask her questions.

CLAIMANT: Okay. Mr. Stevenson, have I been in your office before on any other

25

situations or matters concerning any issues?

EW-1:     Yes.

CLAIMANT: And what was that concerning?

EW-1:     The most recent time is when you were being given warnings again

          for tardiness, I believe. I could check and confirm that. In the

          course of being given a warning you had mentioned to Mr. David

          Tramble that you didn't think that the environment in the office was

          professional. He directed you to come and speak to me about that

          and you did. And we spoke about that. I spoke to the management

          team. There is another time that you were complaining that a co-

          worker was terminated for violating safety rules and for whatever

          reason you thought you were in the middle of it and I explained that

          you were not. He was terminated for violating safety rules and that

          was that. I'm not sure if there's more you're looking for, Ms.

          Powell.

CLAIMANT: I was expecting to get more detail as to why I was in the office to

          visit you about being unprofessional. How could an issue of

          tardiness be so important whenever sexual harassment was not an

26

issue?

EW-1:     When you came to me and spoke of the fact that your department
          head had told you multiple times that tardiness was a big issue for
          them. Apparently you didn't believe that. You think tardiness was
          such ... was or should be a big deal and that is why they were
          writing you up again. You had complained that sometimes you
          would overhear co-workers say "Where is this person or that
          person?" and the response was something along the lines of "Check
          under the boss's desk. She's probably trying to get a promotion." I
          asked you specifically whether you thought that that was any kind of
          sexual harassment and you were in fact empathic that you did not.
          You just thought it was unprofessional. I asked the management
          team not to make comments like that and they said that was not a
          problem. But the ... what they were telling you was "stop being
          late." What you were telling me is "I don't see why being late is a
          problem."

CLAIMANT: When you say "being late," at 8:00, is that my time to be in the
          office? Is that my time to be at work? 8:00 to 5:00, is that correct?

27

EW-1:        That's correct.

CLAIMANT: Okay.  When I come through the guard shack where the time clock is, where people clock in, that's 8:00.  You want them to be there at 8:00 because I do the abnormal.

A.H.O.:      Okay, ask the question.

CLAIMANT: Okay.  So when I come through that gate, it's 8:00.  Is that considered being late?

EW-1:        If you're at the gate at 8:00 instead of in your office at 8:00, then yes you were late.  You were ... all employees are required to be in their work area when work starts.  Now in regards to when they clock in, if they went for coffee breaks, ate donuts, and they are still late at their work area, they're late.  They're expected to be at their work area and this was explained to you on a couple of occasions.

CLAIMANT: Do you agree that I asked you to let me start clocking in so that I would prove that I was there at 8:00 and at my work area?

EW-1:        I don't really remember that.  No.

CLAIMANT: In '04.  The first time that I was accused by Chris Chapman several times of being late.

28

EW-1:  I do not remember that specifically. No, not saying that it didn't happen but I just have no recollection of it. And as a salaried employee, salaried employees don't clock in. It doesn't come up on the abnormal report.

CLAIMANT: Nothing shows up on the abnormal report until one minute after 8:00 and the employees are docked for tardiness, is that correct?

EW-1:  No. People's clock-in and clock-out records shows on the abnormal report. And saying that salaried employees because they're not in the hourly data base, even if you swipe your badge, to the best of my knowledge, does not show up in the abnormal report. Salaried employees do not clock in and out.

CLAIMANT: So is it a true statement that salaried employees and operators, hourly employees, are they treated the same on time schedules, 8:00 until their work day is over? 8:00 is the starting time?

EW-1:  Not for everybody.

CLAIMANT: Not everyone?

EW-1:  There are many different shifts. However, my position is we tell all employees that punctuality is important and your department went

29

out of their way multiple times to say that on many occasions you were tardy and they wanted you to improve in that area. They continued seeing you being tardy and so you continued to get written up for it. And that is … that is one issue along with other performance issues that they had documented to me, evidence that has already been submitted.

CLAIMANT: Thank you. For the performance issues, what type of performance were they expecting from me?

EW-1: To the best of my knowledge, if I remember correctly, they were saying that they wanted you to utilize your time. Said punctuality, seek additional work when team work is finished. Try not to make errors. They wanted you to learn a little bit more. I remember one of your evaluations he said that you specifically had gotten some training materials at home to improve on your software.

CLAIMANT: I believe that was in '99, the first year I started. That answered my question. So do you agree that 2006 was the last time that I had a raise since 2001?

EW-1: That was the last time you had a raise was March 1, 2006.

01AE000032
18502.0019

CLAIMANT: The question was "Could you verify of any other additional raises through the evaluations from '01?

EW-1: I'm sorry. I wasn't here. In answer to some previous questions, Mr. Steve Page did your evaluation in 2000, 2001, 2002. I don't know what you're looking for, though.

A.H.O.: Did she receive raises in those periods of time?

EW-1: Some of them she did. In fact, each evaluation I believe she received an increase with the exception of the two that were submitted to you where she was graded "improvement needed" and PG was performance grade.

CLAIMANT: May I have a copy of the evaluations for '01, '02, '03?

EW-1: I do not have copies of those with me.

CLAIMANT: That's all I have for him.

A.H.O.: Mr. Page, if you would please state your name for the record, spelling your last name.

EW-2: Steven C. Page. P-A-G-E.

A.H.O.: And your position title there.

EW-2: Section Manager.

31

A.H.O.:     Is it fair to say that you were Ms. Powell's immediate supervisor?

EW-2:       Yes.

A.H.O.:     Alright. Mr. Page, Mr. Stevenson indicated that the incident which
            led to the separation ... this final occurred with you. Tell me what
            happened on that day.

EW-2:       On the day in question I came into the office probably 8:20. I
            noticed Ms. Powell and Mr. Cox and Brandy Morris in the POY2
            office. I asked Ms. Powell and Mr. Cox did they have work to do
            and they ... she started arguing. I said, "Look. You need to go back
            to your desk and go back to work." She continued to argue. I left
            and went and got a cup of coffee. Came back to the Quality Control
            office and Ms. Powell continued to argue. I told her she did not
            need to be in the same place with Mr. Cox at the same time because
            of their relationship. It didn't look well. She continued to argue. I
            said, "Do not argue with me. Just do your work." She continued to
            argue. I said again, "Do not argue with me." She continued to
            argue. I went toward my desk. I said, "Also, I need to sign your
            evaluation." She questioned me and said, "When did you start

32

signing my evaluations?" I said, "When I ..." I'm sorry. "As a

vacation record." I said, "When I started doing your evaluation."

And she finished. She came to my desk, brought papers to my desk,

said "You need to sign these." I looked at them. I said, "These are

not my papers." She shoved them back at me and said, "Yes, you

must sign these papers." I said, "Cheryl, pay attention to what

you're doing, watch your attitude, these are not my papers to sign."

A.H.O.:     Well, did you see what these papers were?

EW-2:       They were time records of employees.

A.H.O.:     Would that be something that you would normally do?

EW-2:       It would be for my section, I would. We have Quality Control and

the Auto Packing Section. The Quality Control is signed by a

different supervisor.

A.H.O.:     So she was giving you the Quality Control --

EW-2:       Yes.

A.H.O.:     Documents. Alright you mentioned on at least four occasions that

she was arguing with you. When you say "arguing," what was she

doing? Do you have any recollection of her statements or

33

comments?

EW-2:    She was protesting that she was working when she was standing at
         Brandy Morris' desk.

A.H.O.:  Would she have a reason to be at Ms. Morris' desk?

EW-2:    Sometimes she would.

A.H.O.:  Alright, is this in the same location that she worked or was this
         somewhere else?

EW-2:    It's a separate office.

A.H.O.:  Would Mr. Cox have a reason to be in this same office?

EW-2:    At times, yes.

A.H.O.:  Alright, was there anyone else other than Ms. Morris, yourself, and
         Ms. Powell during this discussion?

EW-2:    At the beginning, no.

A.H.O.:  How about the end then?

EW-2:    There was one other individual there.

A.H.O.:  Who was that?

EW-2:    Mr. Jim Lew.

A.H.O.:  Did Mr. Cox witness any of this conversation?

01AE000036
18502.0019

EW-2:       At the very beginning.

A.H.O.:     And what caused him not to hear the rest of it?

EW-2:       We left the office and went back to the QC office.

A.H.O.:     You and Ms. Powell?

EW-2:       Yes.

A.H.O.:     Alright. Did Ms. Powell raise her voice?

EW-2:       Yes.

A.H.O.:     Alright. Did you raise your voice?

EW-2:       No.

A.H.O.:     Was any profanity used?

EW-2:       No.

A.H.O.:     Alright.  Were you involved in any of the counseling … prior

            counselings issued to Ms. Powell?

EW-2:       Yes.

A.H.O.:     Alright, what … which ones were you involved in?

EW-2:       The two last two warnings were about the tardiness.

A.H.O.:     The March 1 and the February 21?

EW-2:       Yes.

35

01AE000037
18502.0019

A.H.O.:     Alright. Were you in … were you sitting in during those
            discussions?

EW-2:       Yes.

A.H.O.:     Alright. What is your recollection of what was discussed on those
            two occasions, starting with the 2/21/07?

EW-2:       The … we discussed on Ms. Powell's tardiness and asked her to be
            to work on time.

A.H.O.:     Why was that an issue? What caused you to have this conversation
            telling her to be on time? What caused that?

EW-2:       It had been noticed that she was coming to work late. She was not
            in the office at 8:00.

A.H.O.:     And in your discussion with her, do you recall her providing any
            statements or comments to you as to her response to the allegations?

EW-2:       At one time she said she would try to do better.

A.H.O.:     Alright. Down at the bottom of 2/21/07, it appears that she wrote a
            response. Was that written in your presence?

EW-2:       Can I see it?

A.H.O.:     Certainly.

36

EW-2:       Yes it was.

A.H.O.:     And was that discussed ... her response, what she put down here?
            Did ya'll discuss that with her?

EW-2:       No. At that point when she mentioned that, we ... Mr. David
            Tramble, the other Section Manager, referred the matter to
            personnel, Mr. Stevenson.

A.H.O.:     Moving forward then to the March 1, 2007 Letter of Counseling.
            Again, what caused you to ... what caused you to bring this matter
            to her attention on that day?

EW-2:       She continued to be late.

A.H.O.:     And did she provide any response or comments to you as to why she
            continued to be late?

EW-2:       Not that I recall.

A.H.O.:     Would you agree that she also wrote this down at the bottom of that
            page as well in your presence?

