

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)
(Cite as: 2003 WL 21847841 (M.D.N.C.))

Page 1

H
Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
Mona Wilson DAVIS, Plaintiff
v.
SEVEN SEVENTEEN HB PHILADELPHIA CORP. NO. 2 t/a Adam's Mark Hotel, et al. Defendants
No. 1:02CV332.

June 3, 2003.

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

DIXON, Magistrate J.

*1 This matter comes before the court pursuant to Defendants' motion [Doc. # 44] for summary judgment. Plaintiff Mona Wilson Davis filed suit in this case against Defendants Seven Seventeen HB Philadelphia Corp. No. 2 t/a Adam's Mark Hotel ("Seven Seventeen") and HBE Corporation dba Adam's Mark Hotel & Resorts ("HBE") alleging race discrimination in violation of Title VII and 42 U.S.C. § 1981. Davis has filed a response to the motion, and Defendants have replied. In this posture, the matter is ripe for disposition.

Background

A. Factual Summary

Davis, who is African-American, was hired by Adam's Mark Winston Plaza Hotel in Winston Salem, North Carolina, (the "Hotel") in 1995. She was working as a Banquet Captain at the Hotel, when, in May 1997, she applied for, and was denied, promotion to a position as Assistant Banquet Manager. In August 1997, she filed a charge with the EEOC, alleging employment discrimination on the basis of race.

On September 11, 1997, the Hotel's Food and Beverage Director, Scott Holbrook, prepared a memorandum outlining several workplace conduct problems related to Davis. He noted four incidents of misconduct that had been reported to him. He described 1) a report by a co-employee, Linda Braddy, that Davis had arrived 30 minutes late to work, contributing to poor service of breakfast, 2) a report that Davis confronted Braddy for reporting her lateness, telling her to "keep her mouth shut," and to "kiss her ass," thereby making Braddy upset, 3) a report that Davis had improperly secured a gratuity from a customer, and 4) a report that Davis had improperly called in an absence, by failing to report the absence to the appropriate manager. (See Holbrook Affidavit, ¶¶ 15-19, Ex. C). Based on an investigation, which included interviews with customers, employees and Davis, Holbrook concluded that these complaints were warranted, and that the actions by Davis were violations of the employee handbook. He characterized his memo as a "written warning," and noted that any further violations would "result in further progressive disciplinary action."(Id.).

Davis does not dispute that Holbrook prepared the memorandum or talked to the witnesses involved. Nevertheless, Davis provides a different account of the incidents reported by Holbrook. For instance, she claims that the reprimand for arriving late to work (6:30 a.m. instead of 6:00) was unfounded because she had always come to work at 6:30 a.m and had never been previously reprimanded or informed that she needed to come in at 6:00. (Davis Dep., pp. 144-47). She denies that she ever made the alleged threatening comments to Braddy. (Id. at pp. 154-56). She claims that she never solicited an additional gratuity from the complaining customer and that a different manager on duty was responsible for explaining the gratuity to the customer. (Id. at pp. 79, 163-64). Finally, she claims that she was unable to locate the appropriate manager when her

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)
(Cite as: 2003 WL 21847841 (M.D.N.C.))

Page 2

son had an emergency injury. (*Id.* at pp. 172-73).

*2 In November 1997, Holbrook prepared a "write-up" concerning further misconduct on the part of Davis. Three employees (Donna Dillon, an African-American server; Tracy Parker, a Caucasian server; and Marcie King, an African-American banquet captain) "voluntarily came forward" and provided written statements to Holbrook describing how Davis had engaged in an unprovoked outburst of obscenities within earshot of guests in a Hotel cafe. (Holbrook Affidavit, ¶ 20, Ex. D). Considering "the use of profanity in guest areas to be an offense warranting serious disciplinary action, including termination," Holbrook and Virginia Shippole, the Personnel Director of the Hotel, decided to further investigate the profanity incident. (Shippole Affidavit, ¶ 20).