EW-2:       Yes. I'll agree to that.

A.H.O.:     Was she questioned with regard to her information there? Was it
            discussed what she put down here?

01AE000039
18502.0019

EW-2:       Yes.

A.H.O.:     What do you recall being discussed with regard to that then?

EW-2:       We just discussed about the being late and stuff.

A.H.O.:     Was it clear that she needed to be at her desk at that time?

EW-2:       Yes.

A.H.O.:     At 8:00?

EW-2:       Yes.

A.H.O.:     Alright. Did she say, "Well, if I'm at the guard shack at 8:00, that should be sufficient?" I mean was that her position? What was her position then?

EW-2:       I'm not sure of her position. Our position was she needed to be at her desk at 8:00. From her previous, she said that she didn't think it was important to be in the office at 8:00.

A.H.O.:     Alright. This last incident that occurred between you and her then. After ... how did it end? I mean you were back in the QC office and she was trying to give you these documents to sign. Each time she said to sign, you said that they were not ... she needed to be careful. How did it come to an end?

01AE000040
18502.0019

EW-2:       She went back to her desk and I stayed there.

A.H.O.:     Alright, and then was that … was it the same day that you then

            notified her of the termination or was it a subsequent day?

EW-2:       I went to and informed the personnel of what had happened and I

            informed my boss, Mr. Bruce Chen, of what had happened.

A.H.O.:     Alright, so would that have been on the same day as May 24th?

EW-2:       I believe so. Yes.

A.H.O.:     Alright. Any additional information that you would like to provide

            in here today, Mr. Page?

EW-2:       No.

A.H.O.:     Mr. Stevenson, any questions for Mr. Page?

EW-1:       Not at this time, sir.

A.H.O.:     Ms. Powell, any questions for Mr. Page?

CLAIMANT: Yes. Mr. Steve Page, I'm going to first start where he first asked

            you AVout the accusation as to where we were … how this incident

            come AVout. Okay. The morning … do you not know my schedule

            where I should be in the morning?

EW-2:       You should be at your desk in the morning.

39

CLAIMANT: Okay. Do you not know the reasons why I would be in POY2?

EW-2: You have some reasons to go there if you want to make coffee in the morning or either take her some paperwork.

CLAIMANT: That's exactly correct. That is right. Especially do you agree that on Thursday mornings there is a definite reason for me to be in the office at Brandy's desk to receive the payroll, the (inaudible) that is sent to her desk that I pick up? Are you aware of that?

EW-2: Yes, I am aware of that.

CLAIMANT: Okay. Do you agree that you've just become my manager and at this time office since February?

EW-2: No.

CLAIMANT: Do you agree that you really knew my routine? Did you really know my routine?

EW-2: Yes I knew your routine.

CLAIMANT: Well then why was it ... why did you ask me to get to a ... point your finger and say "Get to work"?

EW-2: Because you were not working at the time. You were socializing. Your job was at your desk. You don't need ... I told you that you

01AE000042
18502.0019

didn't need to be standing at Brandy's desk with someone you had a personal relationship with. It didn't look good for the company. You needed to go back to your work. He needed to go do his work.

CLAIMANT: Okay. When I went to Brandy's desk which the printer from the AS400 is where I pick up my (inaudible). Do you agree that I should have left when he walked in the office?

EW-2: I thought you went to go pick up the papers and then go back to your desk. I didn't know you needed to socialize INAUDIBLE.

CLAIMANT: How long were you in that office? How long was I in the office with Brandy?

EW-2: I don't know how long you'd been there. I went in at 8:20 and you were there. You could have been there from 8:00 as far as I know.

CLAIMANT: That's right. You're not sure how long I had been there. You're not sure of how long Ronnie had been in there.

A.H.O.: Well --

CLAIMANT: The question --

A.H.O.: Hold on. Hold on. Let's just ask the question. Let's don't respond or infer what did or did not happen. Let's just ask the question, let

41

him respond to the question, and move to the next question.

CLAIMANT: Why did you point your finger at me and say "Get to work?"

EW-2: Because you were not working.

CLAIMANT: Why didn't you ask me what was I doing at the desk instead of assuming that I wasn't working?

EW-2: When you're standing there and somebody you have a personal relationship is standing there and Brandy's there, and he has a cup of coffee in his hand, I assume that people are working ... I assume that they are not working.

CLAIMANT: Have you ever seen anyone at my desk to stop by and socialize?

EW-2: Yes.

CLAIMANT: Yes? Okay. And --

EW-2: We don't discourage it, you know, UNCLEAR socializing between friends.

CLAIMANT: Did you see me step back from the desk when Mr. Cox came in so he could ask ... ask his question to Brandy? He was there for a reason.

A.H.O.: No, no, no. Again, the question is "Did you see him step back from

42

the desk?"

CLAIMANT: Did you see me step back from the desk?

EW-2: No. I did not.

CLAIMANT: Did you see him enter the room?

EW-2: No.

CLAIMANT: Okay. So what did you see when you came into the office?

EW-2: I saw Ms. Morris sitting at her desk. I saw you standing to the right and I saw Mr. Cox with a cup of coffee standing to the left.

CLAIMANT: Okay. And what did you say to me?

EW-2: I said, "Don't you have work to do?"

CLAIMANT: And what did you say to Mr. Cox?

EW-2: I said, "Don't you have work to do?"

CLAIMANT: Is that all?

EW-2: And then you responded that you were working. I said, "Well, you need to go to your office and work." I told him he needed to go to his area and work.

CLAIMANT: When did I tell you that I was working?

EW-2: When you were doing all your protesting that you were working.

43

CLAIMANT: Wasn't that in the QC department whenever I told you that? I was in the QC department whenever I told you I was working.

EW-2: You said it several times.

CLAIMANT: In the QC office?

EW-2: There also.

CLAIMANT: In the POY2 office again. Would you say that I had a reason to be there at 8:20 in the morning to get my work so that I could complete the payroll?

EW-2: There's not a specific time that you're told to go get the payroll. It can be at 8:05. It could have been 9:00. It could have been 2:00. There's no specific time set aside for you to go pick up the paperwork.

CLAIMANT: And would you agree that you don't tell me when to go pick up paperwork? That I do this whenever I feel the priorities that must be done?

EW-2: No, we do not set a specific time for you to do that.

CLAIMANT: Okay. Thank you. Okay. Do you agree that pointing your finger at me wasn't an argumentative ... an argumentative type of relating to

me that instead of directing a question, do you agree that you
pointed your finger at me and said, "Get to work"?

EW-2:        Yes.

CLAIMANT: Thank you. Do you agree that when I went back to my desk, into
the QC2 department, you came in with your cup of coffee and you
were behind me at my desk. I had given you an AV. You said pay
attention. Do you agree ... do you remember whose AV that was?

EW-2:        You had given your AV to Travis earlier in the day. That's why I
told you I needed to sign your AV, not Travis.

CLAIMANT: But whose AV did I give you? Whose AV did I give you?

EW-2:        I don't know.

CLAIMANT: Your Assistant Supervisor.

EW-2:        Okay.

CLAIMANT: Okay. Your Assistant Supervisor. There was a need for you to sign.
Do you agree that you sign AVs?

EW-2:        I sign AVs. The one you gave me was the supervisor that belonged
to Kirk Jordan who's a QC UNCLEAR, not a packing supervisor.

CLAIMANT: So you're saying, okay --

45

EW-2: And that is in evidence. It happened when I first came … that was at the end of it.

CLAIMANT: When we first came back from POY2 which was only a split moment, do you agree when we got back to the QC2 Field Office, when I gave you the AVs --

EW-2: We came back --

CLAIMANT: That that was Carl Honeycutt's AV?

EW-2: No. You handed me a stack of papers. At the end of the argument it was Kirk Jordan's. That's the ones I handed back to you and said this employee is not mine. And you said, "Yes it is." I said, "No. Pay attention to what you're doing. It is not mine."

CLAIMANT: Okay, so that … do you agree that's whenever I came to find out you were the one to sign my authorization to have vacation?

EW-2: No, that was … no, that happened a few moments previous to that.

CLAIMANT: A few what?

EW-2: Moments previous to that.

CLAIMANT: Moments?

EW-2: Yes.

46

CLAIMANT: Right. Okay. So that's whenever you first became the one to sign off on my AVs was that moment. That's ... do you agree that's why you didn't have my AV to authorize if I could have vacation because you had not signed by AVs in the years?

EW-2: Yes, I had signed your AVs in the years.

CLAIMANT: When ... do you sign it whenever Travis is out?

EW-2: At times.

CLAIMANT: Right. Okay. So it is a clear statement then that you normally don't sign my AVs until that particular day because whenever I was told to give you the AV for approved vacations?

EW-2: As you're well aware, we have more than one boss in the office; three managers, David Tramble, myself, and Travis Hyman. At different times all three of us signs your vacations. This particular year our director asked me to do the evaluations for the management Assistants, so I started signing the AVs.

CLAIMANT: Does that eliminate my immediate supervisor from signing ... is he aware that he doesn't need to sign those?

A.H.O.: He's not here to testify.

01AE000049
18502.0019

CLAIMANT: Okay.

EW-2:      In that instance --

A.H.O.:    When he's not here to testify, you don't have to answer the question.

           She's asking a question about a person who's not here.

CLAIMANT: Okay. Where was Mr. Lew?

A.H.O.:    Who is Mr. Lew?

CLAIMANT: Oh, he's not here.

A.H.O.:    I mean I'm trying to find out who he is. You can ask where he is.

EW-2:      He's a director outside the Plant Manager's office.

CLAIMANT: He was never in the POY2 office, is that correct?

EW-2:      That's correct.

CLAIMANT: Why didn't you ask me what was I doing in the POY2?

A.H.O.:    You've already asked that question and he has answered that

           question.

CLAIMANT: Why did you point your finger at me?

EW-2:      To emphasize that you needed to get back to work.

CLAIMANT: Why did you say that I was loud? Is that what you said? That I was

           arguing?

EW-2:        Loud, argumentative, and confrontational.

CLAIMANT: Okay.  Is it a fair statement to say that I was reacting in a normal,

                    human response after being accused of socializing?

EW-2:        I hadn't never seen you act that way before.

CLAIMANT: No.  I've never been --

A.H.O.:      No.  I don't want you to respond.  Just go to the next question.

CLAIMANT: What made you think that it appeared that we were socializing?

EW-2:        Two people standing at a desk, one holding a cup of coffee, nobody

                    had any documents in their hand.

CLAIMANT: Okay.  And when you asked me to change my attitude, what did you

                    want?