In addition to interviewing Dillon, Parker, and King, Holbrook discussed the matter with Davis. Davis denied having used vulgar language, claimed that other employees used vulgar language at the time, and contended that another employee, D'Lisa Smoot, could corroborate her version of the events. (Davis Dep., p. 194). Holbrook interviewed Smoot. (Smoot Affidavit, ¶¶ 4-5). Smoot claimed at the time that she "did not hear or see anything."(Holbrook Affidavit, ¶ 22; Smoot Affidavit, ¶ 5). Holbrook "construed Ms. Smoot's remarks as an indication that she did not want to get involved in the matter," and found that "her comments did not conform to either Ms. Davis's account or to those of the other witnesses. (Holbrook Affidavit, ¶ 22). Accordingly, Holbrook found that Smoot's testimony "did not help clarify what had occurred."(*Id.*). Having completed the investigation, Holbrook and Shippole found the statements of the other witnesses to be compelling evidence of improper conduct by Davis. They found particularly credible the statements of King, who was believed to be Davis' friend. (Shippole Affidavit, ¶ 22). Given the unequivocal and emphatic statements by the three employees that Davis had used profanity, and the statement from a fourth employee that she had not witnessed anything, Holbrook and Shippole concluded that the allegations of misconduct by Davis were well-founded. Accordingly, the Hotel gave Davis a "final warning," and counseled Davis that any subsequent violations of workplace policy would result in dismissal. (Shippole Affidavit, ¶ 23, Ex. L). Holbrook also counseled Davis concerning the four reported incidents of misconduct described in Holbrook's September memorandum. (Holbrook Affidavit, Ex. C (indicating that Davis "refused to sign" the document on November 12, 1997)).

Davis claims that she never used profanity as described in the written complaints by employees. She also claims that deposition testimony by Smoot and later averments by Dillard contradict Holbrook's account of what the witnesses reported to him. First, Davis claims that Smoot "specifically informed Holbrook that Davis had not used profanity as was alleged by the two servers and corroborated Davis' version of the facts."(Mem. in Opp., p. 8). Second, she points to a declaration by Dillard, dated April 28, 2003, in which Dillard avers that Holbrook told her that he wanted to fire Mona Davis. Additionally, in her declaration, Dillard avers that Holbrook told Dillard what to write in her statement, and that her written statement "is false." (Declaration of Donna Dillard, ¶ 4).

*3 In January 1998, Holbrook prepared a "write-up" for a further set of incidents. The write-up concerned allegations by two different employees who complained of harassment by Davis. The first employee, an African-American Banquet Server working under Davis, Aaron Mackey, complained that Davis had warned him to "be careful" because he "was going to be set up so that [he] would be fired," causing him to be uncomfortable and to fear his job security. (Holbrook Affidavit, ¶ 25, Ex. E). The second employee, a server working under Davis, Tracey Parker, complained that Davis had been harassing her for months, making comments about her weight and calling her a "cow." (*Id.* at ¶ 26, Ex. E). Davis was notified that she was being suspended pending an investigation. At the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)
(Cite as: 2003 WL 21847841 (M.D.N.C.))

Page 3

time, Davis denied that she had engaged in the complained-of conduct. Holbrook and Shippole interviewed Mackey and Parker and found them to be credible witnesses, and determined that the complaints were well-founded.

Davis continues to deny that she engaged in the conduct described in the January 1998 write-up. She claims she never called Parker any names and that she never made any cow or pig noises to her. (Davis Dep., pp. 203-06). Additionally, she claims that she could not have made the threatening statement to Mackey because she was not present at the location where Mackey reported the statement was made. (*Id.* at pp. 200-03).

Based on their investigation regarding the most recent misconduct complaint, as well as "the history of inappropriate and unacceptable conduct and policy violations that Ms. Davis had compiled in the last several months," Holbrook and Shippole determined that Davis should be discharged. (Holbrook Affidavit, ¶ 28). They recommended to the General Manager of the hotel, Mr. Wise, that Davis be discharged, and "under the circumstances, Mr. Wise approved the recommendation to dismiss Ms. Davis."(*Id.*). Davis's employment was terminated on January 21, 1998.

B. Procedural History

Davis initially filed this action as a putative class representative in the Eastern District of Pennsylvania on December 14, 2000. In the Second Amended Class Action Complaint, Davis maintained that the Hotel violated Title VII and 42 U.S.C. § 1981, by: (a) denying her a promotion to the Assistant Banquet Manager position in May 1997 on the basis of race, and (b) retaliating against her for filing an EEOC charge by disciplining her and terminating her employment in January 1998. (Am.Compl., ¶¶ 59-66).