EW-2:        For you to quit arguing with me and get back to work.

CLAIMANT: Was it not in my best interest to explain to you what I was doing in

                    the POY2?

EW-2:        I didn't ask you what you were doing because I told you to go back

                    to work.

CLAIMANT: That is correct.  You did … why didn't you ask me --

A.H.O.:      That has been answered.

49

CLAIMANT: Okay. Now, at the end of this situation, why wouldn't you let me walk to the Administrative Building instead of riding with you in a golf cart?

EW-2: Because it's close to 12:00, getting close to lunch time. We'd go to personnel and get finished up. It was hot. It didn't take as long for somebody to walk than ride a golf cart.

CLAIMANT: But didn't I get there at the same time you did? You drove. I walked.

EW-2: Yes. Because I delayed waiting to leave until you had time to get there.

CLAIMANT: What were you doing to delay you?

A.H.O.: Again, Ms. Powell, I don't see how that's relevant. If he was asking you to go to Human Resources and discuss your separation, whether or not he went and got a soda or a cup of coffee or donut or whatever, it's not relevant to why you were separated.

CLAIMANT: Okay. Why was it so important to get it all finished before noon?

EW-2: Not to mess up no one's lunch time.

CLAIMANT: Right. And I appreciate you allowing me to come back the next day

50

to do the paperwork.

A.H.O.:       Question.

CLAIMANT: Why weren't you at the exit interview?

EW-2:         After talking to your Personnel Manager, it was determined that it wasn't necessary for me to be there just to sign the paperwork.

CLAIMANT: Do you believe that the real reason I was discharged ... do you agree that the real reason that I was discharged was because of the accusations I had against you for sexual harassment and wanting physical relations with me?

EW-2:         You were terminated because you were argumentative and confrontational that day and based upon your previous incidents of being tardy.

CLAIMANT: And do you agree that you gave me a warning in February and then again in March for tardiness? I think it was like one month after one warning. Just in the last couple of months.

EW-2:         Yes.

CLAIMANT: Because I would not comply with your requests?

A.H.O.:       Which requests are you referring to?

51

CLAIMANT: Well, to be physical, to let him have physical relations with me.

A.H.O.: Is that the reason or not?

EW-2: No.

CLAIMANT: Why did you tell me whenever we were cleaning up in April for Mr. Len, the executive Vice President, with his visit at UNCLEAR, why did you tell me that I sure looked good in those jeans today and looked me in my eyes to where it was very upsetting and disturbing to me? When I was standing at the files --

A.H.O.: You've asked your question. Let him respond. The question was why did you make that statement?

EW-2: I'm trying to recall the statement.

A.H.O.: I mean you can respond if you don't recall the statement or if you do recall the statement then you can respond why did you make the statement?

EW-2: I don't recall this.

CLAIMANT: Okay. Do you recall when you asked me to go pick you up from Side One in the golf cart and you told me ... do you recall or do you recall telling me that I looked like a movie star while we were in the

01AE000054
18502.0019

golf cart when I went and picked you up?

EW-2:       I think I did. I don't remember when it happened. I think I made a comment you reminded me of someone though.

CLAIMANT:  Why would you say something like that? Being in top management? Why would ... why would senior management such as yourself make a comment?

EW-2:       As a compliment.

CLAIMANT:  Okay. Now do you feel the real reason that you wrote me up for tardiness and had me terminated was because I would not have the physical relations that you wanted with me?

A.H.O.:     That's been answered.

CLAIMANT:  Okay. Would you agree in telling me that the only way to get a promotion is to get underneath the boss's desk?

EW-2:       That type of language has been used before in reference to kissing up to the boss. Yes.

CLAIMANT:  So in other words, kissing up to the boss versus, excuse the terminology, "fuck sucking your dick."

EW-2:       No.

01AE000055
18502.0019

CLAIMANT: So would you repeat that again please? What is the meaning of "getting underneath the boss's desk to get a promotion?"

EW-2: Doing what could please the boss.

CLAIMANT: Doing what to please the boss. Thank you. Did I hear you say that I have ... you have never heard me raise my voice before until May 24th?

EW-2: I don't recall you being loud and confrontational before.

CLAIMANT: Okay. The tardiness issue, when is, excuse me, let me back up. Are you aware that I was told to be at my desk at 7:55?

EW-2: Not specifically.

CLAIMANT: Okay. Do you agree it takes eight minutes to walk from the car to where my desk is?

EW-2: I think it's about six minutes.

CLAIMANT: About six minutes. Thank you. How many minutes is it from the time clock to my desk?

EW-2: About four minutes.

CLAIMANT: Thank you. Are you jealous that my fiancé was working at the company before he was terminated and is that why you blew up that

54

morning?

EW-2:        No.

CLAIMANT: So it was not jealousy?

EW-2:        No.

CLAIMANT: Not jealousy. Were you jealous of me having lunch with another

               worker in the plant and other than Mr. Cox?

EW-2:        No.

CLAIMANT: Have you ever talked to any of the other worker, director, or

               manager, and asked him --

A.H.O.:      Other worker meaning who?

CLAIMANT: Other worker --

A.H.O.:      Now you're referring to someone's manager, we don't know who

               that is.

CLAIMANT: In mechanical, did you talk with Mr. Kevin Stogner about seeing me

               and his worker, Mr. Palmer Lane, having lunch together and you

               wanted to know why?

EW-2:        I made a comment and talked with Kevin Stogner about you and

               mechanic having lunch using the golf cart in the edge of the woods

during lunch period.

CLAIMANT: Where was the golf cart? In the edge of the woods?

EW-2: Yes.

CLAIMANT: Okay. Do you know where the oak tree is?

EW-2: Yes.

CLAIMANT: Are you aware that's where they are building a picnic table to put their part of the workers and Mr. Stogner was the gentleman to build the picnic table there?

EW-2: The main reason is the company golf cart is not be used as a personal lunch vehicle, particularly taken off the road into the woods.

CLAIMANT: Apparently you ... do you know what the rules are?

A.H.O.: Alright, we're getting away from the issue again. Let's bring it back to the issue of separation.

CLAIMANT: Okay. So don't you agree that it's just jealousy is the reason why I'm terminated? Why you terminated me?

A.H.O.: He's answered ... that's been asked and answered.

CLAIMANT: Now when you get back to the time of being late, why would I be

01AE000058
18502.0019

written up for being late on February 15th and February 16th

whenever I was scheduled for vacation?

EW-2:          If you were on vacation you wouldn't be late.

CLAIMANT: Well, the reason ... may I elaborate on why I went to work?

A.H.O.:        Just ask the questions.

CLAIMANT: Okay.

A.H.O.:        He's responded to the question.

CLAIMANT: Do you agree that Travis Hyman's mother passed away and that we
               might would go to the funeral?

A.H.O.:        Well, again, Ms. Powell, I'm going to have to curtail your questions
               because they are ... basically there's a gunshot, what we refer to as a
               birdshot. You're just throwing out a bunch of questions that are not
               really relevant to the issue of separation. If there's a point blank
               question you want to ask, ask it. But we don't need to beat around
               the bush to try to get these answers. Okay? You can ask the
               question, "Did I work on February 15, 2007?" He can respond "Yes
               or no." If you did work then you can ask your next question about
               whether or not you were late or not. But we don't need to know

57

about whether or not somebody's funeral was that day and all this other periphery information.

CLAIMANT: Well, it's kind of hard to ask questions, Your Honor, whenever you are trying to make a statement.

A.H.O.: That's what I'm saying. You can't make a statement. Questions only. If you're trying to understand whether or not his impression of you .. whether or not you can run fast is the question. "Do I run fast?" The question is not "I run fast." That's not a question. "Do I run fast?" is a question. So that's all I'm asking you to do is make questions. What you're doing is you're making a long statement to try to get him to ... or I should say, trying to get your disagreement with his previous answer, which I'm not going to allow you to do anymore. We're dragging this out way too long so I'm going to have to curtail it a significant amount. So we need to get back to the questions of why you were separated, specifically of why you're separated.

CLAIMANT: Okay. Alright. Did I work on February 15th?

EW-2: INAUDIBLE. Let me see, February 15th, you were late.

01AE000060
18502.0019

CLAIMANT: Continue on. Do you see any more of the entries?

A.H.O.: The question is "Were you late ... did you work on the 15th?" Your response to that question would be what, Mr. Page?

EW-2: Yes she was at work.

A.H.O.: Alright, next question, Ms. Powell.

CLAIMANT: Was I approved for vacation previously for that?

A.H.O.: For what?

CLAIMANT: For vacation?

A.H.O.: For the entire day? For a portion of the day? For what?

CLAIMANT: For the 15th and 16th? For two days.

EW-2: Yes.

CLAIMANT: And who signed for that? For the approval.

EW-2: David Tramble and Travis Hyman.

CLAIMANT: Okay.

EW-2: And I think that's it.

CLAIMANT: Okay. Do ... so did you write me up for being tardy for February 15th whenever I had scheduled vacation? And this is one of the reasons why I was terminated because of tardiness?

59

EW-2:          The tardiness was the reason leading up to it.

CLAIMANT: Excuse me?

EW-2:          Yes, tardiness was one of the reasons leading up to your termination, previous poor performance history.

CLAIMANT: So your warning should be eliminated from this exhibit. Would that be accurate because I was at work that day? I had scheduled vacation but I was written up for being tardy? Why was I written up for being tardy if I was scheduled for vacation?

EW-2:          Because you came in and decided to come to work that day and you were late

CLAIMANT: Okay.

EW-2:          And you didn't report it as being late. You only revised it after the fact that we told you it was wrong; you went back and revised it.

CLAIMANT: This entry from personnel. This is not right.

A.H.O.:        Again, that's a statement.

CLAIMANT: Okay.

A.H.O.:        Next question.

CLAIMANT: Okay. Okay. So would you walk under a roof that had a steam

01AE000062
18502.0019

valve that was coming and pouring water up on the roof from the

sink value?  Would you continue to walk that way or would you

walk into the building another way?

A.H.O.:       How is this relevant to the issue of your separation?

CLAIMANT: If I was late coming back from lunch and I was written up for being

late two minutes, for not being at my desk.

A.H.O.:       Well, that … so what's your question to him about whether or not he

would do it?  I'm not concerned with what he would or would not

do.  I'm concerned with what you did and did not do.

CLAIMANT: Were you aware that I walked into the office building another way

to eliminate the pouring water from the steam bath to get into the

building?  Are you aware that's why I was late at my desk?

A.H.O.:       On what specific day?