On March 25, 2002, the Eastern District of Pennsylvania denied the motion for class certification in this action, and transferred, for improper venue, three plaintiffs, Diana Byrd, Tracey Ford, and Davis, to the Middle District of North Carolina. Byrd took a voluntary dismissal of her claims without prejudice on July 15, 2002. A Joint Stipulation of Dismissal with Prejudice disposing of Ford's claims was filed on March 17, 2003, leaving Davis as the only remaining Plaintiff. (*See* Doc. # s 35 & 43).

*4 In their motion for summary judgment, filed March 25, 2003, Defendants argue that there are no genuine issues of material fact as to any of Davis's claims. Defendants also assert Seven Seventeen is an improper defendant in this action, given that Seven Seventeen is a separate legal entity relating to a hotel in Philadelphia, which has never owned, managed or operated the Winston Salem Hotel that employed Davis. As such, Defendants request that all claims against Seven Seventeen should be dismissed with prejudice, thereby leaving HBE as the only proper defendant. (Mem. in Supp., p. 1). Davis responded on May 2, 2003, opposing the motion only insofar as it pertains to Davis's § 1981 retaliation claim. (Mem. in Opp., p. 2). Defendants submitted a reply on May 19, 2003.

Discussion

A. Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."FED.R.CIV.P. 56(c). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd, v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (quoting FED.R.CIV.P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Virginia,* 67 F.3d 53, 56 (4th Cir.1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251 (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex,* 477 U.S. at 331 (Brennan, J., dissenting)."[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

B. Unopposed Summary Judgment on Certain Claims

Davis opposes only a portion of Defendants' summary judgment motion in her response. She writes,

*5 Davis filed the present action against Defendants in the context of a Second Amended Class Action Complaint wherein she alleged specifically that Defendants *terminated her employment in retaliation* for having opposed discrimination. (Para.66). Davis opposes the motion *only insofar as it pertains to her claim of retaliation in violation of 42 U.S.C. § 1981.*

(Mem. in Opp., p. 2) (emphasis added). In her Memorandum in Opposition, Davis thus makes clear that she is now only arguing in support of "her claim of retaliation in violation of 42 U.S.C. § 1981."(Mem. in Opp., p. 2). Accordingly, Defendants' unopposed motion for summary judgment as to Davis's first claim, non-promotion on the basis of race, should be granted. Additionally, Defendants unopposed motion for summary judgment as to Davis's claims based on Title VII should be granted.[FN1] Furthermore, Defendants unopposed motion concerning the issue of dismissing Seven Seventeen as a Defendant should be granted.

> FN1. Defendants also moved for summary judgment on grounds that all the Title VII claims and the § 1981 non-promotion claim were time-barred. *See Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 149-51 (1984) (stating that Title VII claims must be filed within 90 days of receiving an EEOC right to sue letter); *Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 281 n. 2 (4th Cir.2000) (stating that § 1981 claim must be filed within 3 years of the wrongful act). Davis did not oppose this argument, thus providing an additional basis upon which summary judgment should be granted as to these claims.

C. Contested Claim

Apart from isolating unsupported claims, Davis's memorandum in opposition is also helpful in clarifying the nature and boundaries of her remaining retaliation claim. Davis' complaint could, on its face, be read to assert *two* additional claims of retaliation, one alleging retaliation in disciplining Davis, and another for retaliation in terminating Davis. (*See* Mem. in Supp., p. 2). While this may be a fair reading of her complaint, Davis does not, in her memorandum in opposition, explicitly divide her remaining claim into two distinct parts. Rather, she clearly indicates that she is only asserting *one* "claim of retaliation" and that this retaliation claim is a claim that "Defendants *terminated her employ-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*ment* in retaliation for having opposed discrimination."(Mem. in Opp., p. 2; *see also* p. 17 (stating in her "conclusion" that "genuine issues of material fact exist regarding whether Defendants' *decision to terminate Plaintiff's employment* was motivated by retaliation for filing an EEOC charge") (emphasis added)). She appears to allege that because the termination was undisputably based on all the disciplinary counselings, these events together relate to a single "claim of retaliation." (Mem. in Opp., p. 2). For instance, she asserts that after her charge was filed, "Davis began to receive unsupported disciplinary counselings, ultimately *resulting in* her termination."(*Id.*). Furthermore, she argues that "Defendants claim that Plaintiff was terminated *as a result* of written disciplinary counselings reflecting a pattern of misconduct," but that "Defendant's [sic] purported reason *for the termination* is unworthy of credence."(*Id.* at p. 12) (emphasis added). As such, Davis does not appear to be asserting for purposes of this case that any individual act of disciplinary counseling by the Hotel is a "discrete act" of retaliation actionable in itself and apart from the termination which followed.[FN2] With these points in mind, the court will now turn to the merits of Davis's retaliatory discharge claim.