CLAIMANT: On 4/10, I'm pretty sure.

A.H.O.:       I don't have anything designating … I'll allow the question but I

don't have anything in the record.  You're indicating that that may

relate.  Do you recall that specific incident? --

CLAIMANT: UNCLEAR.

01AE000063
18502.0019

EW-2:   Yes, she arrived late that day but it was in the morning time.

CLAIMANT: I was wrong. It was February 20th.

EW-2:   February 20th. February 20th you took four hours sick time and you were late that day also. So there are three or four different entries within QC. All of them are about the same distance.

CLAIMANT: Okay. That's ... do I do my work efficiently?

EW-2:   Some parts you did proficiently and you were noted as doing well in those parts. You received in previous evaluations where if you did well, we noted it. If you didn't do well we noted that.

CLAIMANT: Who is we?

EW-2:   The management team in QC.

CLAIMANT: So you all decide of the evaluations but you did the evaluations?

EW-2:   Yes.

CLAIMANT: Okay. Do you see whenever I was explaining to you what I was doing that morning, do you see that that was a natural emotion, a tone of voice? Did you see that I was being a natural emotion to an accusation?

EW-2:   I saw you as being confrontational and argumentative.

62

CLAIMANT: So why ... which did you terminate me on? What was the reason
that you terminated me?

EW-2: The final reason was you being argumentative and confrontational
leading to what we call insubordination to a superior.

CLAIMANT: Okay. Thank you. That's all I have.

A.H.O.: Mr. Stevenson, any further questions for Mr. Page?

EW-1: No sir.

A.H.O.: Ms. Morris, if you would please state your name for the record,
spelling your last name.

EW-3: Brandy Morris. M-O-R-R-I-S.

A.H.O.: And your position title there.

EW-3: Administrative Assistant in Production on the part of the side of QC.

A.H.O.: On this day in question of May 24, 2007, did you have an occasion
to speak with Ms. Powell or was she at your desk when Mr. Page
approached?

EW-3: Yes sir.

A.H.O.: Tell me what happened that day.

EW-3: She was actually picking up her abnormal report which is the payroll

63

report that comes ... prints off of my printer. She was standing directly in front of me and Mr. Steven went and got some coffee out of the break room and he was walking back on the floor ... actually before that happened Mr. Ronnie Cox was standing also beside Ms. Cheryl at my desk. They were both talking to me about employee that had previously been out hurt ... gotten hurt at work the day before, asking if they were alright. And she was picking up her abnormal Report. Mr. Ronnie was getting his production notices which actually help him make the order of his job basically. We were sitting there ... they were both asking me on his well-being of the employee that was out on short-term, excuse me, that had been injured at work is what they were asking me.

A.H.O.:    So Mr. Page came back in after getting coffee?

EW-3:    Yes sir. He came back in from getting coffee. He asked Ms. Cheryl about her work area. Ms. Cheryl, you could tell she got a little frustrated, a little ill about it. She looked at him and said, "I am." She looked at me and she said it real loud. She said, "Brandy, I guess I'll have to make an appointment from now on to talk to you."

64

And she went to … walked towards her office still mumbling to Mr. Steve. That's what I saw.

A.H.O.: Alright, did you see Mr. Page was questioned by Ms. Powell about him pointing his finger. Did you observe any of that or him pointing the finger and telling her to get back to work?

EW-3: To be honest, I remember him telling her to get back to work but I do not recall him pointing his finger because I was in between like adding stuff up and also conversating with both employees standing at my desk, so I could have missed that.

A.H.O.: Did you feel that the … well, let me ask this question. Do you feel that Ms. Powell's response and subsequent statements were inappropriate or insubordinate in any way?

EW-3: Absolutely.

A.H.O.: Alright, do you feel that Mr. Page's statement to her initially and any subsequent statements were inappropriate?

EW-3: No sir.

A.H.O.: Did he say it loud?

EW-3: No sir. He did not say it in a loud tone.

01AE000067
18502.0019

A.H.O.: Did Ms. Powell's voice raise?

EW-3: Her voice raised but to the point that where I'm not used to hearing her voice be like that. Her talk very assertive, very ... I mean I've never heard Ms. Cheryl act in that manner. Yes her voice did raise.

A.H.O.: How long did this incident occur beside your desk? How long?

EW-3: Only a few moments. Two minutes max.

A.H.O.: After the two minutes ... after ... who left the location first?

EW-3: Mr. Ronnie ... I recall Mr. Ronnie leaving my desk going back to his work area which is in my department but he ... he was also in the office, like I said, getting some paperwork. Ms. Cheryl headed back towards her office and Mr. Page also headed back to their office.

A.H.O.: Did you hear or witness any other conversation in the QC office?

EW-3: No sir. The only thing I heard was them walking away and her mumbling whenever she was going back towards her office. Now what she was saying I don't know. That was all I witnessed.

A.H.O.: Alright. Any other information that you would like to provide here today?

EW-3: No sir. That's it.

01AE000068
18502.0019

A.H.O.: Alright. Mr. Stevenson, do you have any questions for Ms. Morris?

EW-1: No sir.

A.H.O.: Ms. Powell, any questions for Ms. Morris at this time?

CLAIMANT: Yes. Brandy, don't you recall when Steve walked in?

EW-3: I sure did. I recall whenever ... I remember him walking in the office and getting coffee. Yes.

CLAIMANT: Did you know that he got coffee after he told me and told Ronnie to get back to work?

EW-3: To be quite honest with you I remember him coming in and telling you to get back to work.

CLAIMANT: Right.

EW-3: But actually how every moment played out that day, I don't recall that. But I do recall what happened as far as you and him verbally is what I recall more than anything because I was extremely shocked. That's what I remember that day.

CLAIMANT: Do you remember me saying "What?"

EW-3: Yes.

CLAIMANT: Is that the tone of voice that you have never heard me say before is

01AE000069
18502.0019

"What?"

EW-3: Yes, exactly. You're correct in the way you said "What."

CLAIMANT: And is there anything else that I said other than "What?" Would you please tell me what was said other than "What?"

EW-3: It was the way that you addressed him and you repeatedly ... the way you said it and the way you said "What?" and you were like "Brandy, I'll just have to make an appointment from now on to see you." That's the way you said it. He heard you say that. And in my personal opinion, the way I would not have carried out like that. I would have just went back to my desk and then later explained where you were coming from. But that's where your voice raised. I was shocked to see because I've never seen you raise your voice like that. You know, normally we tend to mumble underneath our breaths or walk on and say things in our head and we don't tend to say it out loud and for you to be acting in that manner was very different than what I was used to.

CLAIMANT: So you said you didn't see him point his finger at me or Ronnie?

EW-3: I don't recall that.

01AE000070
18502.0019

CLAIMANT: Well, then --

EW-3:     He could have. I mean a while ago he said that he did do it but I
          don't remember seeing that. I mean I wasn't standing there
          watching every moment that took place.

CLAIMANT: Okay. So it is possible that you did not know that he hadn't gone to
          get his coffee yet when he first walked through the office. Is it
          possible that you didn't see him stop and tell me to get back to work
          and then go get his coffee?

EW-3:     It's not possible. It's possible that I could have got it mixed up. He
          could have already walked in before he went and got his coffee.

CLAIMANT: Correct.

EW-3:     But, however, I do remember him telling you to get back to your
          work area and what your response was. But whether he had already
          walked by and got coffee first and was coming back from getting
          coffee, I'm not quite sure of because I have a job to do and that's not
          usually the first thing on my mind is to sit there and watch
          somebody walk by and get coffee.

CLAIMANT: Well then how can you say that we walked back to the QC office

69

together?

EW-3:            I said you could have left before him.

CLAIMANT: Right.

EW-3:            I'm saying he could have been behind you. I mean I'm not saying
                 that you walked right beside each other. Is ya'll left and went to the
                 office and I don't know what happened over there.

CLAIMANT: Well then why did you say that you could hear me talking?

EW-3:            I could hear you mumbling --

CLAIMANT: INAUDIBLE.

EW-3:            I didn't say that. If you would have heard what I said, I said you
                 were mumbling under your breath. You were mumbling as you
                 were walking back to the QC area.

CLAIMANT: Okay. So then it's ... it's contradictory that you think you saw me
                 and Steve walk back to the --

A.H.O.:          She's not saying that. She's not said that. She has said Ronald left
                 first then you left and then Mr. Page left, not together. She's
                 empathic with that. You didn't leave together. We don't need to
                 ask questions whether or not they left together. Whether you and he

70

left together.

CLAIMANT: Well, did you know that I was the first one to leave?

EW-3: No I did not know that. I do recall ... I thought from my recollection that Mr. Ronnie left out first and then you walked off. But as far as, you know, you could have walked off first. But ... I mean, I'm not quite exactly sure on that part, but I recall Mr. Ronnie turn around is what I recall first.

CLAIMANT: So you're not really sure of how it played out that morning?

EW-3: Yes, I am very sure what I heard and what I witnessed and how I saw you being extremely ... your voice carrying and the way you acted toward your boss telling you just to simply get back to your work area. I am ... I do directly recall that. But as far as every little detail about who walked to the office to get coffee, if he went and got coffee first, he was coming back from getting coffee, I do not recall that. Anything else I do recall.

CLAIMANT: So the question I have is then "What more did you hear mumbling between Steve and I other than me asking him 'What'?"

EW-3: You said, "What?" And then you looked at me and you shouted out

01AE000073
18502.0019

loud, "Well, from now on Brandy, I guess I'll have to make an appointment to meet you or to come over here and talk to you or to get my abnormal" is what you were saying and he was walking ... he was like walking through desks in front of me when you were saying that is what I heard, you know, so that's what I'm saying. I heard you be ... that's what I see you being argumentative to him. And then when you walked off I could hear you mumbling but what you said didn't really make sense to me because I wasn't sitting there clearly listening to what you were saying as you were walking down the hall. If I had been standing beside you I could have clearly heard you is what I'm saying.

CLAIMANT: Could it have been your imagination that you thought that I said maybe I'd make an appointment when to see you?

EW-3: No, that is not my imagination. You did say that. You said, "From now on maybe I need to make an appointment to see you from now on." That was not my imagination.

CLAIMANT: Okay, so your testimony is ... disregard that. That's all, sir.

A.H.O.: Alright. Mr. Stevenson, any other questions for Ms. Morris?

72

EW-1:          Ms. Morris, on the morning in question, you were at your desk. Two co-workers were there at your desk discussing another co-worker that they knew and Mr. Page came in and --

A.H.O.:      Alright, we don't need to rehash this testimony that she has provided.