> FN2. If she were bringing a claim on grounds that the fall 1997 disciplinary counselings, apart from the termination, alone constituted discrete acts of retaliation, the claim would be time barred. A § 1981 claim must be filed within 3 years of the wrongful act. *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 281 n. 2 (4th Cir.2000). For discrete acts occurring before December 1997,Davis would have had to file her claims before December 2000. *See Nat'l R.R. Passenger Corp. v. Morgan*, 122 S.Ct. 2061, 2071 (2002) ("Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). Although Defendants seem to read Davis's claim as alleging that the 1997 discipline notices were retaliatory, (*see* Reply, p. 3), the court reads Davis's claim as only alleging that the 1997 discipline notices were a pretext for the retaliatory discharge in 1998. Although any claim based on the 1997 discipline notices as discrete retaliatory acts would be time barred, this does not mean that Davis should be time barred from arguing that the reason for her discharge (the pattern of discipline write-ups in 1997-1998) was pretextual because it is dishonest.

*6 In seeking to establish her claim under § 1983, Davis relies upon the familiar *McDonnell Douglas* burden-shifting analysis. Under this analysis, an employee must first establish a prima facie case of retaliation by showing (1) that she engaged in protected activity, (2) the employer discharged her, and (3) that a causal connection existed between the discharge and the protected action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1999) (citing *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985))."The burden of establishing a prima facie retaliation case is not onerous." *Ross*, 759 F.2d at 365. If the plaintiff meets this burden, the employer then may rebut plaintiff's prima facie case by articulating a non-retaliatory reason for its actions. *Id.* Then, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual. *Id.* at 365-66.

Here, Davis has met the three elements of the prima facie case of retaliation. The filing of the EEOC charge was protected activity, and her termination indisputably constituted adverse employment action. Moreover, under the circumstances of this case, the proximity of the time of filing to the time of subsequent write-ups and ultimate discharge gives rise to a sufficient inference of causation to satisfy the prima facie requirement. *See King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir.2003) (citing *Williams*, 871 F.2d at 457 ("Appellant's proof of a causal connection between the protected activity

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and her discharge was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality."); *Haulbrook v. Michelin North America,* 252 F.3d 696, 706 (4th Cir.2001) (finding existence of a prima facie case "due solely to the proximity of time of [the employee's] termination" with the protected activity). It may be true that the length of time (roughly five months) between Davis's charge and her ultimate termination is greater than that used in other cases to establish an inference of causation between the two events. *See, e.g., Haulbrook* 252 F.3d at 706 (26 days); *King,* 328 F.3d at 151 n. 5 (2 1/2 months); *Williams,* 871 F.2d at 454 (3 1/2 months); *see Causey v. Balog,* 162 F.3d 795, 803 (4th Cir.1998) (finding that a thirteen month interval between the charge and termination is "too long to establish causation absent other evidence of retaliation"). But, under the circumstances of this case, given the interrelationship between the termination and the discipline, which began roughly one month after the filing of the charge, the time delay until the termination is not too great to destroy an inference of causation for the prima facie case.