EW-1:          No questions, sir.

A.H.O.:      Then let's move to Ms. Powell. Then Ms. Powell, the dates I read earlier from May 8 of '99 through May 24, 2007, does that sound accurate?

CLAIMANT: March 9th, I was thinking.

A.H.O.:      And were you last employed as an Administrative Assistant?

CLAIMANT: March 8th.

A.H.O.:      Were you last employed as an Administrative Assistant?

CLAIMANT: Yes.

A.H.O.:      And were you terminated by Mr. Page and Mr. Stevenson?

CLAIMANT: That's correct.

A.H.O.:      Did they provide you a reason for your termination?

CLAIMANT: Yes they did.

01AE000075
18502.0019

A.H.O.: What was the reason you understood?

CLAIMANT: Socializing which is against company policy with my fiancé.

A.H.O.: Alright. With regard to Mr. Stevenson's testimony here today as it relates to the incident between you and Mr. Page, tell me what happened that morning.

CLAIMANT: Excuse me. I'm sorry? I didn't --

A.H.O.: Tell me what happened between you and Mr. Page that morning. Hold on.

EW-3: Can I make a restroom break?

A.H.O.: Go ahead and remain out in the lobby and if we need to, we'll call. Let the record reflect that Ms. Morris is being excused for a brief moment. Go ahead Ms. Powell.

CLAIMANT: Beginning with what happened when Steve Page and I --

A.H.O.: Between you and Mr. Page that morning, what's in question here today. I want to know what happened from your perspective.

CLAIMANT: I went to POY2's desk which is Brandy Morris' office which is a real hall way --

A.H.O.: Let's speed it up. Speed it up.

01AE000076
18502.0019

CLAIMANT: Okay. I went to pick up my abnormal report and UNCLEAR sheets.
As I was standing there ... for the moment there was Ronnie Cox
standing there. He came in while I was there.

A.H.O.: Are you --

CLAIMANT: Ronnie Cox is my fiancé. I recommended him a job there. They
hired him --

A.H.O.: I'm not concerned with that whatsoever. He was standing there.
What happened?

CLAIMANT: And I backed ... I just stepped back so he could address to Brandy
because Brandy could help him to get his job done. And I know that
to let an employee of that department speak with their
Administrative --

A.H.O.: Again, Ms. Powell, I don't need to know all that. Okay? The
interaction between you and Mr. Page. That's what I want to know.
Okay. That's what I want to know. That's what is at issue here
today. You're disputing it so I want to hear your position about your
interaction with Mr. Page.

CLAIMANT: He walks in. He says, "Get to work." I said, "What?" He said, "Get

75

01AE000077
18502.0019

to work." I said, "What?" And then he turned to Ronnie and said,

"And you Ronnie get upstairs and get to work." And then he turned

to me and said, "Get to your desk." I turned around. I went back to

my desk. And the phone rang. It was for Steven Page.

A.H.O.: Alright. In this office outside of Ms. Morris, did you ever make a

statement to Ms. Morris to the fact that I'm going to have to make an

appointment with you from now on?

CLAIMANT: No sir.

A.H.O.: You didn't make that statement?

CLAIMANT: No sir. I turned around and walked back to my desk because Steve

said, "Go back to your desk."

A.H.O.: Did you mumble anything on the way back to the desk?

CLAIMANT: No sir.

A.H.O.: Did you go back to your desk?

CLAIMANT: I did that.

A.H.O.: What happened then?

CLAIMANT: The phone rang. I answered. It was for Steve Page. I gave him the

phone. When he got off the phone he was standing there at the desk

01AE000078
18502.0019

behind my desk. And Mr. Jim Lew, the director to the AVP, was

standing there ... was sitting there at his desk. And I said, "Steve,

why didn't you ask me what I was doing in POY2's office?" He

said ... he said, --

A.H.O.: Well, first of all, what are you referring to when you're looking

down and trying to refresh your memory?

CLAIMANT: My notes of the accusation.

A.H.O.: Was that notes that you took on the specific day that they occurred

or did you write those notes in preparation of the hearing here

today?

CLAIMANT: Preparation for the hearing.

A.H.O.: Please from your memory is what I'm looking for.

CLAIMANT: Okay. So whenever he was behind my desk, I said, "Steve, why

didn't you ask me what I was doing in POY2's office?" And he said,

"Cheryl, change your attitude." I said, "Steve, I'm upset." I said,

'This is a natural emotion. I am upset for the way you have

addressed this issue." And he said, "Cheryl, change your attitude."

I said, "Steve, what appears and what is are two different things. I

77

was not socializing. He just so happened to walk in at the same time
I was standing there getting my reports."

A.H.O.:      How long had you been standing there getting your reports?

CLAIMANT: Thirty ... I had just walked in. It all happened within a flash ... a
flash of a lightning.

A.H.O.:      So after you made the statement "what appears and what is are two
different things," what happened from that point?

CLAIMANT: He said, "And from now on I will be signing your AVs." Do you
know what AVs are? Absences and vacations.

A.H.O.:      Okay.

CLAIMANT: So I said, "Well, I have one on Travis Hyman's desk. I was asking
for ... to be off the 29th for a doctor's appointment." So I said,
"When did you become the supervisor that signs my absences and
vacations?" And he said, "I always have." I said, "No sir." And so
he said, "And I'll also do your evaluations too." I said, "When did
this happen ... take place?" He said, "This year." He said, "We
always ..." He said, "We always change." But I'm not so sure
that's the way that it goes. I know in '99, the first year I started, he

01AE000080
18502.0019

did, but this began this year. March was the first time that he's done

my ... signed off on my evaluation in years.

A.H.O.: Would it be possible that management makes decisions that are not

relayed to you?

CLAIMANT: Sure.

A.H.O.: In a timely fashion?

CLAIMANT: Well, sure.

A.H.O.: So why are you finding this to be out of the ordinary or strange or

whatever?

CLAIMANT: Because I was not complying with ... I did not have a socializing

experience with Steve Page and he was jealous.

A.H.O.: I mean, well, how does that have anything to do with whether or not

he's signing your evaluation and/or AVs now?

CLAIMANT: Because --

A.H.O.: I mean you're bringing --

CLAIMANT: He's telling me --

A.H.O.: I mean, what ... at some point and time it never happened because

you were terminated the same day so what I'm asking is why is that

01AE000081
18502.0019

relevant on that particular day as it relates to your separation?

CLAIMANT: I think he just lost it whenever he saw me and my fiancé standing and talking and I didn't talk to him, but only on a professional manner.

A.H.O.: So your whole position is that you were terminated because you refused advances from him?

CLAIMANT: Correct.

A.H.O.: Did you ever relay that to anyone prior to this day ... prior to May 24th?

CLAIMANT: Yes sir.

A.H.O.: Who?

CLAIMANT: To Mr. Eric Stevenson.

A.H.O.: When?

CLAIMANT: February ... approximately February 24th, approximately.

A.H.O.: You indicated or questioned Mr. Page that this was in response to your February 21 counseling. Is that correct?

CLAIMANT: I'm sorry.

A.H.O.: You had a February 21 counseling. You went and saw Mr.

80

Stevenson on the 24th?

CLAIMANT: Okay. Yes.

A.H.O.: Alright. Mr. Tramble issued this to you so why would you question Mr. Tramble's decision?

CLAIMANT: Because ... why would I question Mr. Tramble's decision on being late because --

A.H.O.: It's from Mr. Tramble to you.

CLAIMANT: It says Steve Page observed so Steve told Tramble and Tramble issued it.

A.H.O.: Were you late on February 15th?

CLAIMANT: I was.

A.H.O.: Were you late on February 20th?

CLAIMANT: February 20th? I don't recall because on February 15th, I was on vacation but I decided to come in because there was a death in the office and I thought it was my place to be there to cover so the man could go to their co-worker and same status and to support them at the funeral.

A.H.O.: So with regard to that did you notify anyone that you'd be coming in

81

prior to coming in?

CLAIMANT: No I did not.

A.H.O.: Then what did Mr. Stevenson tell you when you approached him and informed him that you felt that Mr. Page was advancing on you?

CLAIMANT: He said that he could not fire anybody but he would talk to them and he would get back with me in a few months to see how things were going.

A.H.O.: Did you have any further discussion with Mr. Stevenson AVout that matter?

CLAIMANT: I did. I told him that --

A.H.O.: What day was it?

CLAIMANT: It was just about three days later. Whenever he called Kevin ... whenever he called Kevin Stogner which was probably three days later.

A.H.O.: When who called?

CLAIMANT: When Steve Page called Kevin Stogner and accused me of being in the woods with Mr. Palmer Lane. I also then went to Mr. Stevenson. I said, "We have a problem. Steve is not talking to me in a ... not

01AE000084
18502.0019

giving me any jobs, ignoring me, you know, just totally silence."
And he also accused ... accused me of being in the golf cart in the
woods at lunch time with a worker.

A.H.O.: So what was Mr. Stevenson's response to that?

CLAIMANT: He said that he would follow-up in four to five months to see how
things were then.

A.H.O.: Alright, then Mr. Tramble issued another warning to you on March
1, 2007 regarding tardiness.

CLAIMANT: Right. But it was more about the poor performance that he was
emphasizing on this time whenever we were discussing, which there
were ... all of management was in there. It was very humiliating
and ganging up on me with all of the management in there. And so
that's why ... the writing here. I was so upset because of ... the
same day that it's stated here on the 21st, he said that I had a problem
with tardiness. That was the day that the steam bath had come down
and I turned around and I saw Travis Hyman which is my Assistant
Manager walking in the same time. If I was late he was late. But I
didn't choose to walk underneath the water. I went ahead and

83

walked around to go into the POY2 side office so I may have been a minute late at my desk.

A.H.O.: Okay, I understand your position that you were only a minute or two late, but if you take the compounding of the situation that you've been previously late and you've been previously warned about your lateness, tardiness, and again you're being tardy, I mean why do you think that's out of the ordinary that you're being counseled for this again?

CLAIMANT: This one ... the reason I think is out of the ordinary is because it says poor performance and it's --

A.H.O.: I understand you have a question about performance but I'm talking about the tardiness.

CLAIMANT: Well, because whenever you're in an office and you're to be there at 8:00 and I'm there at 8:00. The shift changes at 8:12. Okay. I'm there at 8:00 to be there for these people that needs help, questions answered, I'm there. I'm there to answer their questions when they're not there. There again so I'm there.