*7 Defendants, in turn, have met their burden of production by coming forward with a legitimate non-retaliatory reason for terminating Davis. According to Holbrook and Shippole, Davis was terminated based on well-founded allegations of misconduct in January 1998 *and* "the history of inappropriate and unacceptable conduct and policy violations that Ms. Davis had compiled in the [previous] several months."(Holbrook Affidavit, ¶ 28; Shippole Affidavit, ¶ 28). To be clear, the reason for Davis's discharge was thus not only the misconduct in January 1998, but also the entire history of disciplinary violations which Holbrook had investigated and documented from September 1997 to January 1998. For this period, Defendants documented seven incidents of misconduct:

1) a report by a co-employee, Linda Braddy, that Davis had arrived 30 minutes late to work, contributing to poor service of breakfast;

2) a report that Davis confronted Braddy for reporting her lateness, telling her to "keep her mouth shut," and "to kiss her ass;"

3) a report by a customer that Davis had improperly secured a gratuity from the customer;

4) a report that Davis had improperly called in an absence;

5) a report by three employees that Davis had engaged in an outburst of obscenities within earshot of guests;

6) a complaint by an African-American employee working under Davis, Aaron Mackey, that Davis had warned him to "be careful" because he "was going to be set up so that [he] would be fired," causing him to be uncomfortable and to fear his job security; and,

7) a report by a co-worker, Tracey Parker, that Davis had been harassing her for months, making comments about her weight and calling her a "cow."

(Holbrook Affidavit, ¶¶ 15-27). It is undisputed that this "history of inappropriate and unacceptable conduct and policy violations" is, on its face, a legitimate non-retaliatory reason for termination. Defendants have therefore met their burden of production, under the *McDonnell Douglas* analysis.

The remaining issue is whether Davis has presented evidence which could reasonably permit the inference that the Defendants' proffered reason for the termination is pretextual. To establish pretext in a discharge, a plaintiff must produce evidence that shows that Defendants' "assessment of her performance was dishonest or not the real reason for her termination." *Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 280 (4th Cir.2000)."[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette v. Corning,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)
(Cite as: 2003 WL 21847841 (M.D.N.C.))

Page 7

*Inc.,* 133 F.3d 293, 299 (4th Cir.1998); *see Warren v. Halstead Ind., Inc.,* 613 F.Supp. 499, 508 (M.D.N.C.1985) ("[T]he court's focus is not on Defendant's business judgment or the fairness of its actions, but on its motivation."). Thus, "when an employer gives a reason for ... discharging an employee, it is not the Court's province to decide whether the reason was wise, fair, or even correct, so long as it truly was the reason for the employer's action." *Julsaint v. Corning, Inc.,* 178 F.Supp.2d 610, 618-19 (M.D.N.C.2001) (citations omitted). Accordingly, it is not enough for a plaintiff to show that the discharge was based on groundless complaints, or that the employee did not, in fact, violate company rules prior to the discharge. *Dunn v. City of High Point,* 68 F.Supp.2d 672, 679-80 (M.D.N.C.1999); *Berrow v. Wake Forest Univ.,* No. 6:90CV00261, 1991 U.S. Dist. LEXIS 19344 *10 (M.D.N.C. Oct. 16, 1991) (denial that misconduct occurred, or claim that events reported did not, in fact, occur is not material to finding pretext in discharge). Similarly, it is not enough to "dispute [ ] the correctness of the outcome of investigations" into misconduct. *Smith v. R.J. Reynolds Tobacco Co.,* No. 1:02CV63, 2003 U.S. Dist. LEXIS 2138 *15 (M.D.N.C. Feb. 11, 2003).

**\*8** With this framework in mind, much of Davis's protestations over the merits of the complaints against her are irrelevant to the issue of pretext. For instance, Davis claims that the reprimand for arriving late to work was unfounded because she had always come to work at 6:30 a.m and had never been previously reprimanded or informed that she needed to come in at 6:00. She claims that she never solicited an additional gratuity from the complaining customer and that a different manager on duty was responsible for explaining the gratuity to the customer. She claims she never used obscenities as complained. She claims she never called Tracy Parker a cow or engaged in any other harassing or juvenile behavior. Finally, she claims that she could not have made the threatening statement to Mackie because she was not present at the location where Mackie reported the statement was made.