A.H.O.: Let me ask --

84

CLAIMANT: Whenever it comes --

A.H.O.:    Let me ask this. You may question Mr. Page about being at the
           guard shack and being at your office. Were you ever notified at any
           point and time during your employment that your start time is 8:00
           and that you're to be at your desk at 8:00?

CLAIMANT: Actually, I've been told last year by the QC director, Bruce Chen,
           that I was to be there at 7:55 so my --

A.H.O.:    To be where at 7:55?

CLAIMANT: At my desk.

A.H.O.:    So did you comply with that request?

CLAIMANT: I did.

A.H.O.:    So on the occasions that you were not at your desk at 7:55, were you
           late?

CLAIMANT: Not until Mr. Stevenson said work start time was at 8:00. I
           questioned --

A.H.O.:    Did you start to come in at 8:00?

CLAIMANT: I was there at all times.

A.H.O.:    Their position is that you were not so I'm trying to resolve that

01AE000087
18502.0019

matter and give you an opportunity to respond. So if you're told a

year ago to be there at 7:55 and then Mr. Stevenson said the start

time is 8:00, what did you do? Come in at 7:55 or come in at 8:00?

CLAIMANT: 7:45, 7:50, 7:55.

A.H.O.:     At your desk?

CLAIMANT: At my desk. It was not a definite time every day.

A.H.O.:     Were you at your desk every day before 8:00?

CLAIMANT: Not every day at 8:00.

A.H.O.:     Okay.

CLAIMANT: I was in the office making coffee. I mean that was …may I tell you

what I was told to do?

A.H.O.:     Certainly.

CLAIMANT: To go by the QC director's office which is UNCLEAR, Bruce Chen.

I didn't have to say "good morning," but stand there and let him

look at me.

A.H.O.:     Who told you to do that?

CLAIMANT: Travis Hyman.

A.H.O.:     And who is he?

86

CLAIMANT: I was not supposed to say ... he was my manager. He's the one that I have reported to for eight years.

A.H.O.: Alright, when you received your counseling on March 1, 2007, it indicated that additional problems including attendance may result in further disciplinary action up to and including termination, did you know that you could be terminated for any additional issue that arose in the future?

CLAIMANT: That is the terminology we use for everybody.

A.H.O.: I understand that. But did you understand that you could be terminated for that, for any reason thereafter?

CLAIMANT: I did. I did..

A.H.O.: Any additional information that you would like to tell me then here today?

CLAIMANT: Yes. I do not feel that I raised my voice in any way out of disrespect. My tone is a high pitch whenever I am frustrated. I never said anything out ... out of line. I was in control. I asked questions as to why I was being accused and I explained myself as to what I was doing at the time he said I was socializing. I have never

87

been disrespectful. I have always gone out of my way to comply

with every ... every suggestion, every ... every command. I have

gone out of my way to keep my job and to love and to be with these

people. I have had no problems until the ... until since I have been

bothered by the talk of having to get underneath the desk and the

boss ... underneath the boss's desk to get a promotion. When that

was going on in an office every day more than one time a day

talking ... and they'd lay around and just ... you know, and just --

A.H.O.:         And when you say "they" who are you referring to?

CLAIMANT: Steve Page, Travis Hyman, Brent Cutright. Brent Cutright is my

supervisor. Travis Hyman is my manager. Steve Page has been

working over on Side One for many years until recently he's come

over to Side Two in the beginning in the mornings. Steve was never

at this office as much as he has since February. So that's why I

asked did he know what I was doing. And for socializing, there is

constant people that go to ... he asked them, you know, I mean there

is all the time socializing with them and that's what he is jealous of.

That I would not talk with him, you know, or confide in him. I feel

01AE000090
18502.0019

that is just I would not comply to his favoritism towards me.

A.H.O.: Anything else?

CLAIMANT: Well, it bothers me that I was supposed to be the leader of public example. Steve said that whenever he wrote me up for tardiness that I should lead by example and wow. That has just put me down to where the faith and the trust that I had in senior management just brought it down to low level for someone to be acting this way towards me and then completely say that two minutes or four minutes is a reason to be fired. But yet the way that I get talked to and talked into their office is not important. It does affect the way people work. It's not the ... lateness is ... it does affect management but management affects me whenever you're talking sexual harassment. And another thing, discrimination. I'm a woman and do you think that the man that was late ever got wrote on his AV that he had to write when he was two minutes late?

A.H.O.: Ma'am, who are you referring to?

CLAIMANT: Travis Hyman, the same day that I came in on 2/21.

A.H.O.: Well, I'll ... I don't know if he was written up or not. I don't know.

89

CLAIMANT: Right. I mean, you know, Steve Page leaves for three hours during the middle of the day. He doesn't record that on his AV. Greg Morris leaves out for tooth surgery for two days. He didn't have to write that on his AV. These are men that can do these things. I'm a woman of two minutes late. Maybe that's what they see as two minutes but, you know, I make coffee for them in the mornings because that's what they want. That's what I've been told to do. Sometimes if I come in that POY2 office area I go directly to the kitchen and make the coffee and then go to my desk which is maybe a minute. Maybe that's where the minute or two is coming in from. But I'm not five minutes, four minutes late.

A.H.O.: Do you sign it or do you clock in?

CLAIMANT: I wanted to but I wasn't given that privilege. I do not sign in. I was ... I've tried since '04 because of '04. I was told that I left one minute early and I was written up for that. I left one minute early and I normally don't turn my computer off until 5:00 or after 5:00. I had worked overtime to where Bruce Chen would not pay me for. I have been told to buy decorations for the office. I spent a $100.00

90

of my own money. Bruce Chen told Travis Hyman to tell me to spend $100.00 or to go beautify the office. I beautified the office, brought the receipts in, gave it to Travis. Bruce and Travis was arguing back and forth, you know, "I'm not paying the bill." Bruce would not pay for it but he said "I told her to do this." And I got up and I said, "Travis, that's okay. I'll take the receipt. I'll take these plants back home with me." I tore the receipt up, the check requisition, and I took my plants home. They tell me to do things and then ... then it's not what they said they did. The same incident with the reason that I was terminated. I never knew anything about argumentative until I found out from you all of argumentative. It was only socializing with my fiancé which is against company policy. And there again we just so happened to be at the desk at the same time, he getting his stuff, I getting my stuff. There again I apologize Steve if I --

A.H.O.: No, no, no. Anything else you want to tell me about your separation?

CLAIMANT: I just feel there should have been a warning of being argumentative,

01AE000093
18502.0019

a warning of … instead of being fired.  I don't think it was

justifiable cause to just fire me.

A.H.O.:     Anything else?

CLAIMANT: That's it.

A.H.O.:     Alright.  Mr. Stevenson, any questions for Ms Powell?

EW-1:     Yes I do, sir.  And afterwards I'd like to add --

A.H.O.:     INAUDIBLE you'll have an opportunity to respond to those

statements.

EW-1:     Ms. Powell, on February 22nd, did Mr. Dave Tramble give you a

warning?

CLAIMANT: February 22nd.  I have one dated February 21st.

EW-1:     Okay.  At that time did you complain that there was

unprofessionalism in the office?

CLAIMANT: Yes sir I did.

EW-1:     Did Mr. Tramble tell you that he hadn't seen any?

CLAIMANT: Yes.

EW-1:     Did you in fact meet with me?

CLAIMANT: Yes.

01AE000094
18502.0019

EW-1:     Did you complain that sometimes people would make statements about where is so and so, check under the boss's desk, she's probably trying to get a promotion?

CLAIMANT: I complained that it was a constant conversation of play, being very lax in the office, being very unprofessional and that I would be wanting it to stop. And being that it was told to you was to stop it. I wanted it stopped.

EW-1:     Yes. Did the conversations … did those conversations stop?

CLAIMANT: Yeah, the first few days. But then when … okay … go ahead.

EW-1:     Are you saying that it continued?

CLAIMANT: Yes sir.

EW-1:     When it continued did you come and complain to me about it?

CLAIMANT: No, I directed it to the persons.

EW-1:     And did that resolve it?

CLAIMANT: It was the same day that I was fired. I didn't have a chance to go back to talk to you.

EW-1:     What day were you separated?

CLAIMANT: The 24th of May. The same day.

93

EW-1:       So the problem ... from that February when you spoke to me until

the day that you were fired you're saying that the problem was

resolved? It was no longer a problem until that one day?

CLAIMANT: Right.

EW-1:       Okay.

CLAIMANT: It just kind of ... it shifted to another way. Not that direct statement.

EW-1:       Thank you. Did you tell me that you did not regard that as sexual

harassment? Very specifically make that statement that you did not

consider it to be sexual harassment, really unprofessional conduct?

CLAIMANT: I did not say that it was not sexual harassment. That it was only

from unprofessional conduct. I did not state that.

EW-1:       Okay. On the day that you were separated, can you tell me what ...

what was the unprofessional conduct that you complained of?

CLAIMANT: Well, Devon Baxley and Bob Carsons was talking, you know,

hanging out in the office with the other guys, Travis and Brent, and

Eric Watson was over there. And he said, "Yeah, well I know where

Eric is. He's sitting in Steve Page's desk. That's how he got the

promotion. He's been underneath Steve's desk. That's how he got

01AE000096
18502.0019

his promotion." I stood up and I said, "Devon," I said and then I looked at Travis and I looked at Eric Watson and then I looked at Brent Cutright, and this was about 10:30 or so. I said, "I wish that you would not speak that kind of talk. It makes me think of homosexuality and I prefer that not to be spoken in here."

EW-1:        What was their response?

CLAIMANT: Devon apologized. And then they all scattered. They all left. Eric then and Steve Page went to the office down the hall, closed doors, and then the next thing I know it was the time that Steve told me to get into the golf cart with him which I didn't want to get into the golf cart with him.

EW-1:        You alleged, implied, whatever, however you want to that Steve Page had requested a physical relationship with you. Did you ever tell me that?

CLAIMANT: No.

EW-1:        When I spoke to you you claimed that I had said I would follow up in six months. Did I in fact say that I would look into it right away and that it's typical for us six months later not only the immediate

95

thing but also six months later to go back to make sure that

everything is still resolved after we take care of a situation?

CLAIMANT: You did say ... I think you said four or five months you would

follow up.

EW-1: The unreimbursed ... alleged unreimbursed expenses, did you ever

... you said that you just took some flowers home and you didn't

bother with it.

CLAIMANT: That's right.

EW-1: When you talked to me about Mr. Bruce Chen saying that you

needed to be at your desk at five till, did I not tell you that he doesn't

speak English very well and that if he meant if you need to come

five minutes early to make sure you're not late that's not

inappropriate but make sure you're not late? Nobody said you had

to be there five minutes early. He said that you can't be late.