Even if the court were to accept all of Davis's accounts of the events as true, none of this testimony is effective to show that Defendants honestly believed Davis's version of events but disciplined her anyway. At most, Davis's testimony shows that Defendants reached an *incorrect* conclusion following their investigation into the alleged misconduct. More realistically, it shows that, after interviewing witnesses concerning each of the above incidences, Holbrook determined that Davis's stated version of the events at the time was less credible than the reports of other witnesses. Either way, though, Davis's conflicting version of events forming the basis of the reports of misconduct is insufficient to establish pretext. *See Dunn,* 68 F.Supp.2d at 679-80.

Only with regard to one of the above contested offenses, the purported outburst of obscenities by Davis in November 1997, does Davis point to further evidence, the deposition of Smoot and declaration of Dillard, which she contends shows dishonesty on the part of Holbrook. If the evidence were, in fact, as Davis represents it in her brief, it might raise a closer question of pretext. But, Davis misrepresents the evidence. For example, Davis's summary of Holbrook's and Smoot's testimony points to certain alleged inconsistencies:

When Holbrook confronted Davis with these allegations [of profanity use], Davis told Holbrook to speak with D'Lisa Smoot because she could verify that Davis did not use profanity as accused and was telling the truth. Holbrook *testified that he spoke with Ms. Smoot and that she told him that she had no comment and did not want to get involved.*

When she was deposed in connection with the present action, Ms. Smoot told a different story that contradicted Holbrook's version of events. Ms. Smoot testified that she *specifically informed Holbrook that Davis had not used profanity* as was alleged by the two servers and *corroborated Davis' version of the facts.*

(Mem. in Opp., pp. 7-8) (emphasis added).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

This summary misreports Holbrook's and Smoot's actual testimony in this case in several respects. First, Holbrook testified that Ms. Smoot informed him that she "did not hear or see anything," (Holbrook Affidavit, ¶ 22), not that she had "no comment" as Davis now summarizes. Smoot confirms this much in her deposition:

*9 Q. Did Scott Holbrook ask you if Mona used profanity at work?

A. Yeah, Scott did.

Q. What did you tell him?

A. No, I did not hear it nor did I see what happened at that particular time.

Q. Okay. Were you present at the particular time that Scott was asking you about?

A. I was there, but we worked in two different sections. I was at the cash register at the [café].... I was not around there with them.

Q. And you told Scott Holbrook that Mona did not use any profanity at work?

A. Not to my knowledge, she didn't.

Q. What did he say?

A. He just said that was okay that I didn't hear, so I didn't.

(Deposition of D'Lisa Smoot, pp. 10-11). Smoot further confirms that there is no conflict between her testimony and Holbrook's testimony in her affidavit. She states, "I told Mr. Holbrook that I did not hear or see anything. There were two areas in the Dirtwater Fox Café. On the day in question, I was working in the cashier area. From that location, I could not hear or see what was happening in the guest area near the kitchen. I do not know whether Ms. Davis used profanity in that area of the Dirtwater Fox Café that day."(Smoot Affidavit, ¶ 5).

As such, Smoot did not "testify that she *specifically informed Holbrook that Davis had not used profanity.*"(Mem. in Opp., pp. 7-8). Instead, Smoot testified that she told Holbrook that *she*"did not hear it nor ... see what happened at that particular time," and that she was not working around Davis at the time. (Smoot Dep., p. 10). Furthermore, Smoot did not testify that she "corroborated Davis's version of the facts."(Mem. in Opp., p. 8). Rather, she testified that she told Holbrook only what she had seen or heard, and she admitted to Holbrook she was not clear on Davis's whereabouts or activity away from her. (*See* Smoot Dep., pp. 11-12).[FN3] This is far from telling Holbrook that she could confirm or corroborate that Davis had not used profanity that night or that other employees used profanity instead. In addition, the substance of Smoot's account is materially different from Davis's version of the facts.[FN4] For instance, Smoot claims that she called Davis over because she had a "problem with the cash register ." (Smoot Dep., p. 11). By contrast, Davis claims that she came to the café to get change for a function in a different building. (Davis Dep., p. 179). Next, according to Davis, she suggested that Smoot notify the servers of a price correction, and that was what precipitated an outburst of obscenities by the servers Dillard and Parker. (Davis Dep., p. 180). By contrast, Smoot does not mention ever telling anything to Dillard or Parker about a correct price, nor does she mention that they were swearing at Davis. (Smoot Dep., p. 11). Thus, Smoot did not testify that she corroborated Davis's claim, nor could she have corroborated Davis's claim based on her deposition testimony.