CLAIMANT: I have heard you say that sometimes we don't understand the

UNCLEAR but you never said what he meant ... what you thought

he meant, you know.

EW-1: Was I clear that you do not need to be there five minutes before

96

8:00? You need to make sure that you're not late?

CLAIMANT: You just said that make sure you're not late.

EW-1: Several years ago did you send out invitations to multiple people in the plant inviting them to attend a sex toy party?

CLAIMANT: No sir I did not.

EW-1: Did you ever invite Mr. Steve Page to attend a sex toy party?

CLAIMANT: No I did not.

EW-1: Was it a lingerie party that you invited him to?

CLAIMANT: I have never invited Steve to a party.

EW-1: Were there other invitations that you sent out inviting people to a lingerie party?

CLAIMANT: I have never sent invitations out at that plant as far as sex party, lingerie party, bridal party, no party; I have never invited anybody to.

EW-1: Those will be all the questions, sir.

A.H.O.: Okay. I'm going to go and get Mr. Cox real quick and we'll get his testimony. We'll go ahead and proceed from that point.

CLAIMANT: Do I stay here?

97

A.H.O.:      You stay here. Okay. Mr. Cox, my name is Danny Beach. I'm conducting a hearing here today to determine whether or not Ms. Powell is entitled to unemployment insurance benefits or not based upon her separation. She has called you as a witness to provide testimony on her behalf. I'm simply going to place you under oath and ask you some questions then the employer will have the opportunity to ask you questions as well as Mr. Stevenson who is representing the employer here today. Before I begin to do that do you have any questions for me?

CW-1:       No.

A.H.O.:      Alright. If you would please raise your right hand and be placed under oath. Do you solemnly swear or affirm the testimony you are about to give in this hearing to be the truth, the whole truth, and nothing but the truth, so help you God?

CW-1:       I do.

A.H.O.:      And please state your name for the record, spelling your last name.

CW-1:       Ronald D. Cox. C-O-X.

A.H.O.:      Are you employed with Nan Ya Plastics?

98

CW-1:     No sir.

A.H.O.:   You were separated?

CW-1:     Yes sir.

A.H.O.:   And when were you separated?

CW-1:     I believe the official date was 6/5.

A.H.O.:   June 5?

CW-1:     Yes.

A.H.O.:   And were you terminated or did you quit?

CW-1:     I was terminated.

A.H.O.:   Do you have a relationship with Ms. Powell?

CW-1:     I do.

A.H.O.:   What is your relationship?

CW-1:     Fiancé.

A.H.O.:   Alright.  On May 24, 2007, did you witness any interaction between

          Ms. Powell and Mr. Page in the POY2 office?

CW-1:     I did.

A.H.O.:   Tell me what you observed.

CW-1:     I came in … start from the first … I came in for my meeting to talk

01AE000101
18502.0019

to Ms. Brandy Morris about working orders. As I came to the desk where Brandy was, Ms. Powell backed up. She was at the desk UNCLEAR something. INAUDIBLE and about the same time Mr. Page was coming through. It all kind of happened quickly. And he said, "Cheryl, don't you have a job to do? Get back to your desk." And she kind of turned around and said, "What?" He said, "I said get back to your desk." And I'm paraphrasing. I'm doing the best I can remember. And then he looked at me. He said, "Ronnie, you better get upstairs and go to work." And I turned around and told him I was down there UNCLEAR. It happened so fast. That's about the extent of it.

A.H.O.: When he told you to go back upstairs, what did you do?

CW-1: Well, I went ahead ... I think I may have already asked Brandy AVout an order. I turned around and told him that I was downstairs working. I was asking Brandy about an order. Then when I finished I went on back up, you know, I went back to work. INAUDIBLE.

A.H.O.: And when Mr. Page initially instructed Ms. Powell to ... if she had a job to do and she needed to go back to her desk, did you have any ...

100

do you recall Ms. Powell making any response?

CW-1:       She just said, "What?"

A.H.O.:     Did you hear her make any other statements?

CW-1:       She may have said, "I am over here working." I don't remember

            exactly what was said. Like I said it happened so fast. It was like

            when I came in Mr. Page was coming down the hall.

A.H.O.:     Do you feel that Ms. Powell's statement or statements was

            inappropriate?

CW-1:       No. No sir.

A.H.O.:     Was it made it a loud or elevated voice?

CW-1:       Not that I remember.

A.H.O.:     Do you recall Mr. Page's statements being in a loud or elevated

            voice?

CW-1:       Yes sir I do. In fact it quite astonished me and the attitude that he

            had when he came in.

A.H.O.:     Alright. Did you ever hear Ms. Powell make a statement to Ms.

            Morris that she guessed or figured she'd have to make an

            appointment with her from now on to get her paperwork?

101

CW-1:       I don't remember that.  She could have but like I say it happened ...
            it all happened so fast.

A.H.O.:     So all you heard Ms. Powell said was "What?"

CW-1:       Basically that's it.  Yes sir.  Or "What did you say?"

A.H.O.:     I believe you indicated that she might have made a statement that
            she was doing her job and she was working.

CW-1:       Right.  She might have made a statement.  She was working.  And
            that's when I turned around and told Steve that I was down there,
            you know, ... there was no time for chit-chat.  My job was fast-
            paced.  I was in there to do what I had to do and get out.

A.H.O.:     Alright, any other information that you would like to tell me that
            relates to Ms. Powell's separation?

CW-1:       No sir.  That was ... I would guess that at the very longest that part
            was maybe two minutes.  It was like a flash.

A.H.O.:     Alright.  Ms. Powell, any questions that you have for Mr. Cox at this
            time?

CLAIMANT:  Do you remember him pointing his finger and asking me or telling
            me to get back to work?  Did you see him point his finger at me?

01AE000104
18502.0019

CW-1:      He pointed his finger at you when he was talking. He did do that.

CLAIMANT: Thank you. Do you ... may I ask him a question?

A.H.O.:      Yeah. I was going to say "Any other questions?" So go ahead.

CLAIMANT: Do you think that he was trying to start an argument with us?

CW-1:      I believe Mr. Page was trying to start an argument with both of us
and it seemed as though he was not my supervisor and I was in the
right field office so he was maybe trying to start a fight with me
also.

CLAIMANT: Okay. Thank you. That's all the questions I have.

A.H.O.:      Mr. Stevenson, any other questions for Mr. Cox?

EW-1:      No sir.

A.H.O.:      Alright. Mr. Cox, thank you for providing your testimony here
today. At this point and time you're free to return back to the lobby.
Thank you.

CW-1:      Thank you.

A.H.O.:      We have taken testimony from all parties present at the hearing
today. I'm going to move back to the employer then at this time.
Mr. Stevenson, you've heard Ms. Powell and Mr. Cox's testimony,

103

as well as Mr. Page's and Ms. Morris', is there any statements that you would like to make at this time?

EW-1: Yes sir there are. In February, Ms. Powell came to me and she complained that there was unprofessional conduct. I'm very aware of the sexual harassment implications and very specifically and very emphatically she said that she did not consider it to be a sexual harassment; that she considered it to be unprofessional conduct that was addressed and resolved. She complained about the situation of the golf cart. And seeing it as jealousy rather than the golf cart is there for the people who are working through lunch hour in the (inaudible) to be able to use to go out and get samples. They weren't supposed to be using the golf cart. We had people who had stolen things and believe they took the golf cart out to the tree lines and tossed them over the fence, etc., and I explained this clearly to Ms. Powell that the issue is you're not supposed to be driving the golf cart out there. There are … Ms. Pam Deutch specifically complained that she had received an invitation from … this is several years before … from Ms. Powell inviting her to a sex toy

01AE000106
18502.0019

party. Mr. Steve Page has reported and I've heard other people report it although it was many years ago and I don't remember who else complained about that. And as far as Mr. Steve Page making advances, when I investigated that situation I was very clear and very specific and Ms. Powell was also very clear that none of the conversations were ever directed at her. And that in fact she participated in the conversations and laughed right along with everybody else and that she had never objected to it. When I asked the management team there to not talk like that they did. I disagree with her characterization of what happened on the last day that she was separated. Mr. David Tramble is the one who had given her the employee evaluation in '04. Everybody agreed that she should receive another employee evaluation. When she began to get these warnings that's when she began to make the complaints. And our position is still very firm. When Mr. Steve Page came in the employees were socializing. He told her to go back to her department and wait until her fiancé was gone and then she could go back there and do her work. And she was argumentative,

105

confrontational, and that's when she was separated. And that concludes my statement, sir.

A.H.O.:    To respond to Ms. Powell's argument then, was she terminated due to her complaints about these matters of the sexual nature?

EW-1:    Not even a little bit. That was not at all considered.

A.H.O.:    Was ... to your knowledge was she discriminated in any fashion as it relates to her time issue, the tardiness issue?

EW-1:    Her allegations of other people and what times they were or weren't there I can't speak to them, know anything about that, but I do know timeliness is very important to everybody. The director in that area, Mr. Bruce Chen, he sees it as it makes his section look bad because people are coming in late. His ... I can't say that nobody has ever come in late but Ms. Powell wasn't written up for every time she was late. She was ... had a chronic habit of tardiness. That is what got her the warnings. The specific outburst and being confrontational is what ultimately ended up with her being terminated.

A.H.O.:    Any other statements?

106

EW-1:      No sir.

A.H.O.:    Ms. Powell, any other questions for Mr. Stevenson at this time?

CLAIMANT: Who is Pam Deutch? Somebody that you said I had sent --

EW-1:      Pam Deutch worked at … in the safety office several years ago.

CLAIMANT: I wasn't there. --

A.H.O.:    Again, you've asked him the question. He's responded.

CLAIMANT: Okay. Where did you get your information from?

A.H.O.:    Relating to what?

CLAIMANT: Relating to I gave an invitation to Ms. Pam Deutch?

EW-1:      Pam Deutch.

CLAIMANT: I've never got … do you know that I … when did she work there?

EW-1:      She left several years ago.

CLAIMANT: Does she have another name?

EW-1:      I don't recall her maiden name.

CLAIMANT: Did you know that I've never heard of that person before?

A.H.O.:    That's kind of what your knowledge is or what your question is or
           what your opinion is.

CLAIMANT: Okay. Can I make statements or are these are just questions?

01AE000109
18502.0019

A.H.O.:        These are just questions. Just questions. I've still got questions for

               Mr. Page as well and then I'll come back to you.