> FN3. This portion of the Smoot deposition reads:
>
> Q. Well, did any customers come up to you and complain that night?
>
> A. No, not that I remember.
>
> Q. Was Mona Davis in the [café] that night?
>
> A. No, not to my knowledge.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)
(Cite as: 2003 WL 21847841 (M.D.N.C.))

Page 9

Q. Was she working that night?

A. I vaguely remember - I cannot remember. I believe she worked, but not directly over there.

Q. Okay. Where do you -

A. I think she came over for something, because I had to ask her a question.

Q. Right.

A. And she came over and left. I don't know.

Q. So when she came over, did you ask her to come over?

A. I'm thinking that I did, because, like I said, I had just started, and I had a problem with the cash register. And I called Mona to ask her something about it, and I think she came over to show me what to do then left.

Q. Are you the only person she spoke with when she came over to the [café] that night?

A. I don't know. I guess so. I don't know.

Q. Okay. Did you tell all the information you just told me to Scott Holbrook?

A. Yes.

FN4. According to her deposition, Davis's version of the facts is that she was not working in the café that day, but that she came over to the cash register where D'Lisa Smoot was working to get change for a function she was overseeing. Smoot asked Davis a question about the price that the staff should be charging for coffee. Davis told Smoot the proper price. (Davis Dep., pp. 179-80, 183). Smoot then went to tell "two wait staff girls that they were charging the wrong price," and "they became livid, and began to curse [Davis] out or say things about [Davis]." (Davis Dep., p. 179). The two wait staff girls were Dillard and Parker. Davis then "walked right past" the girls, and went into the kitchen, where the chef asked about what was "the commotion going on." (Davis Dep., p. 183). Davis then left the café.

In addition, contrary to Davis's claim, Holbrook never contended that Smoot "told him ... that she did not want to get involved" in the matter. (Mem. in Opp., p. 7). Rather, Holbrook *"construed* Ms. Smoot's remarks as an indication that she did not want to get involved in the matter," and found that "her comments did not conform to either Ms. Davis's account or to those of" the other witnesses. (Holbrook Affidavit, ¶ 22). Accordingly, Smoot's deposition testimony does not conflict with the account given in Holbrook's affidavit, much less show that Holbrook dishonestly discounted or rejected Smoot's version of the events.

*10 Finally, even if Smoot's version of the events given to Holbrook contradicted the other witness statements and corroborated Davis's statement in some respects, this is not sufficient to show that Holbrook honestly believed that Davis did not use profanity. Rather, it simply shows that Holbrook was confronted with varying reports of what happened at the café. As Holbrook notes, given differences in the testimony, and given that Smoot simply claimed not to see or hear any profanity being used, Holbrook concluded that the other witness reports of King, Dillard, and Parker were more helpful in clarifying what had occurred. (Holbrook Affidavit, ¶ 6). This conclusion may have been incorrect, unfair, or too hasty, but that, in itself, is insufficient to show that Holbrook honestly believed that Davis didn't use profanity. *See Julsaint,* 178 F.Supp.2d at 618-19.

Next, Davis argues that an April 2003 declaration by Donna Dillard, one of the witnesses who submitted a statement to Holbrook regarding the profanity

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

incident, shows that Holbrook honestly believed that Davis did not engage in misconduct. Davis claims that, in the declaration, Dillard "asserted that Davis did not use profanity."(Mem. in Opp., p. 8). Davis also claims that "according to her sworn declaration that accompanies this Memorandum, Ms. Dillard asserted that Holbrook asked her to fabricate a complaint against Davis because he wanted to fire Davis."(*Id.*). Again, Davis has misrepresented the evidence. In the declaration, Dillard states,

I submit this declaration in connection with a handwritten statement dated November 12, 1997 that ... Holbrook, my former supervisor, told me to write about Mona Davis.