CLAIMANT:   Did you not think that when I went to you and I reported about the

               unprofessionalism and the talk that was being said amongst each

               other and being directed towards me that that was not a form of

               sexual harassment? Being the personnel manager, don't you think

               that --

A.H.O.:        Well, you've asked a question. Let him respond.

EW-1:        Yes. Considering some of the other things when I spoke to your ...

               the people in your department, they said that they never once

               thought that you'd feel uncomfortable with talking about somebody

               being a brown-noser. These weren't sexual things. It was a

               description of a sympathetic co-worker. Nobody was talking about

               engaged ... being in sex acts. This simply doesn't go on. They

               were simply talking about somebody being a brown-noser or having

               to get under ... or go under the boss's desk for a promotion. It's a

               crass way of describing things. However, when you specifically and

               I went back and forth with you and you specifically said "I do not

01AE000110
18502.0019

consider this to be sexual harassment." I relied on what you said; that it wasn't sexual harassment. And I have a record that you had complained of unprofessional conduct. I addressed it and it stopped.

CLAIMANT: Do you recall me specifically asking you to tell Steve Page to stop and I said that he is the one to lead by example?

EW-1: You complained of several members of management. I have them all in this record here. You did not single out Steve Page. You never once said that Steve Page .. in fact, what you emphasized was that nobody was ever talking to you when they would have these conversations. But you didn't like listening to them. Then you went on to say that often times you would joke and laugh with everybody else.

CLAIMANT: Do you agree whenever ... do you agree like when there's men in the office and there's only one woman there that your ... that I would be singled out?

EW-1: No.

CLAIMANT: So do you agree that you see where that I wouldn't say that it was sexual harassment because I could lose my job?

109

EW-1:       No.

CLAIMANT: Do you see that that how I could see that it is sexual harassment?

A.H.O.:     Again, you're asking for your interpretation of a matter. He can't respond to anything as it relates to your interpretation or your opinion.

CLAIMANT: Okay. How could you have put a stop to this? How could you stop this type of practice?

EW-1:       As we said before, I spoke to the management team and asked them to stop. Then you agreed that it did stop from February to now.

CLAIMANT: Okay. Why didn't I get the opportunity to tell you on May 24th?

EW-1:       You had the opportunity to tell me whatever you wanted to. You chose to leave. When you returned you specifically said that you did not want to discuss the issues. You simply wanted to go through the paperwork and the business portion of the exit interview.

CLAIMANT: What was the specifics that I was to comment on?

EW-1:       I'm not ... I don't understand the question.

CLAIMANT: Let me ask it another way. What kind of questions do terminated employees ask whenever they've been terminated for a direct reason

110

that you said your supervisor, Steve Page, has decided to terminate you because of socializing with your fiancé? What kind of questions could I have asked?

A.H.O.: Again, you're asking him for information that you would do and you can not place his brain to yours and come up with questions that you want to ask.

EW-1: I can answer --

A.H.O.: You don't have to answer the question. She's asking --

CLAIMANT: Let me ask it in another way. What do employees ask?

A.H.O.: It's not relevant to the issue here today.

CLAIMANT: Okay. So I don't have any more questions about that particular incident of the termination.

A.H.O.: Ask your next question.

CLAIMANT: Okay. Are you accusing me of sending out invitations ... do you have a copy of that invitation that I could see and where my name was on there?

EW-1: I do not.

CLAIMANT: Okay. Let's see. I don't have any more questions.

111

A.H.O.:     Mr. Page, at this point and time, we're going to move back to you. One last question for you. Did you discriminate in any way towards Ms. Powell?

EW-2:     No.

A.H.O.:     Did you treat her any different than anyone else in your office under your supervision?

EW-2:     No.

A.H.O.:     Did you sexually harass Ms. Powell?

EW-2:     No.

A.H.O.:     Any other statements that you would like to make at this time, Mr. Page?

EW-2:     No.

A.H.O.:     Alright. Mr. Stevenson, any other questions for Mr. Page?

EW-1:     No sir.

A.H.O.:     Ms. Powell, any other questions for Mr. Page at this time?

CLAIMANT: Yes. When you talk about me. ... okay. How am I going to ask this? When you call your wife on the phone, she works in the safety department, is that correct?

01AE000114
18502.0019

EW-2:      She does.

CLAIMANT: She does. Okay. When you talk about lunch and what you're going

to do when you get off work, is that socializing?

EW-2:      Yes.

CLAIMANT: Okay. Is fifteen minutes too much time to spend on the telephone

with your wife while you both have jobs to do?

EW-2:      I think fifteen minutes is a long time. Yes.

CLAIMANT: Thank you.

A.H.O.:    Any other questions?

CLAIMANT: No.

A.H.O.:    I have no additional questions for either party. Ms. Powell, any

other statements before I conclude the hearing then?

CLAIMANT: Well, I did report to Mr. Stevenson the day before that I was fired

about Steve Page; that he ... I felt had wrongfully terminated a

gentleman that had filed for early retirement and Steve fired him the

morning that --

A.H.O.:    I don't want to hear about that. The fact that he fired forty people is

not relevant to the fact that you were separated. Okay. I'm here with

113

your separation and not anyone else's separation. So how is the fact that you went to someone and said that you felt that Mr. Page should not have terminated this individual relevant to your separation?

CLAIMANT: Because I again had been ... I have told on Steve of being bothering me physically, wanting physical --

A.H.O.: Well, you can respond to that but this has nothing to do with this other person being separated. So what statement did you want to make with regard to closing out this hearing? What other statement did you want to tell me?

CLAIMANT: Well, he told Bruce Chen "I fired the guy who had applied for short-term disability." And I wrote up the involuntary notice. And then I felt like that I was in the middle of it because Mr. Edward Graham had come to me prior --

A.H.O.: Again, Ms. Powell, I ... you can make the argument " I feel that because I was in the middle of this they terminated me." You can make that statement. You don't have to prove anything here today. The employer ... the employer is here describing why you were separated from employment. It's their burden to show that you were

114

terminated for cause. You don't have to prove one thing in this hearing. Okay. It's the employer's burden. Okay. And you can make allegations as to why you were separated from employment and that's fine but you don't have to go in any detail to explain what your position is. All I do is as soon as you make that statement I question them. That's all I'm doing. That's all I have to do. If they said yes, I'm going to follow up. If they say "no," that's the end of it. Okay?

CLAIMANT: I feel I was separated because of discrimination.

A.H.O.: Alright, and I've asked them that question and they've said "No."

CLAIMANT: Okay.

A.H.O.: Any other information you want to tell me before I conclude?

CLAIMANT: It goes back a long way.

A.H.O.: I'll tell if it's relevant or not.

CLAIMANT: Okay.

A.H.O.: And why are we bringing it up now as opposed to some previous time. I'm ready to close the hearing now. So why are you bringing it up now and not before?

115

CLAIMANT: Because I'm proving --

A.H.O.: You don't have to prove anything.

CLAIMANT: Okay, well then, just disregard it.

A.H.O.: Anything else you want to tell me before I conclude the hearing then?

CLAIMANT: I feel that I was not insubordinate. I was not speaking out of line. That I only asked questions to save my job. I wanted to work there. I had a lot of time invested there. I knew my job. I have been told by Steve Page in March that my job performance was excellent. For me to work on my tardiness. And there again I do not totally agree … I do not agree with the tardiness situation. I explained myself as best I could in a fast economy fashion because I was pushed and pressured. Whenever I do the … whenever I was being written up they hurried to get me out of there. The same way with my evaluations. Duh, duh, duh, get out of there. They even … Steve Page even told me for my next year don't write a lot. Don't tell a lot. And then whenever in my exit interview I was not given enough time. It was ten minutes to twelve. I had an appointment at 12:15.

116

> That's the reason why I wanted to leave that day. I did not want to stay and try to make such future decisions --

A.H.O.: Well, at that point and time you were fired so what did it matter?

CLAIMANT: I had to decide if I could afford the 401K.

A.H.O.: I mean I understand that --

CLAIMANT: As far as --

A.H.O.: I'm not disputing the discussions about that but I understood you to mean that you were questioning whether or not you were being terminated for socialization or for being argumentative and you didn't want to discuss that at that point.

CLAIMANT: I knew nothing about argumentative.

A.H.O.: Well, the fact that you wanted to discuss your insurance problems. I had no problem with that. I mean that's decisions you have to make that's going to affect way beyond that particular day in question. And the fact that you wanted to come back later I have no problem with that. There's nothing wrong with that whatsoever. And the fact that you wanted to come back and talk about it another day. Again, I have no problem with that. I'm here to make a decision on

117

at some point and time the employer said, "Okay. We're going to cut ties with this particular person." What made them cut the ties at that particular point? Whether or not you came in and listened to an exit interview is not relevant. Whether or not you were told you were fired over the telephone or in person is not relevant. It doesn't really matter who told you you were terminated. You were terminated. Why were you terminated? That's what I'm trying to find out. That's what I'm going to make my decision on. So all the stuff that you were talking about the exit interview, I'm not even considering any of that because it has no bearing on my decision.

CLAIMANT: I was told because I was socializing.

A.H.O.: Again, you've told me that earlier.

CLAIMANT: Other than that --

A.H.O.: You told me that earlier.

CLAIMANT: I do not agree. That's why I'm here appealing the decision. I knew nothing about this. I had never been warned on being argumentative.

A.H.O.: Well, if someone's insubordinate, do you need a warning? If

118

someone's going to be insubordinate, does the employer or is the employer required to say "Hey, that's action is insubordinate. You don't need to do it again." Or is it a terminable offense?

CLAIMANT: I think that I should be told not to raise your voice or I believe that I should have been told that my voice was being raised. I have not ...have I raised my voice here today?

A.H.O.: I'm not answering the questions. You're answering my questions.

CLAIMANT: Okay. I feel I should have been warned, orally, written, ever how it goes instead of just being terminated. I feel I was wrongly terminated on false information.

A.H.O.: I have no additional questions for either party as it relates to the issue of separation. And as there is no further testimony, I hereby declare that this hearing is adjourned.

**HEARING CLOSED.**

01AE000121
18502.0019

This is to certify that the foregoing pages are a direct transcription of an audio recording

and it is as true and accurate as could be determined by such audio recording.

IN WITNESS WHEREOF, I have hereunto subscribed my name this the

26th day of August, 2007.

_____
Betty Stevens

SWORN to before me this the
_____ day of _____, 2007.

_____
Notary Public for North Carolina
My Commission Expires: _____

01AE000122
18502.0019