What happened is that Mr. Holbrook told me that he wanted to fire Mona Davis. He told me to write and sign a statement claiming that I was present when Mona used profanity at work. He told me what to write. He said he would use the statement against Mona Davis. I wrote down what he told me to write and signed it because I feared that he would fire me if I did not follow his instructions. What I wrote in that November 12, 1997 statement about Mona Davis is false. Mona Davis never said or did the things stated in that statement.

(Donna Dillard Declaration, ¶¶ 3-4).

First and foremost, Dillard does *not* assert that Holbrook "asked her to *fabricate* a complaint against Davis."(Mem. in Opp., p. 8). Rather, Dillard asserts that Holbrook told Dillard "to write and sign a statement claiming that [Dillard] was present when Mona used profanity at work. He told me what to write."(Dillard Dec., ¶ 4). Dillard does not indicate whether Holbrook believed that such a statement would be untrue in any way or written for the purpose of deception. Secondly, Dillard did not declare that Holbrook told her to write the statement *"because* he wanted to fire Davis."(Mem. in Opp., p. 8). Rather, Dillard simply declared "Mr. Holbrook told me that he wanted to fire Mona Davis."(Dillard Dec., ¶ 4).

*11 Furthermore, accepting Dillard's declaration as it is actually stated as true, while Holbrook told Dillard that he wanted to fire Davis, there is no indication that he wanted to fire her for any reason other than her profanity misconduct. Moreover, even if Holbrook told Dillard "what to write" it does not follow that Holbrook directed her to write anything other than what she verbally told him when she, like the other two witnesses, "voluntarily came forward" with a report of profanity. (*See* Holbrook Affidavit, ¶ 20).[FN5] Indeed, Dillard states in her declaration that *now* she declares that her statement was false. But, notably missing is any declaration that she *told or indicated to Holbrook* that the account embodied in the written statement was false at the time. In addition, the statement by Dillard that she signed the statement because she feared Holbrook would fire her if she didn't follow Holbrook's instructions is immaterial to the pretext analysis. This statement shows only what Dillard feared at the time, and not what Holbrook thought about the veracity of her statement.

> FN5. Holbrook states in his affidavit that "three hotel employees [including Dillard] *told me* that Ms. Davis had engaged in an unprovoked outburst of obscenities ... All three employees *voluntarily came forward,and* all three provided handwritten statements *outlining their account* of Ms. Davis's conduct."(Holbrook Affidavit, ¶ 20) (emphasis added). While Dillard's declaration attacks the veracity of the written statement, it does nothing to rebut Holbrook's averment that before the handwritten statement was drafted, Davis had already 1) come forward and 2) verbally told him what had happened. Thus there is no disputed fact that Dillard initially *told* Holbrook about Davis's use of profanity. Simply because Holbrook subsequently told Dillard 'what to write' does not mean that he directed her to write anything other than what she verbally told him earlier.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)
(Cite as: 2003 WL 21847841 (M.D.N.C.))

Finally, the Dillard declaration does not rebut the undisputed fact, asserted by Holbrook, that two other witnesses, King and Parker, "voluntarily came forward," claimed that Davis used profanity, and prepared written statements to that effect. (Holbrook Affidavit, ¶ 20). As Holbrook states in his affidavit, "I found the adamant statements of the other witnesses to be compelling evidence that Ms. Davis had in fact engaged in the use of profanity in the presence of guests that morning."(Holbrook Affidavit, ¶ 23). Thus, regardless of the process by which Dillard's statement was produced, there is no evidence showing that Holbrook knew Parker and King's statements were fabricated, or that Holbrook believed the other allegations of profanity were false. Therefore, the Dillard declaration is insufficient to show that Holbrook honestly believed that Davis hadn't used profanity in violation of workplace conduct standards and policy.

In sum, Davis has failed to provide evidence which would permit a reasonable inference that Defendants' stated reason for the discharge, a finding of misconduct in January and a finding of history of misconduct in September and November, was not genuine or a pretext for retaliation.

Conclusion

For these reasons, Davis's retaliatory discharge claim is without merit. Therefore, IT IS RECOMMENDED that Defendants' Motion [Doc. # 44] for Summary Judgment be GRANTED.

M.D.N.C.,2003.
Davis v. Seven Seventeen HB Philadelphia Corp. No. 2
Not Reported in F.Supp.2d, 2003 WL 21847841 (M.D.N.C.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.